12-CV-3265

§JS 44  (Rev. 12/07)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.  (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

## I. (a) PLAINTIFFS

Alan Schmidt, on behalf of himself and in a representative capacity on behalf of all other similarly situated and derivatively on behalf

**DEFENDANTS**

See attached

**(b)** County of Residence of First Listed Plaintiff  **Bennington County,VT**
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)

NOTE:  IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

Brian J. McCormick, Jr.,  Sheller, P.C.
1528 Walnut Street, 4th Fl Phila., PA  19102 (215) 790-7300

Attorneys (If Known)

## II. BASIS OF JURISDICTION  (Place an "X" in One Box Only)

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question (U.S. Government Not a Party)
- ☒ 4  Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only)                           and One Box for Defendant)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☒ 4 | ☐ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT  (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | 28 USC 157 | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | **PERSONAL INJURY** | | | ☐ 450 Commerce |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel & Slander | ☐ 362 Personal Injury - Med. Malpractice | **PROPERTY RIGHTS** | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' Liability | ☐ 365 Personal Injury - Product Liability | ☐ 820 Copyrights | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 830 Patent | ☐ 480 Consumer Credit |
| | ☐ 345 Marine Product Liability | | ☐ 840 Trademark | ☐ 490 Cable/Sat TV |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 630 Liquor Laws | **PERSONAL PROPERTY** | | ☐ 810 Selective Service |
| ☒ 160 Stockholders' Suits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | **LABOR** | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 720 Labor/Mgmt. Relations | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | | ☐ 385 Property Damage Product Liability | ☐ 730 Labor/Mgmt.Reporting & Disclosure Act | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 740 Railway Labor Act | ☐ 892 Economic Stabilization Act |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 790 Other Labor Litigation | ☐ 893 Environmental Matters |
| ☐ 220 Foreclosure | ☐ 442 Employment | **Habeas Corpus:** | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 894 Energy Allocation Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | | ☐ 895 Freedom of Information Act |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | **IMMIGRATION** | |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 540 Mandamus & Other | ☐ 462 Naturalization Application | ☐ 900Appeal of Fee Determination Under Equal Access to Justice |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | ☐ 550 Civil Rights | ☐ 463 Habeas Corpus - Alien Detainee | ☐ 950 Constitutionality of State Statutes |
| | ☐ 440 Other Civil Rights | ☐ 555 Prison Condition | ☐ 465 Other Immigration Actions | |

| | | | **SOCIAL SECURITY** | |
|---|---|---|---|---|
| | | ☐ 640 R.R. & Truck | ☐ 861 HIA (1395ff) | |
| | | ☐ 650 Airline Regs. | ☐ 862 Black Lung (923) | |
| | | ☐ 660 Occupational Safety/Health | ☐ 863 DIWC/DIWW (405(g)) | |
| | | ☐ 690 Other | ☐ 864 SSID Title XVI | |
| | | | ☐ 865 RSI (405(g)) | |
| | | | **FEDERAL TAX SUITS** | |
| | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | |
| | | | ☐ 871 IRS—Third Party 26 USC 7609 | |

## V. ORIGIN  (Place an "X" in One Box Only)

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from another district (specify)
- ☐ 6 Multidistrict Litigation
- ☐ 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
28 U.S.C. 1332(a), (d)

Brief description of cause:
Class action brought on behalf of the public shareholders alleging breach of fiduciary duty

## VII. REQUESTED IN COMPLAINT:

☑ CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

**DEMAND $**

CHECK YES only if demanded in complaint:
JURY DEMAND:  ☒ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

(See instructions):  JUDGE _____   DOCKET NUMBER _____

DATE  06/07/2012

SIGNATURE OF ATTORNEY OF RECORD

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JUN  8 2012

FOR THE EASTERN DISTRICT OF PENNSYLVANIA — DESIGNATION FORM to be used by counsel to indicate the category of the case for the purpose of assignment to appropriate calendar.

Address of Plaintiff: Box 221, Bondville, Vermont 05340-0221

Address of Defendant:  See Attached

Place of Accident, Incident or Transaction:  Commonwealth of Pennsylvania

12    3265

*(Use Reverse Side For Additional Space)*

Does this civil action involve a nongovernmental corporate party with any parent corporation and any publicly held corporation owning 10% or more of its stock?

(Attach two copies of the Disclosure Statement Form in accordance with Fed.R.Civ.P. 7.1(a))     Yes X   No ☐

Does this case involve multidistrict litigation possibilities?     Yes ☐   No ✓

*RELATED CASE, IF ANY:*

Case Number: _____   Judge _____   Date Terminated: _____

Civil cases are deemed related when yes is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?
   Yes ☐   No ✓

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?
   Yes ☐   No ✓

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action in this court?
   Yes ☐   No ✓

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?
   Yes ☐   No ✓

CIVIL: (Place ☐ in ONE CATEGORY ONLY)

A. *Federal Question Cases:*

1. ☐ Indemnity Contract, Marine Contract, and All Other Contracts
2. ☐ FELA
3. ☐ Jones Act-Personal Injury
4. ☐ Antitrust
5. ☐ Patent
6. ☐ Labor-Management Relations
7. ☐ Civil Rights
8. ☐ Habeas Corpus
9. X Securities Act(s) Cases
10. ☐ Social Security Review Cases
11. ☐ All other Federal Question Cases (False Claims Act)
    (Please specify)

B. *Diversity Jurisdiction Cases:*

1. ☐ Insurance Contract and Other Contracts
2. ☐ Airplane Personal Injury
3. ☐ Assault, Defamation
4. ☐ Marine Personal Injury
5. ☐ Motor Vehicle Personal Injury
6. ☐ Other Personal Injury (Please specify)
7. ☐ Products Liability
8. ☐ Products Liability — Asbestos
9. ☐ All other Diversity Cases
    (Please specify)

## ARBITRATION CERTIFICATION
*(Check Appropriate Category)*

I, Brian J. McCormick, Jr. , counsel of record do hereby certify:

☒ XX Pursuant to Local Civil Rule 53.2, Section 3(c)(2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☐ Relief other than monetary damages is sought.

DATE:  06/08/12                    Brian J. McCormick, Jr.                    PA 81437

                                   Attorney-at-Law                          Attorney I.D.#

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

I certify that, to my knowledge, the within case is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE:  06/08/12                    Brian J. McCormick, Jr.                    PA 81437

                                   Attorney-at-Law                          Attorney I.D.#

CIV. 609 (6/08)                    JUN 8 2012

**List of Defendants**
John A. Skolas
12 Lenape Ave.
New Hope, PA 18938

   And

Leanne Kelly
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

   And

John L. Armstrong, Jr.
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

   And

R. Frank Ecock
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

   And

Zola B. Horovitz, Ph.D.
6468 Enclave Way
Boca Raton, FL 33496

   And

Osagie O. Imasogie
Phoenix IP Ventures
One Crescent Dr., Suite 400
Philadelphia, PA 19112

   And

Mitchell D. Kaye
XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

1

And

David C. Cavalier
XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

And

Peter J. Savino
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

And

Robert F. Shapiro
Klingenstein, Fields
787 Seventh Ave, 6th Floor
NY, NY 10019-6016

And

Paul K. Wotton
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

And

James B. Wyngaarden
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

And

Robert DeLuccia
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

And

2

David Luci
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

And

Steve Rouhandeh
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

Or

c/o Access Pharmaceutical
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

And

Jeffrey Davis
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

Or

c/o Access Pharmaceutical
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

And

Mark Alvino
Griffin Securities LLC
18 State Street, 3rd Floor
New York, NY 10004

Or

c/o Access Pharmaceutical
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

And

James M. Pachence
Virium
116 Village Boulevard, Suite 200
Princeton, New Jersey 08540
c/o SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

And

Genaera Liquidating Trust
c/o Argyce LLC
Attn: John Skolas
P.O. Box 299
New Hope, PA 18938

And

Biotechnology Value Fund, Inc.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

And

Ligand Pharmaceuticals, Inc.
11085 N. Torrey Pines Road
LaJolla, CA 92037

And

XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

And

Argyce LLC
12 Lenape Ave.
New Hope, PA 18938

And

4

Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

And

MacroChem
116 Village Boulevard
Suite 200
Princeton, NJ 08540

And

Access Pharmaceuticals
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

And

Ohr Pharmaceuticals
489 Fifth Avenue
28th Fl.
New York, NY 10017

And

Mark N. Lampert
BVF Inc.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

And

John L. Higgins,
Ligand Pharmaceuticals
11085 N. Torrey Pines Road
LaJolla, CA 92037

And

Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

5

**List of Defendants**

John A. Skolas
12 Lenape Ave.
New Hope, PA 18938

  And

Leanne Kelly
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

  And

John L. Armstrong, Jr.
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

  And

R. Frank Ecock
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

  And

Zola B. Horovitz, Ph.D.
6468 Enclave Way
Boca Raton, FL 33496

  And

Osagie O. Imasogie
Phoenix IP Ventures
One Crescent Dr., Suite 400
Philadelphia, PA 19112

  And

Mitchell D. Kaye
XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

1

And

David C. Cavalier
XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

And

Peter J. Savino
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

And

Robert F. Shapiro
Klingenstein, Fields
787 Seventh Ave, 6th Floor
NY, NY 10019-6016

And

Paul K. Wotton
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

And

James B. Wyngaarden
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

And

Robert DeLuccia
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

And

2

David Luci
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

   And

Steve Rouhandeh
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

   Or

c/o Access Pharmaceutical
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

   And

Jeffrey Davis
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

   Or

c/o Access Pharmaceutical
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

   And

Mark Alvino
Griffin Securities LLC
18 State Street, 3rd Floor
New York, NY 10004

   Or

c/o Access Pharmaceutical
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

3

And

James M. Pachence
Virium
116 Village Boulevard, Suite 200
Princeton, New Jersey 08540
c/o SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

And

Genaera Liquidating Trust
c/o Argyce LLC
Attn: John Skolas
P.O. Box 299
New Hope, PA 18938

And

Biotechnology Value Fund, Inc.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

And

Ligand Pharmaceuticals, Inc.
11085 N. Torrey Pines Road
LaJolla, CA 92037

And

XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

And

Argyce LLC
12 Lenape Ave.
New Hope, PA  18938

And

4

Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

      And

MacroChem
116 Village Boulevard
Suite 200
Princeton, NJ 08540

      And

Access Pharmaceuticals
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

      And

Ohr Pharmaceuticals
489 Fifth Avenue
28th Fl.
New York, NY 10017

      And

Mark N. Lampert
BVF Inc.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

      And

John L. Higgins,
Ligand Pharmaceuticals
11085 N. Torrey Pines Road
LaJolla, CA 92037

      And

Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462



**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**CASE MANAGEMENT TRACK DESIGNATION FORM**

Alan Schmidt, on behalf of himself and in               :
representative capacity on behalf of all other          :
similarly situated and derivatively on behalf           :
Genaera Corporation,                                    :      CIVIL ACTION
                                                        :
          Plaintiffs,                                   :      No. _____
                                                        :
     v.                                                 :
                                                        :
John A. Skolas, et al.                                  :
                                                        :
          Defendants                                    :

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.)  In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

**SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:**

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255.                          ( )

(b) Social Security – Cases requesting review of a decision of the Secretary of Health
    and Human Services denying plaintiff Social Security Benefits.                              ( )

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2.      ( )

(d) Asbestos – Cases involving claims for personal injury or property damage from
    exposure to asbestos.                                                                       ( )

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are
    commonly referred to as complex and that need special or intense management by
    the court. (See reverse side of this form for a detailed explanation of special
    management cases.)

(f) Standard Management – Cases that do not fall into any one of the other tracks.                  ( ✓ )

06/08/12                          Brian J. McCormick, Jr.               Plaintiffs
**Date**                          **Attorney-at-law**                  **Attorney for**

(215) 790-7300                    (215) 546-0942                       bjmccormick@sheller.com
**Telephone**                     **FAX Number**                       **E-Mail Address**

**(Civ. 660) 10/02**

  

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF PENNSYLVANIA**

---

Alan W. Schmidt, on behalf of himself and in a
representative capacity on behalf of all other
similarly situated and derivatively on behalf
Genaera Corporation,

              Plaintiff,

      v.

John A. Skolas
12 Lenape Ave.
New Hope, PA 18938

      And

Leanne Kelly
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

      And

John L. Armstrong, Jr.
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

      And

R. Frank Ecock
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

      And

Zola B. Horovitz, Ph.D.
6468 Enclave Way
Boca Raton, FL 33496

      And

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

No. _____



**JURY TRIAL DEMANDED**



Osagie O. Imasogie                          :
Phoenix IP Ventures                         :
One Crescent Dr., Suite 400                 :
Philadelphia, PA 19112                      :
                                            :
     And            :
                                            :
Mitchell D. Kaye                            :
XMark Capital Partners, LLC                 :
301 Tresser Boulevard, Suite 1320           :
Stamford, CT 06901                          :
                                            :
     And            :
                                            :
David C. Cavalier                           :
XMark Capital Partners, LLC                 :
301 Tresser Boulevard, Suite 1320           :
Stamford, CT 06901                          :
                                            :
     And            :
                                            :
Peter J. Savino                             :
c/o Genaera Corporation                     :
5110 Campus Drive                           :
Plymouth Meeting, PA 19462                  :
                                            :
     And            :
                                            :
Robert F. Shapiro                           :
Klingenstein, Fields                        :
787 Seventh Ave, 6th Floor                  :
NY, NY 10019-6016                           :
                                            :
     And            :
                                            :
Paul K. Wotton                              :
c/o Genaera Corporation                     :
5110 Campus Drive                           :
Plymouth Meeting, PA 19462                  :
                                            :
     And            :
                                            :
James B. Wyngaarden                         :
c/o Genaera Corporation                     :
5110 Campus Drive                           :
Plymouth Meeting, PA 19462                  :

2

   And          :
              :
              :

Robert DeLuccia       :
Dipexium Pharmaceuticals   :
22 Camelot Court      :
White Plains, NY 10603    :
              :
   And          :
              :

David Luci        :
Dipexium Pharmaceuticals   :
22 Camelot Court      :
White Plains, NY 10603    :
              :
   And          :
              :

Steve Rouhandeh      :
SCO Financial Group     :
1325 Avenue of the Americas, 27th Floor :
New York, NY 10019     :
              :
   Or           :
              :

c/o Access Pharmaceutical    :
2600 Stemmons Freeway    :
Suite 176        :
Dallas, TX 75207-2107     :
              :
   And          :
              :

Jeffrey Davis        :
SCO Financial Group     :
1325 Avenue of the Americas, 27th Floor :
New York, NY 10019     :
              :
   Or           :
              :

c/o Access Pharmaceutical    :
2600 Stemmons Freeway    :
Suite 176        :
Dallas, TX 75207-2107     :
              :
   And          :
              :

Mark Alvino                                      :
Griffin Securities LLC                           :
18 State Street, 3rd Floor                       :
New York, NY 10004                               :
                                                 :
     Or                 :
                                                 :
c/o Access Pharmaceutical                        :
2600 Stemmons Freeway                             :
Suite 176                                         :
Dallas, TX 75207-2107                            :
                                                 :
     And                :
                                                 :
James M. Pachence                                :
Virium Pharmaceuticals, Inc.                     :
116 Village Boulevard, Suite 200                 :
Princeton, New Jersey 08540                      :
c/o SCO Financial Group                          :
1325 Avenue of the Americas, 27th Floor          :
New York, NY 10019                               :
                                                 :
     And                :
                                                 :
Genaera Liquidating Trust                        :
c/o Argyce LLC                                   :
Attn: John Skolas                                :
P.O. Box 299                                     :
New Hope, PA 18938                               :
                                                 :
     And                :
                                                 :
Biotechnology Value Fund, Inc.                   :
900 N. Michigan Ave., Suite 1100                 :
Chicago, IL 60611                                :
                                                 :
     And                :
                                                 :
Ligand Pharmaceuticals, Inc.                     :
11085 N. Torrey Pines Road                       :
LaJolla, CA 92037                                :
                                                 :
     And                :
                                                 :

4

XMark Capital Partners, LLC                :
301 Tresser Boulevard, Suite 1320     :
Stamford, CT 06901               :
                                       :

       And                         :
                                       :

Argyce LLC                          :
12 Lenape Ave.                     :
New Hope, PA  18938            :
                                       :

       And                         :
                                       :

Dipexium Pharmaceuticals       :
22 Camelot Court                :
White Plains, NY 10603        :
                                       :

       And                         :
                                       :

MacroChem                        :
116 Village Boulevard          :
Suite 200                         :
Princeton, NJ 08540             :
                                       :

       And                         :
                                       :

Access Pharmaceuticals        :
2600 Stemmons Freeway      :
Suite 176                         :
Dallas, TX 75207-2107        :
                                       :

       And                         :
                                       :

Ohr Pharmaceuticals           :
489 Fifth Avenue               :
28th Fl.                          :
New York, NY 10017            :
                                       :

       And                         :
                                       :

Mark N. Lampert               :
BVF Inc.                         :
900 N. Michigan Ave., Suite 1100    :
Chicago, IL 60611              :
                                       :

       And                         :
                                       :

John L. Higgins,                              :
Ligand Pharmaceuticals                        :
11085 N. Torrey Pines Road                    :
LaJolla, CA 92037                             :
                                              :
                Defendants.                   :
                                              :
      And                                     :
                                              :
Genaera Corporation                           :
5110 Campus Drive                             :
Plymouth Meeting, PA 19462                    :
                                              :
          Nominal Defendant.                  :
_____:

## VERIFIED CLASS ACTION AND
## SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Alan W. Schmidt, on behalf of himself and (i) all other Shareholders of

Defendant Genaera Corporation; (ii) all other Unit Holders of Genaera Liquidating Trust; and

(iii) derivatively on behalf of Genaera by and through his undersigned counsel, brings this civil

action against Defendants Genaera Corporation, John L. Armstrong, Jr., R. Frank Ecock, Zola B.

Horovitz, Ph.D., Osagie O. Imasogie, Mitchell D. Kaye, David C. Cavalier, Robert F. Shapiro,

Genaera Liquidating Trust, Biotechnology Value Fund, Inc., Ligand Pharmaceuticals,

Incorporated, XMark Capital Partners, LLC, Argyce LLC, John A. Skolas, Mark N. Lampert,

Mitchell D. Kaye, John L. Higgins, Jack Armstrong, Leanne Kelly, Peter J. Savino, Paul K.

Wotton, James B. Wyngaarden, Robert DeLuccia, David Luci, Steve Rouhandeh, Jeffrey Davis,

Mark Alvino, James M. Pachence, Dipexium Pharmaceuticals, Macrochem, Access

Pharmaceuticals and Ohr Pharmaceuticals jointly and severally, and, in support thereof, says:

## INTRODUCTION

1.      This is an action brought on behalf of the public shareholders of Defendant

Genaera Corporation ("Genaera" or the "Company") asserting claims, *inter alia*, for breach of

6



fiduciary duty, including the duty of loyalty, against the directors of Genaera, as well as others, in connection with, among other things, the use of a false and misleading proxy statement and illegal vote selling to coerce and otherwise manipulate a shareholder vote in favor of a dissolution of the Corporation and the sale of various assets for considerably less than their value to related and interconnected entities.

2.    Genaera's senior management, along with other, related parties caused loss and damage to stockholders, Unit Holders and the Corporation itself and engaged in certain transactions to reap millions of dollars in unlawful windfall profits at the expense of the Company's shareholders.

3.    In 2009, Genaera had several principal assets, including its licensor interest in the Interlukin 9 antibody program for asthma (the "IL9 Program"); a license requiring royalties and milestone payments for Pexiganan, a topical cream for the treatment of patients with mild diabetic foot infections; the MSI 1436 program for obesity and diabetes; and several squalamine antiangiogenic and other aminosterol compounds.

4.    Genaera's IL9 Program and Pexiganan license (the "Core Assets") constituted virtually the entire value of Genaera's drug development program and portfolio. These two assets could increase greatly in value if they were properly placed with valid, sincere buyers who had sufficient resources, practical knowledge and pharmaceutical pipe-line systems to bring these two drugs to marketplace fruition and completion.

5.    Instead, the insiders at Geneara, named as Defendants herein, aided and abetted the other Defendants forced through a plan of liquidation through which Genaera liquidated its stock and formed a Liquidating Trust in order to appropriate the value of Genaera's assets for

7

themselves and to through control and management its portfolio of assets for the benefit of its Board, officers and other, related parties.

6. Genaera and/or the Liquidating Trust, with the knowledge of the individual Defendants, sold the Core Assets for a fraction of the value recognized by Genaera's management.

7. Rather than hold onto the Core Assets and/or obtain a premium price for Genaera's Share Holders, who later became Unit Holders, the Genaera Board, led by conflicted management insiders, agreed to sell the Core Assets for a nominal price.

8. As a result of this wrongful course of conduct by company insiders, Genaera's Share Holders, who later became Unit Holders, were deprived of the true value of their stockholdings and unitholdings and a fair share of the later proceeds and profits from these potential blockbuster drugs.

## PARTIES

**A.  Plaintiff**

9. Plaintiff Alan W. Schmidt is an individual residing in Vermont, and a citizen of the State of Vermont, who is a Unit Holder of the Genaera Liquidating Trust.

**B.  Defendants**

10. Defendant Genaera Corporation ("Genaera") was a company organized under the laws of Delaware with its principal place of business in Plymouth Meeting, Pennsylvania.

11. Defendant John L. Armstrong, Jr. was at all times relevant herein a Director of Genaera Corporation. Defendants Armstrong joined Genaera in October 2003, and became acting CEO in late 2005. He also served as Genaera's President after January 2006. He was made a Director in February 2006.

8

12.     By virtue of his position as a Director, Armstrong was under a continuing duty to,
among other things, direct and control the operations of Genaera, to exercise due care and
diligence in those operations and to oversee and review all corporate operations. Further,
Armstrong was at all times relevant herein the President and Chief Executive Officer of Genaera.

13.     Defendant R. Frank Ecock was at all times relevant herein a Director of Genaera
Corporation. By virtue of his position as a Director, Ecock was under a continuing duty to,
among other things, direct and control the operations of Genaera, to exercise due care and
diligence in those operations and to oversee and review all corporate operations.

14.     Defendant Zola B. Horovitz, Ph.D. was at all times relevant herein a Director of
Genaera Corporation. By virtue of his position as a Director, Horovitz was under a continuing
duty to, among other things, direct and control the operations of Genaera, to exercise due care
and diligence in those operations and to oversee and review all corporate operations.

15.     Defendant Osagie O. Imasogie was at all times relevant herein a Director of
Genaera Corporation. By virtue of his position as a Director, Imasogie was under a continuing
duty to, among other things, direct and control the operations of Genaera, to exercise due care
and diligence in those operations and to oversee and review all corporate operations. Imasogie
was appointed to Genaera's Board of Directors in December 2003, approximately two months
after Skolas was appointed CFO in October 2003. Upon information and belief, Imasogie did
not know of Skolas being named a defendant in a prior securities class action suit.

16.     Defendant Mitchell D. Kaye was at all times relevant herein a Director of Genaera
Corporation. By virtue of his position as a Director, Kaye was under a continuing duty to,
among other things, direct and control the operations of Genaera, to exercise due care and
diligence in those operations and to oversee and review all corporate operations. Further,

9

Defendant Kaye was, at all relevant times herein, one of, if not the largest, individual shareholders of Genaera common stock. Defendant Kaye also served as the CEO of Defendant XMark Asset Management LLC ("XMark").

17.     Defendant Robert F. Shapiro was at all times relevant herein a Director of Genaera Corporation. By virtue of his position as a Director, Shapiro was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

18.     Defendant Paul K. Wotton, Ph.D. was at all times relevant herein a Director of Genaera Corporation. By virtue of his position as a Director, Wooton was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

19.     Defendant Genaera Liquidating Trust (the "Trust") is the successor in interest to Genaera Corporation organized and existing under the laws of the State of Delaware.

20.     Defendant Biotechnology Value Fund, Inc. ("BVF") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Illinois.

21.     Defendant Ligand Pharmaceuticals, Incorporated ("Ligand") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in California.

22.     Defendant XMark Capital Partners, LLC ("XMark") is a Delaware limited liability company organized and existing under the laws of the of the State of Delaware.

23.     Defendant David C. Cavalier is the Co-Managing Member of Defendant XMark.

10

24.     Defendant Argyce LLC ("Argyce") is a Delaware Limited Liability Company organized and existing under the laws of the State of Delaware with its principle place of business in Pennsylvania.

25.     Defendant John A. Skolas is an individual who is domiciled in New Hope, Pennsylvania and a citizen of the Commonwealth of Pennsylvania.

26.     Defendant Mark N. Lampert is a principal of defendant BVF.

27.     Defendant John L. Higgins is a principal of defendant BVF.

## JURISDICTION AND VENUE

28.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. 1332(a) and the Class Action Fairness Act of 2005, 28 U.S.C. 1332(d).  The matter in controversy exceeds the sums specified by 28 U.S.C. § 1332, exclusive of interest and costs. The citizenship of plaintiff and the defendants is completely diverse.

29.     This Court also has federal question jurisdiction based upon the claims arising under Section 14 of the Securities Exchange Act of 1934.  This Court also has pendant jurisdiction of all non-federal claims because of the relationship between the federal and non-federal claims.

30.     The action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(4)(A) and (B).

31.     This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(3).

32.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because many of the acts, transactions and conduct constituting violations of law complained of in this Complaint occurred in this District and defendants are subject to personal jurisdiction in this District.

11

## CLASS ACTION AND DERIVATIVE ACTION ALLEGATIONS

**A.**   **Class Claims On Behalf Of Genaera Stockholders**

33.     Plaintiff brings the claims described in the First, Fourth, Sixth, Ninth and Tenth Causes of Action individually and on behalf of all other similarly situated former shareholders of Genaera pursuant to Rule 23(a) and (b)(3) of the Fed.R.Civ.P.

34.     The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, plaintiff is informed and believes that there are thousands of Class members.

35.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

(a)     whether the Proxy through which votes on the dissolution were solicited was materially false and misleading in violation of Section 14(a) of the Exchange Act;

(b)     whether the director defendants, aided and abetted by the other defendants, breached fiduciary duties owed to plaintiffs and other shareholders;

(c)     whether plaintiff and the other Class members have been damaged by defendants' conduct; and

(d)     the amount of damages suffered by plaintiff and the Class.

36.     The claims of the plaintiff are typical of the claims of the Class because plaintiff's claims arise out of the same facts and events and relationships among class members and Genaera and the Genaera Liquidating Trust.

37.     The representative plaintiff will fairly and adequately protect the interest of the Class.

38.     A Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**B.     Class Claims On Behalf Of Genaera Liquidity Trust Unit Holders**

39.     Plaintiff brings the claims described in Second and Eighth Causes of Action on behalf of all similarly situated Unit Holders of Genaera Liquidity Trust pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

40.     The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, plaintiff is informed and believes that there are thousands of Class members.

41.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

(a)     whether defendants breached its duties to Unit Holders;

(b)     whether the Trustee aided and abetted by the other defendants, breached fiduciary duties owed to plaintiff and other shareholders;

(c)     whether plaintiff and the other Class members have been damaged by defendants' conduct; and

(d)     the amount of damages suffered by plaintiff and the Class.

42.     The claims of the plaintiff are typical of the claims of the Class because plaintiff's claims arise out of the same facts and events and relationships among class members and Genaera and the Genaera Liquidating Trust.

43.     The representative plaintiff will fairly and adequately protect the interest of the Class.

13

44.     A Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**C.     Shareholder Derivative Claim On Behalf Of Genaera Corporation And/OrThe Genaera Liquidating Trust.**

45.     Plaintiff brings the claims described in Third, Fifth and Seventh Counts derivatively, in the name of and for the benefit of Genaera Corporation pursuant to Rule 23.1 Federal Rules of Civil Procedure.

46.     Plaintiff has been a shareholder of Genaera continuously from approximately 1998 through June 12, 2009, the date of the dissolution of Genaera.

47.     Plaintiff has not made any demand on the Board to institute this action. Demand is excused here because the Board has been disbanded. Demand on the Liquidating Trustee would be futile because it is incapable of exercising independent judgment. Plaintiff will adequately and fairly represent the interests of all unaffiliated shareholders similarly situated in enforcing the right of the corporation.

48.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

## BACKGROUND

**A.     Factual Background Relating to Genaera and Its Business**

49.     Genaera was a biotechnology company which was in the business of developing certain pharmaceutical drugs, and held licenses to intellectual property, patents, technology, files of technical knowledge, materials, and know-how related to the development of certain pharmaceutical drugs.

14

50.     Since Genaera's inception, it funded its operations primarily through the proceeds of public and private placements of securities, through contract and grant revenues, research and development expense reimbursements, the sale of Pennsylvania research and development tax credit carry forwards and interest income.

51.     At all times relevant, Genaera did not engage in selling any products or pharmaceutical drugs.

52.     In December 2003, Genaera adopted "a corporate code of ethics", stating that the Directors were "committed to ethical business practices."

53.     In January 2007, Genaera engaged Banc of America Securities to evaluate and review strategic alternatives to increase the "value realizable by [Genaera's] shareholders" with the company's programs and assets.

54.     Banc of America's final report recommended that Genaera focus on two principal assets: (1) the IL9 program licensed to, and fully funded by MedImmune; and (2) the MSI 1436 program for obesity and diabetes.  It was further recommended that Genaera sell or otherwise monetize: the squalamine antiangiogenic and other aminosterol compounds; the "mucoregulators" that inhibit mucus over-production; and Pexiganan and other antimicrobial peptides.

**B.     XMark and Defendant Kaye Begin to Purchase a Controlling Interest In Genaera**

55.     In May 2003, Defendant BVF, through its President, Defendant Mark Lampert, acquired sufficient stock and warrants in Genaera to make BVF a 9.7% owner of Genaera stock. As of May 28, 2003, Defendant Lampert controlled 17.3% of Genaera's equity, including shares owned by Ziff Asset Management and BVF.

56.     BVF later sold a majority of its 2003 stock acquisitions a few months after purchase.

15

57.     On August 4, 2003, Perceptive Life Sciences Master Fund filed a lawsuit, charging Genaera with breaches of contractual obligations in connection with a May 2003 sale of stock and warrants to BVF and others.

58.     Defendant Lampert was a close acquaintance with Defendant Mitchell Kaye, the Chief Executive Officer of XMark. Upon information and belief, as a result of this relationship, Defendant Lampert introduced Defendant Kaye to Genaera.

59.     In 2007, XMark again began accumulating large amounts of Genaera's common stock.

60.     On March 8, 2007, XMark filed a Form 13G that reported it owned 6.2% of Genaera, as of February 26, 2007, which included warrants with a $18.90 (adjusted) exercise price in that filing.

61.     XMark later reported, in a Form 13D, that, as of March 16, 2007, it owned 9.7% of Genaera's stock.

62.     Upon information and belief, Defendant Kaye, both individually and through XMark, began building his Genaera position in late 2006.  Defendant Kaye:

   a. bought warrants in private transactions;

   b. knew, or should have known, that he could not exercise the warrants, and could only realize their value, if Genaera were acquired;

   c. knew, or should have known, that BVF also owned same $3.66 warrants;

   d. knew, or should have known, that the $3.66 warrants had no public market, and therefore could only be bought privately; and

   e. knew, or should have known, that there was a very small number of warrant holders that could have sold warrants to Xmark and/or BVF.

16

63.     On September 28, 2007, Defendant Kaye was elected to Genaera's Board of Directors.

64.     By September 28, 2007, Defendant Kaye's company, XMark, had accumulated 3,687,142 shares, or 21% of Genaera's stock.  In addition, XMark owned 52,500 warrants to buy Genaera stock at $18.90, and another 3,729,489 warrants to buy stock at $3.66.

65.     Defendant Kaye purchased XMark's warrants in private transaction, and could only realize their value if Genaera were acquired.

66.     Between 2007 and 2009, XMark was the largest stockholder of Genaera, reported as owning 26.11% of Genaera stock in June 2009.

## C.     Genaera Directors Claim They are Trying to Save the Company

67.     In May 2008, Genaera announced various initiatives it would take to conserve its resources so that it could continue to develop its assets.  Among those initiatives to improve the Company's cost structure were reductions in executive base compensations, forfeitures of cash incentives and bonuses to executives, reduction in the workforce, and streamlining of expenditures to focus on program specific needs.

68.     These initiatives were expected to provide Genaera with enough cash on hand to fund its operations through the second quarter of 2009.

69.     These initiatives included the development of MSI-1436 for diabetes and obesity. Another principal asset was the IL9 asthma antibody, which required only modest legal expense to maintain patents while MedImmune was responsible for all development.  The aminosterol assets, including the antiangiogenic squalamine; the mucoregulators; and the Pexiganan anti-infective were all to be sold outright, or out-licensed for others to develop.  The Pexiganan asset

17

had already been licensed to Defendant MacroChem Corp. ("MacroChem"), a specialty

pharmaceutical company, in October 2007.

70.     Upon information and belief, Genaera tried to sell a portion of the IL9 rights to an

unidentified investor in order to get funds to continue the MSI-1436 development to the point

where the MSI-1436 program could be sold or partnered, or sell the entire company for terms

that reflected the recognized value of MSI-1436 after the study with the new MSI-1436

formulation that provided a protracted period for MIS-1436'S bioavailability.

71.     Despite these efforts, beginning in January 2009, Genaera's Board of Directors

held several meetings to discuss various alternatives for the future of Genaera including selling

assets, partnering with other companies, and dissolving the business.

### 1.     <u>Genaera's Board of Directors Dissolves The Company</u>

72.     In or around April 2009, upon information and belief, Genaera's Board of

Directors apparently determined that the prospects of continuing as an ongoing business were not

promising and that dissolution and liquidation would return the greatest value to stockholders as

compared to other available strategic alternatives.

73.     At this time, XMark and BVF were reportedly the largest shareholders of

Genaera.

74.     On April 18, 2009, Genaera's Board of Directors (the "Directors") unanimously

approved a Plan of Dissolution to dispose of all the assets of the company, wind up its affairs,

pay or adequately provide for the payment of all the company liabilities, and distribute to or for

the benefit of its stockholders all of the company assets, including establishing a liquidating trust

to complete the liquidation of the Company and recommended that Genaera's stockholders vote

to approve the plan.

75.     The April 18th vote was unanimous only among the Directors attending that meeting.  Defendant Kaye did not attend the April 18th meeting, and did not vote with the Directors at that meeting.  The Shareholders were never provided with an explanation as to why Defendant Kaye did not attend, even by telephone.

76.     The proxy states that Defendant Kaye had assured the other Directors he would support the recommendation to transition to a Liquidating Trust.  Plaintiffs allege that this was the most important vote/decision made by Genaera's Directors in the Company's history.

77.     The proxy stated, in relevant part:

> it is not currently anticipated that our liquidation and dissolution will result in any material benefit to any of our executive officers or to directors *who participated in the vote to adopt the Plan of Dissolution.* [emphasis added].

78.     Because Defendant Kaye did not participate in the "vote to adopt the Plan of Dissolution", he was not bound by the limits that he could not gain any "material benefit."

79.     Genaera issued a public announcement, on April 28, 2009, that the Board had recommended that the Company's Shareholders approve a "Plan of Dissolution."

80.     In the proxy prepared for soliciting shareholder support for the Directors' recommendation to approve the liquidation and dissolution of the company, the Directors told shareholders "[s]ales of our assets will be made on such terms <u>as are approved by the Board of Directors</u> in its sole discretion." (emphasis added).

81.     The above statement would later prove to be misleading, and ultimately was proven to be totally false.  There was no Board involvement, nor "approval", for the transactions that Defendant Skolas executed on his own initiative.

82.     The proxy did not mention that a Trustee had *already been selected*, or that any shareholder that might vote in favor of the plan would lose his legal standing as a shareholder, or

that any shareholder that subsequently accepted distributions made from the Liquidating Trust would waive his right to sue for remedial action.

83.     The proxy also did not mention the idea of monetizing Genaera's Net Operating Loss ("NOL"), which was significant at that time.  Genaera's NOL (as of December 31, 2008) was $206,349,000, which could have saved a purchasing company millions of dollars in taxes it would otherwise have to pay.

84.     Plaintiff previously discussed Genaera's large NOL with Defendant Armstrong; Dr. Gast; Leanne Kelly, Genaera's CFO; and Jennifer Bilotti, a Senior Vice President, because the present value of future tax savings would be of considerable economic value if Genaera were sold entirely to a large pharmaceutical company instead of being only partly sold via a partnership agreement for the various programs.

85.     On April 29, 2009, the day following the announcement, the stock declined 32.7% on volume 96 times the average volume for the preceding ten days.

86.     Genaera management later claimed that it had approached more than 90 prospective partners, and that the Company's advisors had approached 43 potential purchasers/partners without closing a deal.

87.     On June 4, 2009, Genaera held a special meeting of Stockholders to vote on the Director's recommendation to adopt a Plan of Dissolution.

88.     At that meeting, the Plan of Dissolution was approved by the stockholders with the proxy votes representing a majority of the shares cast in favor of the resolution to approve the plan.

89.     At the time of the meeting, Genaera's management knew that with the proxy votes received, an affirmative vote was assured.

a.   Defendant Kaye, a Genaera Director and an officer of Genaera's largest shareholder, XMark, had previously indicated he would vote his shares for approval of the transition to a Liquidating Trust.

b.   On at least two occasions, Leanne Kelly, Genaera's CFO, acknowledged to Plaintiff Schmidt that the Board of Directors had enough votes to approve its own recommendation to transition into a Liquidating Trust. Although Ms. Kelly urged Plaintiff Schmidt to vote his shares in favor of the liquidation, she conceded that the Board already knew that the plan would be approved before the formal meeting.

90.   The very next day, June 5, 2009, after voting to dissolve and liquidate Genaera, XMark sold one-third of its shares of Genaera stock at a price that was inflated more than 162% over the average selling price for the ten preceding trading days.

91.   XMark sold 1,378,732 shares at $0.3095, which was more than 1.6 times the average $0.19095 average of the closing price for the ten preceding days.

92.   The volume of XMark's transaction -- 1,378,723 shares -- was approximately equal to 21 times the average daily volume calculated from the volume of the ten preceding days.

93.   The Form 4 report for the June 5 sale was signed by Defendant Cavalier as the Co-Managing Member of XMark.

94.   Upon information and belief, the sale Defendant Cavalier reported with the Form 4 filing was the result of manipulated and illegal trading activity, which he knew, or should have known about.

95.   A major shareholder seeking to sell a sizable block of stock under the circumstances of a corporate liquidation induced by the company's limited cash should have

entailed a discount from the $0.19 trading level – not a premium that amounted to an average price 162% over the prevailing trading level.

96.     Upon information and belief, the XMark sale on June 5, 2009 was a prearranged sale to a willing buyer who had agreed to pay XMark a substantial premium for the shares.

97.     On June 12, 2009, Genaera filed Articles of Dissolution with the Delaware Secretary of State.   All the Company's assets and liabilities were transferred to the Genaera Liquidating Trust (the "Liquidating Trust").

98.     Argyce LLC was named Trustee of the Genaera Liquidating Trust effective upon the filing of Genaera's Certificate of Dissolution.  Under Delaware law, the Trust became the successor in interest to the Company's contractual and regulatory obligations.

99.     The Directors sought an expedited approval of the dissolution, so that they could resign and separate themselves from Genaera as quickly as possible.  The expedited approval was also sought so that asset sales subsequent to the dissolution would not be subject to the securities laws that otherwise would apply since they would have had a duty to serve the interests of shareholders when approving such asset sales.

100.    The Directors achieved such separation by transferring Genaera's assets and liabilities to a Liquidating Trust, which was used as a means, or as a device, for evading securities laws.

101.    The Directors knew that federal securities laws would prevent them from acting in their own interest, as Defendant Skolas did as Trustee of the Liquidating Trust, because the Trust would not be subject to the securities laws that apply to a public company.

102.    At the time of the Directors' vote, the Directors knew, or should have known, the following:

22

a. The clinical hold status with the MedImmune program for developing the asthma drug under license from Genaera had been voluntarily initiated by MedImmune, that there was no problem with the drug itself, and that active development would resume later in 2009;

b. That MedImmune was planning an unusually large (and therefore unusually expensive) Phase 2B trial to begin when the clinical hold status ended and development resumed;

c. That the new Phase 2B trial would be one with an "adaptive design" structure and would transition into a formal phase 3 trial, probably before completing the planned Phase 2B trial;

d. MedImmune was extremely confident that it would gain approval, which was reflected in the enormous expense of the unusually large scale in the Phase 2B trial (320 subjects instead of the more typical 100 – 150);

e. That Dr. Michael Gast, Genaera's Chief Medical Officer, was intimately involved with the MedImmune group developing the asthma drug ("MEDI 528"), and actually had participated in discussions with the group regarding the protocol design of the planned Phase 2B study. Upon information and belief, everything that Dr. Gast knew about the MedImmune development activities and its future plans were communicated to Defendant Armstrong, as well as to the other Directors; and

f. That Genaera's management, as well as the Directors, held numerous conversations recognizing that the IL9 asset value could best be preserved for all shareholders by transferring the IL9 Asset to a separate entity, such as a Royalty Trust, that then would distribute future milestone payments and royalties to all shareholders equitably.

## 2.   Formation of the Genaera Liquidating Trust

103.   Simultaneous with the dissolution, Genaera transitioned from a fully functioning company to a Liquidating Trust naming John Skolas, through his company, Argyce LLC, as the Trustee of the Genaera Liquidating Trust.

104.   Defendant John A. Skolas, who previously served as Genaera's Chief Financial Officer, Secretary and General Counsel, executed the Agreement as President of Argyce LLC.

105.   Defendant Skolas and his company, Argyce, were selected as the Trustee by Genaera's Board despite a troubled past in business, including being terminated from Genaera in April 2007 by Defendant Armstrong and having been an individual defendant in a securities

23

class action suit. *See* <u>In re Musicmaker.com Securities Litigation</u>, Civ. A. Mo. 002018 (C.D. Cal.). This earlier suit was settled in October 2002 in favor of the plaintiffs.

106.    Thus, approximately two years after being fired from his role as the company's CFO by Genaera's CEO, Jack Armstrong, with approval of the Board of Directors, he was rehired by that same Board to serve as Trustee of the company's assets.

107.    Pursuant to Delaware statute, the Trust became the successor in interest to Genaera following its dissolution.

108.    The Trust was created to dispose of all the assets of Genaera, and to wind up Genaera's affairs, pay or adequately provide for the payment of all of its liabilities and distribute to or for the benefit of its Unit Holders all of Genaera's assets.

109.    Upon the effective date of the Trust Agreement, all outstanding shares of the Genaera's common stock were automatically deemed cancelled.

110.    In accordance with the Trust provisions, each Genaera stockholder became the owner of one unit of beneficial interest in the Trust for each share of Genaera common stock then held of record by the stockholder.

111.    Defendant Skolas, as Trustee of the Liquidating Trust, participated in multiple frauds that wrongfully converted valuable assets of Genaera.

112.    For example, Defendant Skolas sold assets for prices far below their worth, and absent any royalty provisions.

113.    Those wrongful conversions replaced existing agreements that required royalty payments that should have accrued to the benefit of Genaera shareholders and would have provided shareholders with substantial cash flow if the Trustee had instead sought arrangements to continue that agreement.

114.    Notwithstanding the statements in the proxy, and notwithstanding the Directors' knowledge that the asthma asset licensed to MedImmune was indeed a valid program, upon information and belief, the Directors nevertheless acted to separate themselves from the company as quickly as possible before the general public could become aware of the vitality of MedImmune's IL9 asthma program.

115.    By not establishing a royalty trust for the benefit of shareholders prior to the creation of the Liquidating Trust, or by providing for any other structure in the Plan of Dissolution, the Directors' actions conflicted with the statements in the proxy.

116.    The Directors created a situation where Defendant Skolas could wrongfully give away an enormously valuable asset by selling it outright, free of royalty requirements.  In so doing, Defendant Skolas replaced an existing license with MedImmune that had royalty provisions that could have had royalty provisions and substantial value to Genaera shareholders; instead, he created a substitute agreement with a sale that actually provided economic benefits to a major Genaera shareholder to the detriment to all of the other shareholders.

117.    The Directors breached their fiduciary obligations to all shareholders by creating such a deal or arrangement.

118.    By choosing to ignore statements in their own proxy, the Directors knowingly permitted Defendant Skolas to institute a fraud against all shareholders.

C.    **The Fraudulent And  Self- Dealing Sale of the IL9 Program**

119.    Defendant Skolas and the Board of Directors created the Liquidating Trust mechanism in 2009 so that the IL9 Asset could be sold to BVF in a preferential deal in a way that the Directors never could have done.

1.     **The Value of the IL9 Program to Genaera**

120.     In 2009, one of Genaera's principal assets was its licensor interest in the Interlukin 9 antibody program for asthma (the "IL9 Program"), which was licensed to MedImmune, LLC ("MedImmune"), a wholly-owned subsidiary of AstraZeneca Corporation.

121.     Interlukin 9 ("IL9") is a component of the immune system that is instrumental in the function of several biological actions that combine to create what is often called the asthmatic cascade.

122.     IL9 is primarily secreted by a type of T-cell called "Th2" cells, which are critical components of the immune system.  The Th2 cells are widely recognized as a key factor in the asthmatic response.  Asthma is a condition notable by inflammation and constriction of the airways, along with bronchial "hyperresponsiveness."

123.     Notably, IL9 is not found in the immune systems of healthy people.

124.     The IL9 Program was designed to treat asthma and other respiratory diseases through inhibiting the multifaceted activity of IL9.

125.     MedImmune conducted research, with assistance from Genaera, and several years developing the optimum antibody for IL9, which has been shown not to have immunogenicity issues.  MedImmune also has conducted seven human clinical trials with their new antibody.

126.     Based upon sales projections, Genaera, as licensor, may have received up to $54 million in payments and royalties from MedImmune once the IL9 Program reached certain milestones.

127.     By far, the most important provision of Genaera's license agreement with MedImmune is the royalty requirement.  Various statements have described that amount to be as

"high single digit up to a certain sales level" (level not disclosed), and "low double digits with increased sales."

128.   In February 2008, at the Annual BIO CEO and Investor Conference, Defendant Armstrong, during a slide presentation, stated that the present value of Genaera's IL9 Program was $48 million.   Defendant Armstrong reported that the $48 million assessment was made in the 4th quarter of 2007 by "independent third parties."

129.   The proxy for the June 4, 2009 shareholder's meeting states that in December 2007 "an investment firm" had been "identified as a potential purchaser of a portion of [Genaera's] rights to milestone and royalty payments" for the IL9 Program.  Upon information and belief, Genaera management proceeded to negotiate the terms of the investment "with input from our Board of Directors".

130.   In or around March 2008, without any notice or financial disclosure to the shareholders, Genaera management terminated negotiations to sell a portion of the Company's rights to milestone and royalty payments from the IL9 Program.

131.   Then, on May 1, 2008, during a presentation at the Genaera Annual Meeting, Defendant Armstrong commented on MedImmune's clinical program related to developing the IL9 Program; Armstrong told investors that "we believe firmly that one reason AstraZeneca bought MedImmune was that they think IL9 is significant."

132.   During the same presentation, Defendant Armstrong also told investors that Genaera would be "worth considerably more in 12 months", based in part on the success of the IL9 Program.

133. Defendant Armstrong told investors and Genaera's Shareholders that Genaera was "highly confident" that MedImune would reach a positive conclusion related to the IL9 Program and continue its work with the IL9 Program through the end of 2008.

134. Upon information and belief, Defendant Armstrong was informed about MedImmune's plans for the IL9 Asset because Dr. Gast, Genaera's Chief Medical Officer, was privy to MedImmune's proprietary and confidential information and data and would share it with Defendant Armstrong.

## 2. **Ligand Pharmaceutical Purchases IL9 Asset at Nominal Price**

135. Following Genaera's dissolution, Defendant Skolas, as Trustee, was responsible for selling the remaining Genaera assets, including the IL9 asset, for the benefit of *all* the Unit Holders, without specifically favoring one or more of the Unit Holders to the detriment of the others.

136. Jennifer Bilotti, a Senior Vice President at Genaera, told Plaintiff Schmidt, in a March 2009 telephone conversation, that the IL9 Program could be "put into a shell company for which the shareholders would still get benefit from that when it reaches the market and royalties are received."

137. Moreover, Leanne M. Kelly, the Chief Financial Officer of Genaera, on May 27, 2009, told Plaintiff Schmidt that the Trust could hold the IL9 Program and distribute royalties to shareholders.

138. Under the Trust provisions, the Trustee had three years from the date the Trust was created to sell Genaera assets and possible further extensions beyond that three year period.

139. The Trust also stated, in part (Section 11.2):

> No Beneficiary shall have any right by virtue of any provision of this
> Agreement to institute any action or proceeding at law or in equity against

28

any party other than the Trustee upon or under or with respect to the Trust Assets or the agreements relating to or forming part of the Trust Assets, and **the Beneficiaries (by their acceptance of any distribution made to them pursuant to this Agreement) waive any such right.**

140.    The IL9 asset constituted a significant asset in Genaera's drug development portfolio and was the one asset that could increase in value in the hands of a new buyer without further development and only a small annual expenditure.  MedImmune has responsibility for all development expenses.

141.    On May 18, 2010, Defendant Skolas executed a Purchase and Sale agreement with Defendant Ligand Pharmaceuticals ("Ligand"), a Delaware corporation, for the IL9 Asset in their entirety.

142.    Ligand purchased the IL9 Asset for $2.75 million, which is a fraction of the value previously given to it by Genaera's management and an unconscionably low amount of money.

143.    Indeed, Defendant Skolas had previously stated to Plaintiff Schmidt, among other things, that:

      a.    the IL9 Asset "ha[s] blockbuster potential, $3 to $4 billion peak year sales";

      b.    in referring to the prospect of selling a portion of the IL9 rights, Defendant Skolas claimed that it offered "outsized return potential relative to risk"; and

      c.    "I would like to do something meaningful with the IL-9 program".

144.    By selling the IL9 Asset for such a low price:

      a.    Defendant Skolas ignored the repeated recognition by management and Directors that the fair thing to do for the benefit of **all**  shareholders was to place the IL9 Asset in a royalty trust or some similar continuing entity that can distribute future milestone payments and royalties equitably to Genaera shareholders.

29

      b.   Defendant Skolas also ignored the significant increase in the IL9 program's value identified by the several updates MedImmune posted on the website, www.clinicaltrials.gov, during March and April 2010.

145.    Importantly, the conspirators, Ligand and Skolas, kept BVF unidentified, and BVF was not mentioned or cited in any way in the purchase agreement.

146.    Two days after executing the IL9 Asset purchase agreement with the Liquidating Trust, Ligand *sold a 50% interest to BVF for* half the $2.75 million.

147.    Ligand and BVF acted together to secure the IL9 Asset with high confidence in the IL9 Asset would be commercially successful.

148.    Upon information and belief, that knowledge was conveyed to Ligand and BVF by Defendant Kaye, which was *information improperly appropriated from Genaera.*

149.    This information was used as the basis for the conspiracy and fraud of the Defendants working in concert with Trustee Skolas that culminated in his transferring a valuable asset for less than 5% of its actual worth.

150.    Defendant Skolas breached his duty to the Trust Unit Holders not to consummate **any** transaction prematurely.

151.    Genaera's stockholders never were given a copy of the Trust Agreement, and were not informed as to critical provisions in that agreement about their voting for the Directors' recommendation.  Nor were they informed about accepting distributions from the Trustee when they were asked to approve the Directors' recommendation to transition to a Liquidating Trust.

152.    The proxy for the June 4, 2009 stockholders meeting and the Trust Agreement both allow for a three-year period for monetizing the Genaera assets.   Further, the Trust Agreement provides for possible extensions beyond the three-year period.

153.    By selling the IL9 Asset to Ligand (and, upon information and belief, setting it up for BVF), plus "certain of its affiliates", *just eleven months after* the Trust's establishment, Defendant Skolas misled and prevented all shareholders from receiving a share of the milestone payment that MedImmune was required to make with the formal start of a Phase 3 trial.

154.    The Purchase and Sale Agreement with Ligand strategically concealed the involvement of BVF, Genaera's second largest shareholder.  This was not an "oversight" because BVF was jointly participating as a partner with Ligand and because its partnership interest was approximately equal to that of Ligand.

### 3.    Ligand and BVF  Conceal BVF's Involvement in the IL9 Sale

155.    Until August 2009, BVF, at that time Genaera's second largest stockholder, owned more than 15% ownership in Ligand common stock.

156.    Only 13 days after Genaera's assets and liabilities were transferred to the Genaera Liquidating Trust, BVF cut back on its Ligand position, and sold Ligand stock on four of five business days beginning on June 26, 2009.  BVF began its transition away from being a Ligand insider just 13 days after the Genaera Liquidating Trust was established.

157.    This reduction in stock was made in a key position that BVF had carefully accumulated six months earlier with an active buying campaign where it bought Ligand stock on twenty straight trading days from November 7, 2008 through December 5, 2008, and then added to that position in late January 2009.

158.    BVF stopped selling Ligand common stock when its position declined to a reported 9.99% of the Ligand outstanding common shares of stock.

159.    By cutting its position to just slightly under 10%, BVF evaded status as a *Ligand insider*, which clearly was in anticipation of the arrangement BVF was promoting for the purchase of the Genaera's IL9 asset by using Ligand as a front for a 50/50 partnership with itself.

31

160.   Upon information and belief, Defendant Skolas participated in the concealment that obscured the involvement that BVF has in the transaction.  In reality, BVF had a 50% direct interest in milestone payments and royalties, and BVF provided half the $2.75 million purchase price.

161.   BVF and Ligand could not have used the sham of their 50/50 joint venture being an arms-length deal since BVF was still an insider.

162.   BVF actually stood to gain more than **50%** of the economic benefit of this fraudulent transaction because it also owned almost 10% of *Ligand's* shares.

163.   Relative to the expected value of prospective royalties on several billion dollar sales, the $2.75 million purchase price was a *de minimis* amount.

164.   Defendants Skolas (Trustee) and Lampert (President, BVF) conspired to transfer an asset of enormous value from Genaera's Unit Holders and to bestow a disproportionate benefit to BVF, Genaera's second largest shareholder.

165.   Moreover, Defendants Skolas and Lampert affected a fraudulent transfer from the Liquidating Trust to Ligand for a price that was insignificant relative to the value of the asset.

166.   Upon information and belief, Defendant Kaye (Genaera Director) provided Defendant Lambert (President, BVF) with advice and information that was appropriated from Genaera to facilitate this fraudulent transaction.

167.   The only appropriate conclusion is that Defendant Skolas knowingly and willingly wanted to sell the IL9 Asset to the Ligand-BVF "partnership", even though he was fully aware that Ligand and BVF were partners.

**D.**    **Self-Dealing and Fraud Surrounding the Pexiganan Anti-Infective**

168.    Through the bad faith conduct of Defendant Skolas, and with the cooperation of MacroChem's management, a license requiring royalties and milestone payments for Pexiganan was replaced with a different license free of those obligations, but held by the same MacroChem officers.

169.    Genaera, and its predecessor, had developed Pexiganan, a topical cream for the treatment of patients with mild diabetic foot infections.

170.    Pexiganan is a 22-amino acid linear peptide. It is formulated as a cream and has a novel mechanism of action based on its ability to disrupt the integrity of bacterial cell membranes. It has antimicrobial activity against Gram positive (methycillin resistant staphylococcus aureus (MRSA)) and Gram negative organisms that commonly infect skin and soft tissue. It has a low potential for induction of resistance and no cross-resistance with existing therapeutic antibiotics as a consequence of its mechanism of action.

171.    According to the Centers for Disease Control and Prevention (CDC), the estimated incidence of diabetes in the US exceeds 1.5 million new cases annually, with an overall prevalence of nearly 24 million people (2008), or more than 7% of the US population. It is estimated that as many as one in four persons with diabetes will develop a foot ulcer in their lifetime of which about 60% become infected.

172.    Upon information and belief, in 2008 and 2009, no topical antimicrobials were specifically approved for the treatment of diabetic foot infection.

173.    In July 2007, Defendant MacroChem announced that it had purchased a 90-day exclusive right to enter into a license agreement with Genaera for Genaera's Pexiganan.

174.    MacroChem is a formerly NASDAQ-listed specialty pharmaceutical company that used novel drug delivery technologies to develop pharmaceutical products to treat various medical conditions.

175.    MacroChem paid Genaera $250,000 with the execution of the option agreement. The agreement also included a provision that it could be extended for an additional 90 days with payment of another $250,000.

176.    In a press release, MacroChem stated that both Pexiganan and MacroChem's existing product, "EcoNail", which was in development for treating onychomycosis (fungal infection of the toenails), would be used to treat diseases of the foot predominantly treated by the same prescribing specialists, namely podiatrists. EcoNail was a lacquer which contains the antifungal econazole for treating the toenail fungus onychomycosis topically.

177.    Thereafter, on October 3, 2007, MacroChem executed its second option and acquired exclusive worldwide rights for drug uses of Pexiganan.

178.    Under the terms of the license agreement, the following occurred:

   a.    MacroChem paid Genaera an initial $750,000 of a $1 million fee; the $250,000 balance was subsequently paid on February 1, 2008;

   b.    Along with the rights to Pexiganan, MacroChem received an active NDA, all Genaera research and clinical data, including the "Drug Master File", and a quantity of active peptide material; and

   a.    MacroChem received the rights to all prescription indications for Pexiganan. Genaera retained the rights for products having low concentrations of the active peptide ingredient that can be sold over the counter without prescription for uses such as reducing acne.

34

179.   The terms also included payments of approximately $7 million to Genaera upon the achievement of certain clinical and regulatory milestones through approval, sales-based milestones of up to $35 million, and 10% royalty payments on net sales.

180.   In addition, MacroChem was to assume all clinical development, manufacturing and regulatory activities for Pexiganan.

181.   Later that month, MacroChem announced that Michael Zasloff, M.D., Ph.D., had joined the company's Scientific Advisory Board.

182.   Dr. Zasloff had founded Magainin Pharmaceuticals, Inc. ("Magainin") in 1989, and had discovered the peptide that his Magainin scientists modified and developed to become the proven anti-infective Pexiganan. Magainin eventually changed its corporate name to Genaera.

183.   On June 5, 2008, MacroChem issued a press release and announced a presentation to be made by Dr. Zasloff, its leading Scientific Advisor, at a professional medical symposium in San Francisco. Dr. Zasloff's presentation discussed "recent discoveries in innate immunity that explain the role of antimicrobial peptides in protecting human skin from infection."

184.   At the same symposium, Dr. Zasloff stated that "Pexiganan, like other antimicrobial peptides, has a very low potential for development of antimicrobial resistance a problem associated with conventional agents and of particular concern in the long term management of the diabetic patient." The press release also stated, "Pexiganan, currently being developed by MacroChem, has been evaluated in over 1000 diabetic patients and has already completed two Phase III clinical trials."

185.   In the same press release, Defendant Robert DeLuccia, MacroChem's Chairman, commented "we believe the Pexiganan could fill an important unmet medical need and provide a

35

significant commercial opportunity for our Company in an addressable market of millions of diabetic foot infections annually, which translates to a potential estimated one-half billion dollar market in just the US."

186.   Despite all of the accolades and acclaim, MacroChem spent only $45,110 to further the Pexiganan development in all of 2008.

187.   However, upon information and belief, during the same time period, MacroChem diverted approximately $6.8 million for the benefit of Defendant Rouhandeh through the following means, among others:

> a.   MacroChem's officers, including Defendants Luci and DeLuccia, acted with bad faith by allowing MacroChem to acquire a company, Virium Pharmaceuticals, Inc. ("Virium"), which was controlled by Defendant Rouhandeh.  That transaction was facilitated by a fraudulent "Fairness Opinion".
>
> b.   Some of the MacroChem funds were diverted directly to Rouhandeh.
>
> c.   Some of the MacroChem funds were used to pay Virium debt, which MacroChem assumed.
>
> d.   Some of the MacroChem funds were for "fees" and bonuses for associates and friends of Defendant Rouhandeh.

188.   Upon information and belief, Defendant Kaye knew about, and encouraged, MacroChem's actions as they related to Defendant Rouhandeh.

189.   MacroChem acquired Virium, a nonpublic, development stage company, on April 18, 2008.

190.   Upon information and belief, Defendant Mark J. Alvino, an associate of Defendant Rouhandeh and a Director of MacroChem, and his provided a "Fairness Opinion" in

36

support of MacroChem's acquisition of Virium, stating that, as of the date of the opinion, "the Merger Consideration is fair from a financial point of view."

191.    However, a comparison of key financial data from both companies, including Virium's negative working capital, and MacroChem's positive shareholders' equity, show Alvino's opinion to be unsound.  Thus, this so-called "Fairness Opinion", as will be described below, allowed MacroChem, Defendant Rouhandeh and others to carry out a complex fraud to the detriment of Genaera and its Unit Holders.

192.    Prior to obtaining Virium, MacroChem had no involvement with oncology.  There was no compatibility of products in development between the companies at the time.

193.    The MacroChem acquisition of Virium was implemented for the real purpose of benefiting SCO with MacroChem liquidity instead of using MacroChem funds to advance the commercialization of Pexiganan.  This constituted bad faith by Defendants DeLuccia, Luci, Rouhandeh, Alvino, and Davis.

194.    At the time of the Virium acquisition by MacroChem, Defendants Alvino and Davis both served on MacroChem's Board of Directors.

195.    Defendant Alvino was the Managing Director for SCO Financial Group LLC from July 2002 to May 2007.

196.    Defendant Davis was a Virium Director, as well as a MacroChem Director.

197.    In July 2008, Defendant Access Pharmaceuticals, Inc. ("Access"), a biopharmaceutical company specializing in products for cancer and supportive care, announce that it was acquiring MacroChem.  That transaction closed on or around February 25, 2009.

198.    After the acquisition, Access announced, in a SEC filing, that "[t]he MacroChem board of directors did not engage a financial advisor to assist in the sale of MacroChem or to

render a financial opinion as to the fairness. The board of directors also considered the cost of obtaining a fairness opinion as prohibitively expensive in light of MacroChem's financial condition."

199.    The financial data, however, actually shows that MacroChem's cash situation resulted from the fraudulent manipulation by Defendants SCO/Rouhandeh rather than from MacroChem's own development activities (i.e., Pexiganan). MacroChem had no long term debt on March 31, 2008, but, 18 days later, after the acquisition of Virium, MacroChem was burdened with considerable debt. Also, some MacroChem liquidity was used to pay down part of the Virium debt.

200.    Citing limited resources, Access ceased development of MacroChem's dermatology products, including Pexiganan.

201.    Upon information and belief, the acquisition terms were negotiated by Defendants Jeff Davis and Dave Luci; both of these individuals were directors of both Access and MacroChem. In a proxy statement, MacroChem shareholders were told that MacroChem had run out of money, and might not be able to continue as a going concern.

202.    Upon information and belief, the primary reason that MacroChem's liquidity became compromised was because the company diverted much of it liquidity for Defendant Rouhandeh's benefit as described above.

203.    In 2010, Defendant Skolas terminated the Pexiganan licensing agreement between Access and MacroChem and the Liquidating Trust so that MacroChem's insiders could acquire those same Pexiganan rights from the Trust on behalf of their new company, Dipexium Pharmaceuticals, LLC.

38

204.    Defendants DeLuccia and Luci are the co-founders of Defendant Dipexium, which, upon information and belief, was formed to acquire the rights to Pexiganan, for a pittance, and free of the royalty and milestone payment obligations that were part of the MacroChem licensing agreement.

205.    Although Defendant Skolas was administering the Trust under the pretense of safeguarding the interests of Unit Holders, he was actually working with insiders at other companies to obtain a better deal for them in violation of his duties as the Liquidating Trustee.

206.    The rights acquired by Dipexium, as compared to the rights granted to MacroChem, are not limited to high concentrations of the active peptide for prescription indications, and evidently also include lower concentrations that can be used with a non-prescription over the counter product for acne, which more than doubles the available market compared with the original MacroChem license.

207.    Dipexium acquired the rights for a minor purchase price and free of the original 10% royalties and milestone payment obligations.

208.    In selling the rights to Dipexium, the Trust stated that "it seeks to divest or otherwise monetize all its rights to pexiganan, . . .."

209.    Soon after this transaction, the Dipexium website touted the arrangement with the Trust as follows:

> With limited resource required to complete clinical development, [Dipexium] management believes Pexiganan has peak year sales potential of hundreds of millions of dollars in the U.S. and separately in the EU. . . .
>
> Dipexium believes it can leverage a modest amount of capital into a multifold financial return in a relatively short timeframe. . . .
>
> With Pexiganan, several value-creating milestones have *already* been achieved internally and by our predecessors and several near-term value-inflection points exist on what we believe is a relatively short pathway to approval for an early-stage company.

210.    Defendant Skolas sold Pexiganan, a valuable asset, to Dipexium, a company

formed by Defendants Luci and DeLuccia solely for this purpose, free of the royalty and

milestone payment obligations owed to Genaera and the Unit Holders by MacroChem.

211.    Defendant Skolas cooperated with Defendants DeLuccia and Luci so that they

could replace MacroChem's license, limited to certain indications and having specified royalty

and milestone payment obligations, with an asset without any limitations, and free of all royalty

and milestone payment obligations.

## E.    **Fraud Related to the Aminosterol Assets**

212.    On July 8, 2009, only **26 days** after the Liquidating Trust was established, Skolas

accepted a $50,000 down payment for an agreement to sell another package of Genaera's assets

(the "Aminosterol Assets") for an unacceptable $200,000 price.

213.    Upon information and belief, the buyer, BBM Holdings, Inc. ("BBM Holdings"),

had arranged for financing for the purchase even before the formal vote for the Plan of

Dissolution. As a non-operating shell company, BBM Holdings had no need and no use for

funds, except for purchasing rights to assets.

214.    BBM Holdings' actions demonstrate advance planning with an understanding by

those empowered to disperse Genaera's assets before a formal vote.  BBM Holdings, the buyer,

had reason to be confident in completing its anticipated purchase when it arranged the financing

on June 3, 2009  —  the day before the stockholders' meeting, to formally approve the Directors'

recommendation.

215.    Upon information and belief, BBM Holdings was a non-operating company,

which had no recognizable use for the funds raised other than for the purchase of Genaera's

Aminosterol Assets.

40

216.    The sale clearly was premature relative to the time available to secure a fair price.

217.    Defendant Skolas deliberately encumbered himself from negotiating with another prospective buyer for more favorable terms with almost three years remaining for affecting a sale, and the fact that the sale was to a buyer not able or qualified to conduct any pharmaceutical development are evidence that this was a prearranged transaction.

218.    On August 4, 2009, BBM Holdings, a Utah corporation, reincorporated in the State of Delaware and merged with and into its wholly-owned subsidiary, Ohr Pharmaceutical, Inc., a Delaware corporation.

219.    Upon information and belief, Ohr's management acknowledged that the company had "stolen" the Aminosterol Assets from the Liquidating Trust.

220.    Taken together, the fraudulent sale of the Aminosterol Assets, and the subsequent preferential sale of the IL9 Asset that also was the subject of early advanced planning, define a pattern of fraud and deceit by Defendant Skolas and other conspirators.

## FIRST CAUSE OF ACTION ON BEHALF OF THE STOCKHOLDER CLASS AGAINST THE DIRECTOR AND OFFICER DEFENDANTS FOR BREACH OF FIDICUARY DUTIES AND AGAINST ALL OTHER DEFENDANTS FOR AIDING AND ABETTING THEREOF

221.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

222.    The Director and Officer Defendants at all relevant times owed fiduciary duties of due care, candor and loyalty to Genaera and its shareholders.

223.    As directors and officers of a Delaware corporation, each of the Director Defendants owed and owes fiduciary duties to Genaera and its shareholders. Moreover, as members of the Board, these Defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles. Pursuant to these duties, the

41

Director Defendants specifically owed and owe Genaera the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the duties of candor, good faith, due care and loyalty.

224.    The Director and Officer Defendants breached said duties through their acts and omissions as set forth above.

225.    The actions and decisions of the Director and Officers Defendants are not protected by the business judgment rule for the reasons that the Director and Officer Defendants decisions were not (1) the product of informed judgment; (2) free from domination by a self interested controlling shareholder or group thereof; (3) made with a good faith belief that the actions and decisions were in the best interests of the Genaera and its shareholders; and (4) the Director and Officer Defendants were motivated by conflicting self-interests.

226.    The transactions which are the subject of this cause of action were not the product of either fair price or fair process and thus the transaction do not pass the "entire fairness" test applicable under Delaware law.

227.    The defendants other than the Director and Officer Defendants knew of the breaches of fiduciary duty of the Director and Officer Defendants and knowingly and willingly contributed to, and participated and aided and abetted such breach.

228.    As a result of the foregoing, plaintiff and the Class have been damaged in the amount of losses sustained and in the amount of defendants' profits from the transactions.

**SECOND CAUSE OF ACTION ON BEHALF OF THE UNITHOLDER
CLASS AGAINST DEFENDANT SKOLOS AND ARGYCE FOR BREACH OF
DUTIES OF TRUSTEE UNDER COMMON LAW AND THE APPLICABLE
TRUST AGREEMENT AND AGAINST THE NON OFFICER AND
DIRECTOR DEFENDANTS FOR AIDING AND ABETTING THEREOF**

229.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set

forth herein.

230.     Skolos and Argyce as trustees of the Liquidity Trust owed fiduciary duties to the

Liquidity Trust and Unit Holders.

231.     Skolos and Argyce violated their fiduciary duties by failing to fully inform

themselves of the true value of the assets of Genaera, and by failing to ensure that all dispositions

of assets were made at arms-length with the singular goal of maximizing the value of the Trust

assets and by aiding and abetting the self-dealing conduct of other Defendants as described

herein.

232.     As a result of the foregoing, Skolos and Argyce have breached their fiduciary

duties and have caused loss and damage and diminution of value to the Trust and Unit holders.

**THIRD CAUSE OF ACTION ON BEHALF OF NOMINAL DEFENDANT
GENAERA FOR WASTE OF CORPORATE ASETS AGAINST ALL
OFFICERS AND DIRECTOR DEFENDANTS AND ALL OTHER
DEFENDANTS FOR AIDING AND ABETTTING THEREOF**

233.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set

forth herein.

234.     As directors and officers of a Delaware corporation, each of the Director

Defendants owed and owes fiduciary duties to Genaera and its shareholders.  Moreover, as

members of the Board, these Defendants had specific fiduciary duties as defined by the

Company's key corporate governance documents and principles.  Pursuant to these duties, the

Director Defendants specifically owed and owe Genaera the highest obligation of good faith and

43

loyalty in the administration of the affairs of the Company, including the duties of candor, good faith, due care and loyalty.

235. Each of the Director and Officer Defendants consciously violated these duties. The Director Defendants had a duty to act in good faith and not knowingly violate the law.

236. The action of the Director and Officer Defendants in approving the transactions described herein constituted a waste of corporate assets which are incapable of shareholder, company or trustee ratifications.

237. The Director Defendants consciously violated their corporate responsibilities and fiduciary duties.

238. As a direct and proximate result of the Director Officer Defendants' conscious failure to perform their fiduciary obligations, the Genaera sustained significant damages.

## FOURTH CAUSE OF ACTION ON BEHALF OF GENAERA STOCKHOLDERS AS OF THE RECORD DATE OF THE JUNE 4, 2009 SHAREHOLDE VOTE AGAINST DEFENDANT XMARK AND KAYE FOR ILLEGAL VOTE SELLING

239. Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

240. Defendants Xmark and Kaye voted their shares in favor of the dissolution on or before June 4, 2009.

241. On June 5, 2009 or thereafter, defendant Xmark and Kaye sold a material amount of the outstanding shares of Genaera, in a pre-arranged sale at a premium to the recent 10 day average seller price of Genaera stock.

242. Upon information and belief, defendants XMark and Kaye sold their vote in exchange for the aforementioned premium purchase of their shares.

243. The sale of votes constitutes a violation of Delaware law.

44

244.    As a result of the vote sale, the Dissolution was approved and subsequently, Genaera's assets were sold for a fraction of their recognized value.

245.    The dissolution and subsequent sale of assets caused loss and damage to plaintiff and the shareholder class.

246.    As a result of the foregoing, plaintiff and the shareholder Class suffered loss and damage in an amount to be determined at trial.

### FIFTH CAUSE OF ACTION ON BEHALF OF GENAERA AGAINST DEFENDANT XMARK AND KAYE FOR ILLEGAL VOTE SELLING AND FOR A DECLARATION THAT THE SHAREHOLDER VOTE ON THE DISSILUTION BE VOIDED

247.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

248.    Defendants Xmark and Kaye voted their shares in favor of the dissolution on or before June 4, 2009.

249.    On June 5, 2009 or thereafter, defendant Xmark and Kaye sold a material amount of the outstanding shares of Genaera, in a pre-arranged sale at a premium to the recent 10 day average seller price of Genaera stock.

250.    Upon information and belief, defendants XMark and Kaye sold their vote in exchange for the aforementioned premium purchase of their shares.

251.    The sale of votes constitutes a violation of Delaware law.

252.    As a result of the vote sale, the Dissolution was approved and subsequently, Genaera's assets were sold for a fraction of their recognized value.

253.    The illegal vote selling scheme requires the vote of approval of the dissolution be voided and nullified.

45

254.    As a result of the foregoing, Genaera suffered loss and damage in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION ON BEHALF OF PLAINTIFF AND THE SHAREHOLDER CLASS AGAINST DEFENDANT XMARK AND KAYE FOR ILLEGAL VOTE SELLING FOR A DECLARATION THAT THE SHAREHOLDER VOTE ON THE DISSILUTION BE VOIDED

255.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

256.    Defendants Xmark and Kaye voted their shares in favor of the dissolution on or before June 4, 2009.

257.    On June 5, 2009 or thereafter, defendant Xmark and Kaye sold a material amount of the outstanding shares of Genaera, in a pre-arranged sale at a premium to the recent 10 day average seller price of Genaera stock.

258.    Upon information and belief, defendants XMark and Kaye sold their vote in exchange for the aforementioned premium purchase of their shares.

259.    The sale of votes constitutes a violation of Delaware law.

260.    The "sold" votes are tainted and should be nullified.

261.    The dissolution would not have been approved by a majority of untainted voting shares.

262.    As a result of the vote sale, the Dissolution was approved and subsequently, Genaera's assets were sold for a fraction of their recognized value.

263.    The illegal vote selling scheme requires the vote of approval of the dissolution be voided and nullified.

264.    As a result of the foregoing, plaintiff and the shareholder Class are entitled to a declaration of this Court that the vote of June 4, 2009, in its entirety is null and void.

46

## SEVENTH CAUSE OF ACTION ON BEHALF OF GENAERA AND/OR THE GENAERA LIQUIDATING TRUST FOR DISGORGEMENT OF INSIDER TRADING PROFITS REALIZED BY XMARK AND/OR KAYE IN CONNECTION WITH THEIR 2009 SALE OF GENAERA SECURITIES

265.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

266.    On or about June 5, 2009, a prearranged sale of Genaera stock was consummated and it resulted in Xmark and Kaye receiving a premium price for the Genaera stock.

267.    The prearranged sale was agreed and consummated while Xmark and Kaye were in possession of material non-public information.

268.    As a result of the foregoing, XMark and Kaye profited from their misappropriations of insider information and any profits therefrom are the property of Genaera and if the dissolution vote is not nullified, the Liquidating Trust..

269.    Xmark's and Kaye's use of confidential material information was a misappropriation of insider information.  All profits generated in connection with such misappropriation belong to Genaera or the Liquidity Trust and must be disgorged either to Genaera or the Liquidity Trust.

## EIGHTH CAUSE OF ACTION ON BEHALF OF  GENAERA AGAINST ALL DIRECTOR DEFENDANTS FOR VIOLATION OF SECTION 14(A) OF THE SECURITIES EXCHANGE ACT OF 1934

270.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

271.    This claim is brought by plaintiff derivatively on behalf of nominal defendant Genaera and on behalf of the shareholder class pursuant to Section 14(a) of the Securities Exchange Act of 1934.

47

272.    On or about May 14, 2009, the director defendants caused Genaera to file a materially false and misleading proxy statement in connection with a vote of stockholders meeting of stockholders scheduled for June 4, 2009 which recommended that shareholders approve the dissolution of Genaera.

273.    The dissolution was approved by Genaera stockholders as a result of the false and misleading proxy statement used to solicit plaintiff's and other stockholders' vote in favor of the dissolution.

274.    The proxy statement was materially false and misleading by virtue of its failure to disclose all material facts necessary for stockholders to make a fully informed, uncoerced vote on dissolution.

275.    If Genaera stockholders not affiliated with any defendants had been informed of the material undisclosed information, they would not have voted to approve the dissolution.

276.    Genaera has been damaged by the violation of Section 14(a) alleged in this claim for relief.

277.    The Director Defendants are the cause of such damage and are liable for all loss and damage and any benefits they received from the dissolution should be returned to Genaera or the Liquidating Trust.

### NINTH CAUSE OF ACTION AGAINST DEFENDANTS KAYE, XMARK AND BVF FOR BREACH OF FIDUCIARY DUTIES OWED BY MAJORITY/CONTROLLING SHAREHOLDERS TO PLAINTIFF AND MEMBERS OF THE SHAREHOLDER CLASS AND FOR AIDING AND ABETTING THEREOF BY ALL OTHER DEFENDANTS

278.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

48

279.   At relevant times defendants Xmark, Kaye and BVF were acting in concert and as a group pursuant to Section 13 of the Securities Exchange Act.

280.   Defendants Xmark, Kaye and BVF fraudulently failed to make the filings required under SEC regulations for shareholders acting as a "group" who collectively own more than 10% of the outstanding common stock of a company such as Genaera which was registered as a reporting company with the SEC until it was dissolved.

281.   Defendants Xmark, Kaye and BVF were at all relevant times the majority and/or controlling shareholders of Genaera and as such owed fiduciary duties to the plaintiff and shareholder Class members, as minority shareholders.

282.   Xmark, Kaye and BVF breached their fiduciary duties by abusing their positions of control to their personal advantage to the exclusion of, and out the expense of, the minority shareholders and Genaera.

283.   Xmark, Kaye and BVF were aided and abetted by the other defendants who knew that these defendants were majority/controlling shareholders of Genaera and were, through the actions described herein, breaching their fiduciary duties.  The other Defendants, knowingly aided and abetted the breach of fiduciary duties.

284.   As a result of the foregoing, Plaintiff and stockholders Class and Genaera have suffered loss and damage in an amount to be determined at trial.

## TENTH CAUSE OF ACTION AGAINST
## ALL DEFENDANTS FOR PUNITIVE DAMAGES

285.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

286.    Plaintiff also alleges that each act described above and/or any one of them individually and/or any combination of them constituted individual and/or collective acts of willful, intentional, reckless, and wanton acts against Plaintiff and stockholders Class.

287.    For these reasons, Defendants should be held liable and punished for their willful, intentional, reckless, and wanton acts.

288.    As a result of the foregoing, Plaintiff and stockholders Class and Genaera have suffered loss and demand punitive damages in an amount which will appropriately penalize Defendants for their intentional, reckless, willful, and wanton acts.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alan W. Schmidt, in his representative capacities, prays for judgment as follows:

1.    That this action be certified as a Class action on behalf of the proposed Classes defined in this Complaint;

2.    That the named plaintiff be designated as the representative of the Class, and that named counsel be designated as Class counsel;

3.    That plaintiff and the Class have judgment against defendants on the Causes of Action asserted on their behalf and that they recover all allowable damages from defendants under each applicable cause of action, with interest thereon;

4.    That Genaera and/or the Liquidity Trust have judgment against the defendants on the Causes of Action asserted on their behalf;

5.    That Genaera have judgment against the Defendants on the causes of action asserted on its behalf;

50

6.     That plaintiff, the Classes and the Liquidating Trust and/or Genaera be awarded

punitive damages in an amount of at least $1,000,000,000.00 (One Billion Dollars);

7.     That all defendants be required to disgorge to the Liquidating Trust any

distribution they received form the Liquidating Trust and that all defendants' claims to the assets

of the Liquidating Trust be subordinated to the claims of the non-defendant unit holders

8.     That the cost of this action be taxed to Defendants;

9.     Awarding Plaintiff and their counsel reasonable attorneys' fees, expert fees and

other reasonable costs and expenses; and

10.     Granting such other and further relief as this Court may deem just and proper.


### JURY DEMAND

Plaintiffs hereby demand a trial by jury as to all issues to triable.

**SHELLER, P.C.**

Dated:  June 8, 2012                    /s/ Brian J. McCormick, Jr.
                                        Stephen A. Sheller, Esquire
                                        Brian J. McCormick, Jr., Esquire
                                        1528 Walnut Street, Floor 4
                                        Philadelphia, PA  19102
                                        Tel.: (215) 790-7300
                                        Fax: (215) 546-0942
                                        sasheller@sheller.com
                                        bjmccormick@sheller.com

                                        Lee Squitieri
                                        Squitieri & Fearon, LLP
                                        32 East 57th Street
                                        12th Floor
                                        New York, New York 10022
                                        Telephone:  (212) 421-6492
                                        Fax:  (212) 421-6553
                                        lee@sfclasslaw.com

Joseph R. Santoli
Law Offices of Joseph R. Santoli
340 Devon Court
Ridgewood, NJ  07540

Attorneys for Plaintiffs

## VERIFICATION

I, Alan Schmidt, being duly sworn, depose and say the following under penalty of perjury:

I am the plaintiff in the within action. I have read the foregoing Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those mattes I believe them to be true. I am and have been at all relevant times, a shareholder or the successor in interest by operation of law of the shareholder of the nominal Defendant, Genaera Corporation.

8 June 2012

Alan Schmidt