# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

ALAN SCHMIDT, on behalf of himself and in
a representative capacity on behalf of all other
similarly situated and derivatively on behalf
Genaera Corporation and on behalf of the
Genaera Liquidating Trust,

               Plaintiff,

     -against-

LEANNE KELLY
c/o Argyce, LLC
12 Lenape Ave.
New Hope, PA 18938

     and

ZOLA B. HOROVITZ, Ph.D.
6468 Enclave Way
Boca Raton, FL 33496

     and

JOHN L. ARMSTRONG, JR.
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

OSAGIE O. IMASOGIE
Phoenix IP Ventures
One Crescent Dr., Suite 400
Philadelphia, PA 19112

     and

MITCHELL D. KAYE
XMark Capital Partners, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

     and

Case No. 2:12-cv-03265-BMS

**JURY TRIAL DEMANDED**

ROBERT F. SHAPIRO
Klingenstein, Fields
787 Seventh Ave, 6th Floor
New York, NY 10019-6016

    and

PAUL K. WOTTON
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

    and

ROBERT DELUCCIA
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

    and

GRIFFIN SECURITIES
18 State Street
3rd Floor
New York, NY 10019

    and

DAVID LUCI
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

    and

STEVE ROUHANDEH
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

    and

JEFFREY DAVIS
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

  and

MARK ALVINO
Griffin Securities LLC
18 State Street, 3rd Floor
New York, NY 10004

  and

Nominal Defendant
GENAERA LIQUIDATING TRUST
c/o Argyce LLC
Attn: John Skolas
P.O. Box 299
New Hope, PA 18938

  and

BIOTECHNOLOGY VALUE FUND, INC.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

  and

LIGAND PHARMACEUTICALS, INC.
11085 N. Torrey Pines Road
LaJolla, CA 92037

  and

XMARK CAPITAL PARTNERS, LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

  and

ARGYCE LLC
12 Lenape Ave
New Hope, PA  18938

    and

SCO FINANCIAL GROUP
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

    and

JOHN A. SKOLAS
12 Lenape Ave.
New Hope, PA  18938

    and

DIPEXIUM PHARMACEUTICALS, LLC
22 Camelot Court
White Plains, NY 10603

    and

MACROCHEM CORPORATION
116 Village Boulevard
Suite 200
Princeton, NJ 08540

    and

ACCESS PHARMACEUTICALS INC.
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

    and

OHR PHARMACEUTICALS
489 Fifth Avenue
28th Fl.
New York, NY 10017

    and

MARK N. LAMPERTBVF INC.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

and

JOHN L. HIGGINS
Ligand Pharmaceuticals
11085 N. Torrey Pines Road
LaJolla, CA 92037

Defendants,

and

GENAERA CORPORATION
5110 Campus Drive
Plymouth Meeting, PA 19462

Nominal Defendant.

## AMENDED VERIFIED CLASS ACTION AND SHAREHOLDER DERIVATIVE COMPLAINT FOR DAMAGES AND <u>RESCISSION OF SALES OF ASSETS TO OHR AND DIPEXIUM</u>

Plaintiff Alan Schmidt, on behalf of himself and (i) all other Shareholders of Defendant Genaera Corporation; (ii) all other Unit Holders of Genaera Liquidating Trust; and (iii) derivatively on behalf of Genaera by and through his undersigned counsel, brings this civil action against Defendants Genaera Corporation, John L. Armstrong, Jr., Zola B. Horovitz, Ph.D., Osagie O. Imasogie, Mitchell D. Kaye, Robert F. Shapiro, Genaera Liquidating Trust, Biotechnology Value Fund, Inc., Ligand Pharmaceuticals, Incorporated, XMark Capital Partners, LLC, Argyce LLC, John A. Skolas, Mark N. Lampert, John L. Higgins, Jack Armstrong, Leanne Kelly, Paul K. Wotton, Robert DeLuccia, David Luci, Steven Rouhandeh, Jeffrey Davis, Mark

Alvino, Dipexium Pharmaceuticals, MacroChem corporation, Griffin Securities, Access Pharmaceuticals and Ohr Pharmaceuticals jointly and severally, and, in support thereof, says:

## INTRODUCTION

1.     This is an action brought on behalf of the public shareholders of Defendant Genaera Corporation ("Genaera" or the "Company") and Unit Holders of Genaera Liquidating Trust (the "Trust") asserting claims, *inter alia*, for breach of fiduciary duty, including the duty of loyalty, against the officers and directors of Genaera, as well as other Defendants named herein in connection with, among other things, the use of a false and misleading proxy statement and illegal vote selling to coerce and otherwise manipulate a shareholder vote in favor of a dissolution of the Company and the self-dealing by Defendants in anticipation of pushing Genaera through a liquidation process that led to the sale of various valuable Genaera assets for considerably less than their value to the Purchaser (defined herein),  Defendants and their affiliated entities and persons.

2.     Genaera's officers and directors, along with other, related Defendant parties, caused loss and damage to stockholders, Unit Holders and the Company itself, and engaged in certain transactions to enrich themselves and affiliates at the expense of the Company's shareholders.

3.     In 2009, Genaera had several valuable assets, including (a) its licensor interest in the Interlukin 9 antibody program for asthma (the "IL9 Program"); (b) a license requiring royalties and milestone payments for Pexiganan, a topical cream for the treatment of patients with mild diabetic foot infections; (c) the MSI 1436 program for obesity and diabetes; and (d) several squalamine antiangiogenic and other aminosterol compounds (the "Aminosterol Assets.") These were all valuable assets in which Genaera had invested large sums of money in their

6

development over the previous decade. Their development was funded in part by equity sales which diluted the common stockholders. Their true value was never reflected on Genaera's financial statements. Moreover, the public and Genaera's non-insider shareholders could not understand their true value at the time of the vote for dissolution because relevant contracts were not disclosed publicly.

4.     Beginning at least as early as 2008, Defendants Biotechnology Value Fund, Inc., SCO Financial Group, XMark Capital Partners, MacroChem, Access Pharmaceuticals, Ligand Pharmaceuticals, Inc. and their principals, including Defendants Steven Rouhandeh, Mitchell D. Kaye, Jeffery Davis, Robert DeLuccia, David P. Luci, and Mark Alvino, began to scheme of a way to obtain Genaera's valuable assets for themselves or their related entities without paying fair value.

5.     As early as 2007, the Defendants identified in the paragraph 4 began to position themselves to be ready to acquire the valuable assets of Genaera after its dissolution for less than their fair value.

6.     After the dissolution of Genaera, its Liquidation Trustee, Defendant Argyce, LLC (under the control of Genaera's former CFO who was previously terminated by the company, Defendant John A. Skolas) sold Genaera's Core Assets to insiders and their affiliates (all of whom are Defendants here) at prices for less than their fair value even considering the dissolution context.

7.     As Defendants knew, the dissolution context provided a false "justification" for the fire sale of Genaera's valuable assets to insiders and their affiliates. Subsequent events have established that, in the aggregate, the Core Assets transferred to insiders and their affiliates were, at the *time of transfer,* far more valuable than the prices paid by insiders and their affiliates.

8.      The insiders at Genaera, named as Defendants herein, aided and abetted by the other Defendants, forced through a plan of liquidation by which Genaera dissolved and formed a Liquidating Trust in order to appropriate the value of Genaera's assets for themselves and, through control and management of the disposition of assets, for the benefit of the insiders' affiliated parties.

9.      As a result of this wrongful course of conduct by Defendants, Genaera's Share Holders, who later became Unit Holders, were deprived of the true value of their stock holdings and unit holdings and a fair share of the value of the Core Assets and their Genaera stock and Trust Units.

## PARTIES

**A.      Plaintiff**

10.     Plaintiff Alan Schmidt is an individual residing in Bondville, Vermont, and a citizen of the State of Vermont, who is a Unit Holder of the Genaera Liquidating Trust and former stockholder of Genaera since at least 2006.  Schmidt is a former investment professional and a high-ranking former employee of Brown Brothers Harriman.  Schmidt throughout the years has held many conversations with Genaera officers and directors concerning the Core Assets, their value and the prospects for their commercial exploitation and/or monetization.  Schmidt has tangible contemporaneous evidence of incriminating statements by certain Defendants regarding the facts and circumstances of the issues in this case.

**B.      Defendants**

11.     **Nominal Defendant Genaera Corporation** ("Genaera") was, until its dissolution in 2009, a company organized under the laws of Delaware with its principal place of business in Plymouth Meeting, Pennsylvania.

8

12.     **Defendant John L. Armstrong, Jr.** was at all times relevant herein a Director of Genaera Corporation.  Defendant Armstrong joined Genaera in October 2003, and became acting CEO in late 2005.  He also served as Genaera's President after January 2006.  He was made a Director in February 2006 and continued in that capacity through the dissolution.

13.     By virtue of his position as an Officer and Director, Armstrong was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

14.     **Defendant Leanne M. Kelly** was Genaera's Senior Vice President, Chief Financial Officer and Secretary at the time of dissolution.  Subsequent to the dissolution, Ms. Kelly became one of only three professionals employed at Argyce LLC.  By virtue of her officership, Kelly owed a fiduciary duty to Genaera and its stockholders.

15.     **Defendant Zola B. Horovitz, Ph.D.** was at all times relevant herein a Director of Genaera Corporation and has been since 1995, through the dissolution.  By virtue of his position as a Director, Horovitz was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

16.     **Defendant Osagie O. Imasogie** was at all times relevant herein a Director of Genaera Corporation and has been since January 2004, through the dissolution.  By virtue of his position as a Director, Imasogie was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

17.     **Defendant Robert F. Shapiro** was at all times relevant herein a Director of Genaera Corporation since September 2007, through the dissolution.  By virtue of his position as

a Director, Shapiro was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

18.     **Defendant Paul K. Wotton, Ph.D**. was at all times relevant herein a Director of Genaera Corporation since June 2008, through the dissolution.  By virtue of his position as a Director, Wooton was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

19.     Defendants Shapiro, Imasogie and Horowitz constituted three of the five so-called "independent directors" of Genaera at the time of dissolution and owned no shares of Genaera common stock at the time of dissolution only options.

20.     So-called "independent director" Horovitz owned no shares and no options of Genaera at the time of the dissolution.

21.     Defendant Armstrong, Jr. held 725,000 options in Genaera but only approximately 65,000 shares of Genaera at the time of dissolution.

22.     Defendants Armstrong, Kelly, Horovitz, Imasogie, Shapiro and Wotton are hereinafter referred to as the "Director Defendants".  The Director Defendants did not own any stock holdings to align their interests with the interests of the stockholders or, in the case of Armstrong and Kelly were conflicted because of the prospect of receiving a large severance payment package upon Genaera's liquidation.

23.     **Defendant Mitchell D. Kaye** was at all times relevant herein a Director of Genaera Corporation since September 2007, through the dissolution.  By virtue of his position as a Director, Kaye was under a continuing duty to, among other things, direct and control the

10

operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.  Further, Defendant Kaye was, at all relevant times herein, one of, if not the largest, individual shareholders of Genaera.  Defendant Kaye also served as the CEO of Defendant XMark Asset Management LLC ("XMark") and XMark Opportunity Partners LLC, a life sciences investment Company with investments in Genaera.

24.    **Defendant Genaera Liquidating Trust** (the "Trust") is the successor in interest to Genaera Corporation as of June 9, 2009, and is organized and existing under the laws of the State of Delaware.

25.    **Defendant Biotechnology Value Fund, Inc.** ("BVF") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Illinois.

26.    **Defendant Ligand Pharmaceuticals, Incorporated** ("Ligand") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in California.

27.    **Defendant XMark Capital Partners, LLC** ("XMark") is a Delaware limited liability company organized and existing under the laws of the of the State of Delaware.

28.    **Defendant Argyce LLC** ("Argyce") is a Delaware Limited Liability Company organized and existing under the laws of the State of Delaware with its principle place of business in Pennsylvania.

29.    **Defendant John A. Skolas** is an individual who is domiciled in New Hope, Pennsylvania and a citizen of the Commonwealth of Pennsylvania.

30.    **Defendant Mark N. Lampert** is a principal of Defendant BVF.

31.    **Defendant John L. Higgins** is the President of Ligand Pharmaceuticals.

11

32.     **Defendant SCO Financial Group, LLC** ("SCO") advertises itself as the life

sciences industry which is based in New York City and was founded in 1997.  Its chairman was

at all relevant times Steve Rouhandeh.  Through its investment arm, SCO Capital Partners, LLC,

invested in Somanta Pharmaceuticals, Inc. ("Somanta".)

33.     **Defendant MacroChem Corporation** is a formerly NASDAQ-listed specialty

pharmaceutical company that used novel drug delivery technologies to develop pharmaceutical

products to treat various medical conditions.

34.     **Defendant Griffin Securities** is an investment banking group located in New

York City.  Defendant Alvino has been since 2007 and is currently a managing director at

Griffin. Griffin provided the sham Fairness Opinion on the merger of Virium Pharmaceuticals,

Inc. ("Virium")  and MacroChem in April 2008 which allowed Rouhandeh and Davis to control

MacroChem and begin to steer Genaera towards dissolution and a distress sale of its valuable

assets.

35.     **Defendant Access Pharmaceuticals Inc.** ("Access") is a company controlled by

certain Defendants herein.

36.     **Defendant Dipexium Pharmaceuticals, LLC** ("Dipexium") was founded in

January 2010 to develop and commercialize its pexiganan acetate cream a treatment for mild

infections of diabetic foot ulcers.  It was co-founded by Defendants Robert J. DeLuccia and

David P. Luci for the expenses and ?? purpose of taking control of Genaera's valuable Pexiganan

assets.

37.     **Defendant David P. Luci** is a co-founder and managing partner of Defendant

Dipexium;  prior thereto he was a member of the Access board and a member of the board of

MacroChem as well as its President and Chief Business Officer.

38.     **Defendant Robert J. DeLuccia** was President and CEO and Chairman of MacroChem. He is a co-founder and managing partner of Dipexium.

39.     **Defendant Jeffrey Davis** is the president of SCO and has been employed there since 1997.  In 2005, Davis became a director of Access and its CEO on December 26, 2007. Davis was a director of MacroChem since 2005.

40.     **Defendants Steven H. Rouhandeh, Mark Alvino** and **Jeffrey Davis** are/were all in executive positions at Access at times relevant to the events in this case.  SCO controls Access by virtue of a Director Designation Agreement.  SCO owns 44% of all voting securities of Access.

41.     Defendant Rouhandeh became a director and Access Board Chairman on March 4, 2008.  Alvino became one of SCO's director designees to Access' board in March 2006. From 2007 until February 2009, he was a director of MacroChem.

## JURISDICTION AND VENUE

42.     The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) and the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d).  The matter in controversy exceeds the sums specified by 28 U.S.C. § 1332, exclusive of interest and costs. The citizenship of Plaintiff and the Defendants is completely diverse.

43.     This Court also has federal question jurisdiction based upon the claims arising under Section 14 of the Securities Exchange Act of 1934.  This Court also has pendant jurisdiction of all non-federal claims because of the relationship between the federal and non-federal claims.

44.     The action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(4)(A) and (B).

45.     This action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(3).

46.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because many of the acts, transactions and conduct constituting violations of law complained of in this Complaint occurred in this District and Defendants are subject to personal jurisdiction in this District.

## CLASS ACTION AND DERIVATIVE ACTION ALLEGATIONS

### A.     Class Claims On Behalf Of Genaera Stockholders

47.     Plaintiff brings the claims described in the First, Fourth, Sixth, Ninth and Tenth Cause of Action individually and on behalf of all other similarly situated former shareholders of Genaera pursuant to Rule 23(a) and (b)(3) of the Fed.R.Civ.P.

48.     The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, Plaintiff is informed and believes that there are hundreds of Class members.

49.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

a.   whether the Proxy through which votes on the dissolution were solicited was materially false and misleading in violation of Section 14(a) of the Exchange Act;

b.   whether the director Defendants, aided and abetted by the other Defendants, breached fiduciary duties owed to Plaintiffs and other shareholders;

c.    whether Plaintiff and the other Class members have been damaged by Defendants' conduct; and

d.   the amount of damages suffered by Plaintiff and the Class.

50.     The claims of the Plaintiff are typical of the claims of the Class because Plaintiff's

claims arise out of the same facts and events and relationships among class members and Genaera and the Genaera Liquidating Trust.

51.     The representative Plaintiff will fairly and adequately protect the interest of the Class.

52.     A Class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**B.     Class Claims On Behalf Of Genaera Liquidating Trust Unit Holders**

53.     Plaintiff brings the claims described in Second and Eighth Causes of Action on behalf of all similarly situated Unit Holders of Genaera Liquidity Trust pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

54.     The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, Plaintiff is informed and believes that there are thousands of Class members.

55.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

      a.   whether Defendants breached their duties to Unit Holders;

      b.   whether the DefendantDefendant Trustee Argyce aided and abetted by the other Defendants, breached fiduciary duties owed to Plaintiff and other Unit Holders;

      c.   whether Plaintiff and the other Class members have been damaged by Defendants' conduct; and

      d.   the amount of damages suffered by Plaintiff and the Class.

56.     The claims of the Plaintiff are typical of the claims of the Class because Plaintiff's claims arise out of the same facts and events and relationships among class members and

Genaera and the Genaera Liquidating Trust.

57.    The representative Plaintiff will fairly and adequately protect the interest of the

Class.

58.    A Class action is superior to other available methods for the fair and efficient

adjudication of the controversy.

**C.    Shareholder And/Or Unit Holder Derivative Claims On Behalf
Of Genaera Corporation And/Or The Genaera Liquidating Trust**

59.    Plaintiff brings the claims described in Third, Fifth and Seventh Counts

derivatively, in the name of and for the benefit of Genaera Corporation and/or its successor

Defendant Genaera Liquidating Trust pursuant to Federal Rule of Civil Procedure 23.1.

60.    Plaintiff has been a shareholder of Genaera continuously from approximately

1998 through June 12, 2009, the date of the dissolution of Genaera.  Thereafter, Plaintiff became

a Unit Holder of the Trust by operation of law.

61.    Plaintiff has not made any demand on the Board of Genaera to institute this

action.  Demand is excused here because the Board has been disbanded.  Demand has not been

made with respect to the Trust.  Demand on the Liquidating Trustee would be futile because it is

incapable of exercising independent judgment.  Plaintiff will adequately and fairly represent the

interests of all unaffiliated shareholders similarly situated in enforcing the right of the

corporation.

62.    This action is not a collusive one to confer jurisdiction on a court of the United

States which it would not otherwise have.

## BACKGROUND

**A.    Factual Background Relating to Genaera and Its Business**

63.    Genaera was a biotechnology company in the business of developing certain

16

pharmaceutical drugs, and held licenses to intellectual property, patents, technology, files of

technical knowledge, materials, and know-how related to the development of certain

pharmaceutical drugs.

64.     Since Genaera's inception, it funded its operations primarily through the proceeds

of public and private placements of securities, through contract and grant revenues, research and

development expense reimbursements, the sale of Pennsylvania research and development tax

credit carry forwards and interest income.

65.     At all times relevant to this action, Genaera has owned the rights to its Core

Assets (previously defined). The Core Assets has the potential to earn high returns for Genaera

and its stockholders.

66.     In communications with Plaintiff, various officers and directors of Genaera

admitted that Genaera's Core Assets were valuable and sought after by other companies.

**B.     XMark and Defendant Kaye Begin to Purchase a Controlling Interest In Genaera**

67.     Defendant Lampert was president of Defendant BVF and a close acquaintance

with Defendant Mitchell Kaye, the Chief Executive Officer of Defendant XMark. Plaintiff was

told by Defendant Skolas that Defendant Lampert had introduced Defendant Kaye to Genaera.

Defendant BVF had been buying and selling large amounts of Genaera stock.  By mid-2003,

BVF had accumulated a large position in Genaera common stock, but sold the majority thereof a

few months later.

68.     In 2007, XMark began accumulating large amounts of Genaera's common stock.

On March 8, 2007, XMark filed a Form 13G that reported it owned 6.2% of Genaera, as of

February 26, 2007, which included warrants.  XMark later reported, in a Form 13D, that, as of

March 16, 2007, it owned 9.7% of Genaera's stock.

During this time, Kaye, XMark's CEO:

    a.   bought warrants in private  transactions;

    b.   knew, or should have known, that he could not exercise the warrants, and could only realize their value, if Genaera were acquired;

    c.   knew, or should have known, that BVF owned warrants exercisable at $3.66 per warrant;

    d.   knew, or should have known, that the $3.66 warrants had no public market, and therefore could only be bought privately; and

    e.   knew, or should have known, that there was a very small number of warrant holders that could have sold warrants to XMark and/or BVF.

69.     Defendant Kaye was an investment partner with Defendant Rouhandeh, Davis and SCO in Somanta Pharmaceuticals, a company whose assets were inflated, which allowed Rouhandeh to eventually merge Somanta with MacroChem and later Access and use that entity to push Genaera into liquidation.

70.     By September 28, 2007, Defendant Kaye's company, XMark, had accumulated 3,687,142 shares, or 21% of Genaera's stock.

71.     On September 28, 2007, Defendant Kaye was elected to Genaera's Board of Directors.  By June 2009, XMark was reported as owning 26.11% of Genaera's stock.

## C.    The Value of the IL9 Program to Genaera

72.     Since at least 2007, one of Genaera's principal assets was its licensor interest in the Interlukin 9 antibody program for asthma (the "IL9 Program"), which was licensed to MedImmune, LLC ("MedImmune"), a wholly-owned subsidiary of AstraZeneca Corporation.

73.     Interlukin 9 ("IL9") is a component of the immune system that is instrumental in

the function of several biological actions that combine to create what is often called the asthmatic cascade. IL9 is primarily secreted by a type of T-cell called "Th2" cells, which are critical components of the immune system. The Th2 cells are widely recognized as a key factor in the asthmatic response. Asthma is a condition notable by inflammation and constriction of the airways, along with bronchial "hyperresponsiveness."

74.     Notably, IL9 is not found in the immune systems of healthy people. The IL9 Program was designed to treat asthma and other respiratory diseases through inhibiting the multifaceted activity of IL9.

75.     In December 2007, according to Genaera's proxy for the June 4, 2008 shareholder's meeting , "an investment firm" had been "identified as a potential purchaser of a portion of [Genaera's] rights to milestone and royalty payments" for the IL9 Program. Upon information and belief, Genaera management proceeded to negotiate the terms of the investment "with input from our Board of Directors".

76.     MedImmune conducted research, with assistance from Genaera, and spent several years developing the optimum antibody for IL9, which has been shown not to have immunogenicity issues. MedImmune also has conducted seven human clinical trials with the new antibody.

77.     Based upon sales projections, Genaera, as licensor, could have received up to $54 million in payments and royalties from MedImmune once the IL9 Program reached certain milestones. By far, the most important provision of Genaera's license agreement with MedImmune was the royalty requirement. Various statements have described that amount to be as "high single digit up to a certain sales level" (level not disclosed), and "low double digits with increased sales." In February 2008, at the Annual BIO CEO and Investor Conference, Defendant

Armstrong, during a slide presentation, stated that the present value of Genaera's IL9 Program was $48 million.  Defendant Armstrong reported that the $48 million assessment was made in the 4th quarter of 2007 by "independent third parties."

78.     In or around March 2008, without any notice or disclosure to the shareholders, Genaera management terminated negotiations to sell a portion of the Company's rights to milestone and royalty payments from the IL9 Program.

79.     On May 1, 2008, during a presentation at the Genaera Annual Meeting, Defendant Armstrong commented on MedImmune's clinical program related to developing the IL9 Program; Armstrong told investors that "we believe firmly that one reason AstraZeneca bought MedImmune was that they think IL9 is significant."  During the same presentation, Defendant Armstrong also told investors that Genaera would be "worth considerably more in 12 months", based in part on the success of the IL9 Program.  Defendant Armstrong told investors and Genaera's Shareholders that Genaera was "highly confident" that MedImmune would reach a positive conclusion related to the IL9 Program and continue its work with the IL9 Program through the end of 2008.

80.     Upon information and belief, Defendant Armstrong was informed about MedImmune's plans for the IL9 Asset because Dr. Michael Gast, Genaera's Chief Medical Officer, was privy to MedImmune's proprietary and confidential information concerning the IL9 program and would share it with Defendant Armstrong.

81.     Accordingly, at the time of the dissolution, Armstrong and the entire Board knew that MedImmune was preparing to continue the Phase II studies that had been on clinical hold.

**D.      The Pexiganan Anti-Infective**

82.     As early as 1999, Genaera, and its predecessor, had developed Pexiganan, an anti-

20

infective topical cream for the treatment of patients with diabetic foot infections.

83.     Pexiganan is a 22-amino acid linear peptide.  It is formulated as a cream and has a novel mechanism of action based on its ability to disrupt the integrity of bacterial cell membranes.  It has antimicrobial activity against Gram positive (methycillin resistant staphylococcus aureus (MRSA)) and Gram negative organisms that commonly infect skin and soft tissue.  It has a low potential for induction of resistance and no cross-resistance with existing therapeutic antibiotics as a consequence of its mechanism of action.  At the time Genaera was developing Pexiganan, no topical antimicrobials were specifically approved by the FDA for the treatment of diabetic foot infection.

84.     According to the Centers for Disease Control and Prevention (CDC), the estimated incidence of diabetes in the U.S. exceeds 1.5 million new cases annually, with an overall prevalence of nearly 24 million people (2008), or more than 7% of the US population.  It is estimated that as many as one in four persons with diabetes will develop a foot ulcer in their lifetime of which about 60% become infected.

85.     Defendants Rouhandeh, SCO, Davis, DeLucia, and Alvino planned, conspired and acted on a plan  to put Rouhandeh, SCO and other Defendants  in a position to gain control of Pexiganan.

86.      In or about April 2007, Access,  then controlled by Rouhandeh, agreed to acquire Defendant Rouhandeh's other company, Somanta Pharmaceuticals, and closed that acquisition on or about January 4, 2008.  In 2005, Kaye and/or XMark provided Rouhandeh's closely held shell company, Somanta Pharmaceuticals, with $1 million in exchange for 46.5% of the Series A convertible preferred stock then being issued by Somanta.

87.     MacroChem merged with Virium a nonpublic, development stage company,

21

controlled by Rouhandeh and SCO on April 18, 2008. That transaction allowed Rouhandeh and SCO to acquire a controlling interest in MacroChem.

88.    Upon information and belief, Defendant Mark J. Alvino, an associate of Defendant Rouhandeh and a Director of MacroChem, and his firm, Defendant Griffin Securities, aided and abetted the breaches herein by providing a sham "Fairness Opinion" in support of MacroChem's acquisition of Virium, stating that, as of the date of the opinion, "the Merger Consideration is fair from a financial point of view."

89.    However, a comparison of key financial data from both companies, including Virium's negative working capital, and MacroChem's positive shareholders' equity, show the Fairness Opinion to be a sham.  The so-called "Fairness Opinion", as will be described below, allowed MacroChem, Defendant Rouhandeh and others to carry out a complex manipulation to the detriment of Genaera and its shareholders and Unit Holders.

90.    Prior to merging with Virium, MacroChem had no involvement with oncology. There was no compatibility of products in development between the companies at the time. MacroChem used novel drug delivery technologies to develop pharmaceutical products to treat various medical conditions.

91.    The MacroChem merger with Virium was implemented for the real purpose of benefiting SCO with MacroChem liquidity instead of using MacroChem funds to advance the commercialization of Pexiganan.  This constituted bad faith by Defendants DeLuccia, Luci, Rouhandeh, Alvino, and Davis towards Genaera with whom it had an agreement to develop Pexiganan.

92.    The MacroChem/Access merger made possible the wrongful sale of the Pexiganan Assets to Dipexium. That merger was accomplished through a Fairness Opinion

which had no reasonable basis because of the wide economic and valuation disparities between Virium (with virtually no assets or business prospects) and MacroChem and was provide by Griffin, controlled by Alvino who had severe conflicts of interest at the time.

93.     At the time of the Virium acquisition by MacroChem, Defendants Alvino and Davis both served on MacroChem's Board of Directors and both were managing directors at SCO.

94.     Defendant Davis was a Virium Director, as well as a MacroChem Director.

95.     In July 2007, Defendant MacroChem announced that it had purchased a 90-day exclusive right to enter into a license agreement with Genaera for Genaera's Pexiganan. MacroChem paid Genaera $250,000 with the execution of the option agreement. The agreement also included a provision that it could be extended for an additional 90 days with payment of another $250,000.

96.     In a press release, MacroChem stated that both Pexiganan and MacroChem's existing product, "Econail", which was in development for treating onychomycosis (fungal infection of the toenails), would be used to treat diseases of the foot predominantly treated by the same prescribing specialists, namely podiatrists. EcoNail was a lacquer which contains the antifungal econazole for treating the toenail fungus onychomycosis topically. Thereafter, on October 3, 2007, MacroChem executed its second option and acquired exclusive worldwide rights for drug uses of Pexiganan. The terms also included payments of approximately $7 million to Genaera upon the achievement of certain clinical and regulatory milestones through approval, sales-based milestones of up to $35 million, and 10% royalty payments on net sales. In addition, MacroChem was to assume all clinical development, manufacturing and regulatory activities for Pexiganan.

97.     From all of MacroChem's actions and statements, it appeared MacroChem had the desire, and financial capacity and belief in the potential of the product to aggressively develop and market the product,  that was what induced Genaera to partner with MacroChem.

98.     If Pexiganan had been developed, Genaera was poised to reap huge monetary benefits under its agreement with MacroChem

99.      Under the terms of the license agreement, the following occurred:

   a.   MacroChem paid Genaera an initial $750,000 of a $1 million fee; the $250,000 balance was subsequently paid on February 1, 2008;

   b.   Along with the rights to Pexiganan, MacroChem received an active NDA, all Genaera research and clinical data, including the "Drug Master File", and a quantity of active peptide material; and

   c.   MacroChem received the rights to all prescription indications for Pexiganan. Genaera retained the rights for products having low concentrations of the active peptide ingredient that can be sold over the counter without prescription for uses such as reducing acne.

100.     In October 2007, MacroChem announced that Michael Zasloff, M.D., Ph.D., had joined the company's Scientific Advisory Board.

101.     Dr. Zasloff had founded Genaera's predecessor Magainin Pharmaceuticals, Inc. ("Magainin") in 1989, and had discovered the peptide that his Magainin scientists modified and developed to become the above-mentioned Pexiganan

102.     Defendant Davis, in a January 7, 2008 press release, falsely stated that the acquisition of Somanta by Access brought "very exciting product candidates and one platform technology in the Access pipeline" .

103.     Defendant Davis had a history of making false and misleading statements as when Davis stated in a January 7, 2008 press release that Somanta Pharmaceuticals had its sodium

24

phenylbutarate ("PB") product "currently in Phase II clinical development." In fact, as disclosed

in subsequent SEC filings, Somanta had stated that it "intended" to initiate Phase II development.

Davis' statements were calculated to boost the prospects for a capital raise by Access, which

succeeded on February 4, 2008 when Access sold 2.725 million shares of preferred stock. Also,

in an 8-K issued six months after the Somanta acquisition, Access revealed that "immediately "

after the acquisition , closed it had written the Somanta assets to zero.

104.    On June 5, 2008, MacroChem issued a press release and announced a presentation

to be made by Dr. Zasloff, its leading Scientific Advisor, at a professional medical symposium in

San Francisco.   Dr. Zasloff's presentation discussed "recent discoveries in innate immunity that

explain the role of antimicrobial peptides in protecting human skin from infection." At the

symposium, Dr. Zasloff stated that "Pexiganan, like other antimicrobial peptides, has a very low

potential for development of antimicrobial resistance a problem associated with conventional

agents and of particular concern in the long term management of the diabetic patient."

105.    The June 5, 2008 press release stated (*inter alia*), "Pexiganan, currently being

developed by MacroChem, has been evaluated in over 1000 diabetic patients and has already

completed two Phase III clinical trials." In the same press release, Defendant Robert DeLuccia,

MacroChem's Chairman, commented "we believe the Pexiganan could fill an important unmet

medical need and provide a significant commercial opportunity for our Company in an

addressable market of millions of diabetic foot infections annually, which translates to a potential

estimated one-half billion dollar market in just the US."

106.    On or about this time, certain Defendants conspired and acted to put themselves in

a position to appropriate and control for themselves the fate of Pexiganan.

107.    MacroChem abruptly reversed course on Pexiganan and, despite all of the

accolades and acclaim, MacroChem spent only $45,110 to further the Pexiganan development in all of 2008.

108.    Upon information and belief, during the same time period, MacroChem diverted approximately $6.8 million for the benefit of Defendant Rouhandeh through the following means, among others:

109.    MacroChem's officers, including Defendants Luci and DeLuccia, acted with bad faith by allowing MacroChem to acquire a company, Virium Pharmaceuticals, which was controlled by Defendant Rouhandeh.  That transaction was facilitated by a fraudulent "Fairness Opinion".

      a.   Some of the MacroChem funds were diverted directly to Rouhandeh.

      b.   Some of the MacroChem funds were used to pay Virium debt, which MacroChem assumed.

      c.   Some of the MacroChem funds were for "fees" and bonuses for associates and friends of Defendant Rouhandeh.

110.    Upon information and belief, Defendant Kaye knew about, and encouraged, MacroChem's actions.

111.    In July 2008, Defendant Access Pharmaceuticals, a biopharmaceutical company specializing in products for cancer and supportive care, announced that it was acquiring MacroChem.  That transaction closed on or around February 25, 2009.

112.    Access' acquisition of MacroChem closed in February 2009. After the acquisition, Access announced, in a SEC filing, that "[t]he MacroChem board of directors did not engage a financial advisor to assist in the sale of MacroChem or to render a financial opinion as to the fairness.  The board of directors also considered the cost of obtaining a fairness opinion

as prohibitively expensive in light of MacroChem's financial condition."

113.   Thereafter, citing limited resources, Access ceased development of MacroChem's dermatology products, including Pexiganan.  The financial data, however, actually shows that MacroChem's cash situation resulted from the fraudulent manipulation by Defendants SCO/Rouhandeh rather than from MacroChem's own development activities (i.e., Pexiganan). MacroChem had no long-term debt on March 31, 2008, but, 18 days later, after the acquisition of Virium, MacroChem was burdened with considerable debt.  Also, some MacroChem liquidity was used to pay down part of the Virium debt.

114.   The Director Defendants knew that Genaera had a right under the agreement with MacroChem to demand the return of the Pexiganan Assets if MacroChem would not develop the drug.  However, in breach of their fiduciary duties, the Director Defendants refused or failed to take any action to protect Genaera's interests and instead steered Genaera into dissolution for their own self-dealing purposes and to aid the self-dealing of other Defendants herein.

**E.   In Anticipation of Dissolution, the Director Defendants Suppress the Value of Genaera's Core Assets By Refusing to protect Those Assets But Genaera Directors Claim They are Trying to Save the Company**

115.   In May 2008, Genaera announced various initiatives it would take to conserve its resources so that it could continue to develop its assets.  Among those initiatives to improve the company's cost structure were reductions in executive base compensations, forfeitures of cash incentives and bonuses to executives, reduction in the workforce, and streamlining of expenditures to focus on program specific needs.

116.   These initiatives were expected to provide Genaera with enough cash on hand to fund its operations through the second quarter of 2009.

117.   These initiatives included the development of MSI 1436 for diabetes and obesity

27

which had already consumed millions and millions of dollars of Genaera's cash without yielding a marketable product. Another core asset was the IL9 asthma antibody (described above)which required only modest legal expense to maintain patents while MedImmune was responsible for all development.  The aminosterol assets, including the antiangiogenic Squalamine; the mucoregulators; and the Pexiganan anti-infective were all valuable but unexploited by Genaera.

118.    The Director Defendants knew that Genaera's two largest shareholders  wanted the Company to be dissolved so the Core Assets would come up for distress sale.

119.    The Director Defendants knew that MedImmune was preparing to restart the Phase II trials for the IL9 Program.

120.    Another important asset of the Company which Defendants deliberately failed to exploit and whose value was destroyed in the dissolution was the Genaera's Net Operating Loss ("NOL").

121.    The proxy also did not mention the idea of monetizing the NOL , which was significant at that time.  Genaera's NOL (as of December 31, 2008) was $206,349,000, which could have saved a purchasing company millions of dollars in taxes they would otherwise have to pay.

122.    Plaintiff previously discussed Genaera's large NOL with Defendant Armstrong; Dr. Gast; Leanne Kelly, Genaera's CFO; and Jennifer Bilotti, a Senior Vice President, because the present value of future tax savings would be of considerable economic value if Genaera were sold entirely to a large pharmaceutical company instead of being only partly sold via a partnership agreement for the various programs.

1.    **Genaera's Board of Directors Approves Genaera's Dissolution
And Effects Same Through A Rigged Shareholder Vote
And A False And Misleading Proxy Statement.**

123.    In or around April 2009, upon information and belief, Genaera's Board of

Directors announced that the prospects of continuing as an ongoing business were not promising

and that dissolution and liquidation would return the greatest value to stockholders as compared

to other available strategic alternatives.

124.    At this time, XMark and BVF were reportedly the largest shareholders of

Genaera.

125.    On April 18, 2009, Genaera's Board of Directors (the "Directors") unanimously

approved a Plan of Dissolution to dispose of all the assets of the company, wind up its affairs,

pay or adequately provide for the payment of all the company liabilities, and distribute to or for

the benefit of its stockholders all of the company assets, including establishing a liquidating trust

to complete the liquidation of the company and recommended that Genaera's stockholders vote

to approve the plan.  Defendant Kaye was absent from the most important meeting in the life of

Genaera.

126.    The Directors sought an expedited approval of the dissolution, so that they could

resign and separate themselves from Genaera as quickly as possible.  By resigning, the Director

Defendants would avoid liability for the sale of Genaera's assets for less than their fair value to

interested conflicted parties.

127.    The Director Defendants breached their fiduciary duties by self-dealing and by

aiding and abetting the self-dealing of other fiduciaries by failing and/ or refusing to terminate

the Pexiganan licensee to Access earlier than October 2009. By at least mid-2008, the Director

Defendants knew that although Access had sufficient funds to develop Pexiganan (until such

funds were dissipated/ misappropriated by its controlling shareholders), Access had no  interest

in developing Pexiganan and that the Access controlling shareholders were intent on allowing the Pexiganan assets to stagnate awaiting the dissolution of Genaera so the assets could be acquired cheaply by the Defendants identified herein.

128.    At the time of the Directors' vote, the Directors knew, and failed to disclose in the Proxy Statement, the following:

a.    The clinical hold status with the MedImmune program for developing the asthma drug under license from Genaera had been voluntarily initiated by MedImmune, that there was no problem with the drug itself, and that active development would resume later in 2009;

b.    That MedImmune was planning an unusually large (and therefore unusually expensive) Phase 2B trial to begin when the clinical hold status ended and development resumed;

c.    That the new Phase 2B trial would be one with an "adaptive design" structure and would transition into a formal phase 3 trial, probably before completing the planned Phase 2B trial;

d.    MedImmune was extremely confident that it would gain approval, which was reflected in the enormous expense of the unusually large scale in the Phase 2B trial (320 subjects instead of the more typical 100 – 150);

e.    That Dr. Gast, Genaera's Chief Medical Officer, was intimately involved with the MedImmune group developing the asthma drug ("MEDI 528"), and actually had participated in discussions with the group regarding the protocol design of the planned Phase 2B study. Upon information and belief, everything that Dr. Gast knew about the MedImmune development activities and its future plans were

communicated to Defendant Armstrong, as well as to the other Directors; and

f.  That Genaera's management, as well as the Directors, held numerous conversations recognizing that the IL9 Asset value could best be preserved for all shareholders by transferring the IL9 Asset to a separate entity, such as a Royalty Trust, that then would distribute future milestone payments and royalties to all shareholders equitably.

g.  That Genaera's macular degeneration product was being eagerly sought by at least two active bidders, including the predecessor to Ohr Pharmaceuticals whose principals were well financed and prepared to commit to the developments to launch of the "Wet MD" product.

h.  That Genaera had the right, but refused to exercise it, to demand the return of the Pexiganan assets since Access would not develop it.; and

i.  That Defendants Legend Kaye, Access, Rouhandeh, Davis, Griffin, Alvino, SCO, Luci , DeLuccia and BVF had all coordinated their efforts to steering Genaera to dissolution so that its Core assets could be acquired cheaply at distress sale prices without the interference  of the Director Defendants who would have been obligated by their fiduciary duties to maximize the value of the Core Assets.

129.    The proxy falsely stated that none of the Genaera officers or directors would profit from the dissolution.

130.    The proxy failed to describe the agreement to which the core assets were subject;

131.    The proxy failed to describe the valuation estimates of the core assets by independent parties.

132.    The April 18th vote was unanimous only among the Directors attending that

meeting. Defendant Kaye did not attend the April 18th meeting, and did not vote with the Directors at that meeting. The Shareholders were never provided with an explanation as to why Defendant Kaye did not attend, even by telephone.

133.    Genaera issued a public announcement, on April 28, 2009, that the Board had recommended that the Company's Shareholders approve a "Plan of Dissolution."

134.    The proxy stated, in relevant part:

> it is not currently anticipated that our liquidation and dissolution will result in any material benefit to any of our executive officers or to directors *who participated in the vote to adopt the Plan of Dissolution.* [emphasis added].

135.    Because Defendant Kaye did not participate in the "vote to adopt the Plan of Dissolution", the material benefits to him of the dissolution process and subsequent asset transfers were not disclosed.

136.    In the proxy prepared for soliciting shareholder support for the Directors' recommendation to approve the liquidation and dissolution of the company, the Directors allowed the proxy to falsely assure shareholders "[s]ales of our assets will be made on such terms *as are approved by the Board of Directors*…" (emphasis added).

137.    The above statement was misleading, and ultimately was proven to be totally false. There was no Board involvement, nor "approval" for the transactions that Defendant Skolas executed on his own initiative.

138.    The proxy failed to adequately and explain that the Trustee who had *already been selected* and it was a person/ firm who had connections to insiders and their affiliates would be allowed to handle the sale of core assets even though his firm, Argyce had only two employees, Defendant Skolas and an administrative assistant or that any shareholder that might vote in favor of the plan would lose his legal standing as a shareholder, or that any shareholder

32

that subsequently accepted distributions made from the Liquidating Trust would be deemed to waive their right to sue for remedial action

139.    On April 29, 2009, the day following the announcement, the stock declined 32.7% on volume 96 times the average volume for the preceding ten days.

140.    On June 4, 2009, Genaera held a special meeting of Stockholders to vote on the Director's recommendation to adopt a Plan of Dissolution.

141.    At that meeting, the Plan of Dissolution was approved by the stockholders with the proxy votes representing a majority of the shares cast in favor of the resolution to approve the plan.

142.    At the time of the meeting, and at some time prior thereto, Genaera's management knew that with the proxy votes received, an affirmative vote was assured.

143.    Defendant Kaye, a Genaera Director and an officer of Genaera's largest shareholder, XMark, had previously indicated he would vote his shares for approval of the transition to a Liquidating Trust.

144.    On at least two occasions, Leanne Kelly, Genaera's CFO, acknowledged to Plaintiff Schmidt that the Board of Directors had enough votes to approve its own recommendation to transition into a Liquidating Trust.  Although Ms. Kelly urged Plaintiff Schmidt to vote his shares in favor of the liquidation, she conceded that the Board already knew that the plan would be approved before the formal meeting.

145.    The very next day, June 5, 2009, after voting to dissolve and liquidate Genaera, XMark sold one-third of its shares of Genaera stock at a price that was inflated more than 162% over the average selling price for the ten preceding trading days.

146.    XMark sold 1,378,732 shares at $0.3095, which was more than 1.6 times the

33

average $0.19095 average of the closing price for the ten preceding days.

147.   The volume of XMark's transaction – 1,378,732 shares – was approximately equal to 21 times the average daily volume calculated from the volume of the ten preceding days.

148.   A major shareholder seeking to sell a sizable block of stock under the circumstances of a corporate liquidation induced by the company's limited cash should have entailed a discount from the $0.19 trading level – not a premium that amounted to an average price 162% over the prevailing trading level.

149.   Upon information and belief, the XMark sale on June 5, 2009 was a prearranged sale to a willing buyer who had agreed to pay XMark a substantial premium for the shares.

150.   Upon information and belief, the sale reported with the Form 4 filing was the result of manipulated and illegal trading activity, which he knew, or should have known about.

151.   On June 12, 2009, Genaera filed Articles of Dissolution with the Delaware Secretary of State.  All the Company's assets and liabilities were transferred to the Genaera Liquidating Trust (the "Liquidating Trust").

152.   Argyce LLC was named Trustee of the Genaera Liquidating Trust effective upon the filing of Genaera's Certificate of Dissolution.  Under Delaware law, the Trust became the successor in interest to the Company's contractual and regulatory obligations.

### 2.   Formation of the Genaera Liquidating Trust

153.   Simultaneous with the dissolution, Genaera transitioned from a fully functioning company to a Liquidating Trust naming John Skolas, through his company, Argyce LLC, as the Trustee of the Genaera Liquidating Trust.

154.   Defendant John A. Skolas, who previously served as Genaera's Chief Financial Officer, Secretary and General Counsel, executed the Agreement as President of Argyce LLC.

34

155.    Defendant Skolas and his company, Argyce, were selected as the Trustee by Genaera's Board despite a troubled past in business, including being terminated from Genaera in April 2007 by Defendant Jack Armstrong and having been an individual Defendant in a securities class action suit. *See In re Musicmaker.com Securities Litigation*, Civ. A. Mo. 002018 (C.D. Cal.). This earlier suit was settled in October 2002 in favor of the Plaintiffs in that litigation.

156.    Thus, approximately two years after being fired from his role as the company's CFO by Genaera's CEO was rehired by that same Board to serve as Trustee of the company's assets.

157.    Pursuant to Delaware statute, the Trust became the successor in interest to Genaera following its dissolution.

158.    The Trust was created to dispose of all the assets of Genaera, and to wind up Genaera's affairs, pay or adequately provide for the payment of all of its liabilities and distribute to or for the benefit of its Unit Holders all of Genaera's assets.

159.    Upon the effective date of the Trust Agreement, all outstanding shares of the Genaera's common stock were automatically deemed cancelled.

160.    In accordance with the Trust provisions, each Genaera stockholder became the owner of one unit of beneficial interest in the Trust for each share of Genaera common stock then held of record by the stockholder.

161.    Defendant Skolas, as Trustee of the Liquidating Trust, participated in multiple frauds that wrongfully converted valuable assets of Genaera.

162.    For example, Defendant Skolas sold assets for prices far below their worth, and absent any royalty provisions.

163.     Those wrongful conversions replaced existing agreements that required royalty payments that should have accrued to the benefit of Genaera shareholders and would have provided shareholders with substantial cash flow if the Trustee had instead sought arrangements to continue that agreement.

164.     By not establishing a royalty trust for the benefit of shareholders prior to the creation of the Liquidating Trust, or by providing for any other structure in the Plan of Dissolution, the Directors' actions conflicted with the statements in the proxy.

165.     The Directors created a situation where Defendant Skolas could wrongfully give away an enormously valuable asset by selling it outright, free of royalty requirements.  In so doing, Defendant Skolas replaced an existing license with MedImmune that had royalty provisions that could have had royalty provisions and substantial value to Genaera shareholders; instead, he created a substitute agreement with a sale that actually provided economic benefits to a major Genaera shareholder to the great harm to all of the other shareholders.

166.     The Directors breached their fiduciary obligations to all shareholders by creating such a deal or arrangement.

## F.     The Fraudulent And Self-Dealing Sale of the IL9 Program

167.     Defendant Skolas and the Board of Directors created the Liquidating Trust mechanism in 2009 so that the IL9 Asset could be sold to BVF in a preferential deal in a way that the Directors never could have done.

168.     In its Annual Report for the year ended December 31, 2008, Astra Zeneca described Genaera's IL9 program as one of the  five  "in the pipeline" respiratory studies it highlighted that it was conducting out of a  total of 22 compounds in the respiratory therapy area that it was testing/ developing.

36

1.     **Ligand Pharmaceutical Purchases IL9 Asset at Nominal Price**

169.    Following Genaera's dissolution, Defendant Skolas, as Trustee, was responsible for selling the remaining Genaera assets, including the IL9 asset, for the benefit of *all* the Unit Holders, without specifically favoring one or more of the Unit Holders to the detriment of the others.

170.    Jennifer Bilotti, a Senior Vice President at Genaera, told Plaintiff Schmidt, in a March 2009 telephone conversation, that the IL9 Program could be "put into a shell company for which the shareholders would still get benefit from that when it reaches the market and royalties are received."

171.    Moreover, on May 27, 2009, Defendant Leanne M. Kelly, the Chief Financial Officer of Genaera, and later a principal of Argyce, told Plaintiff Schmidt that the Trust could hold the IL9 Program and distribute royalties to shareholders.

172.    Under the Trust provisions, the Trustee had three years from the date the Trust was created to sell Genaera assets and possible further extensions beyond that three year period.

173.    In October 2009, Medimmune acting under the agreements with Genaera, commenced a new 320- subject Phase IIb study. As a result, according to Argyce's November 2009 executive summary, " the potential launch date is further away but more credibly stated" Argyce unfairly favored insiders Ligand and BVF as bidders by opining that " the trust believes the probability adjusted net present value [ of Genaera's license interest  ] is now a .... fraction of earlier valuation of [ 33 to 43 million] ."

174.    Argyce's valuation had no reasonable basis given the independent market valuations of minimum product sales of .5 billion up to 3-4 billion per year.

175.    The IL9 Asset constituted a significant asset in Genaera's drug development portfolio and could realize an   increase in value in the hands of a new buyer with a modest

expense of money and management resources.

176.    On May 18, 2010, Defendant Skolas executed a Purchase and Sale agreement with Defendant Ligand P, for the IL9 Asset in its entirety.

177.    Ligand purchased the IL9 Asset for $2.75 million, which is a fraction of the value previously given to it by Genaera's management and an unconscionably low amount of money. Ligand then sold a half interest in IL9 to BVF.  Importantly, the conspirators, Ligand and Skolas, kept BVF unidentified, and BVF was not mentioned or cited in any way in the purchase agreement.

178.    Indeed, Defendant Skolas had previously stated to Plaintiff Schmidt, among other things, that

   a.    the IL9 Asset "ha[s] blockbuster potential, $3 to $4 billion peak year sales";

   b.    in referring to the prospect of selling a portion of the IL9 rights, Defendant Skolas claimed that it offered "outsized return potential relative to risk"; and

   c.    "I would like to do something meaningful with the IL-9 program".

179.    By selling the IL9 Asset for such a low price:

   a.    Defendant Skolas ignored the repeated recognition by management and Directors that the fair thing to do for the benefit of **_all_** shareholders was to place the IL9 Asset in a royalty trust or some similar continuing entity that can distribute future milestone payments and royalties equitably to Genaera shareholders.

   b.    Defendant Skolas also ignored the significant increase in the IL9 program's value identified by the several updates MedImmune posted on the website, www.clinicaltrials.gov, during March and April 2010.

180.    At the time, the MEDI-528 program had recently come off its clinical hold and

Medimmune began new Phase II studies.  The sale of Ligand was orchestrated by BVF as was, presumably, the subsequent sale of half intent to BVF.  Thus BVF accomplished indirectly what it could not do directly because of actual conflicts of interest – purchase an interest in the IL-9 antibody program.

181.    The purchase by Ligand in May 2010 included the assignment to Ligand of the collaboration and License Agreement between Medimmune (now a subsidiary of Astra Zeneca) and Genaera in 2011.

182.    Ligand and BVF acted together to secure the IL9 Asset with high confidence in the IL9 Asset would be commercial successful.

183.    Upon information and belief, that knowledge was conveyed to Ligand and BVF by Defendant Kaye, which was *information improperly appropriated from Genaera.*

184.    This information was used as the basis for the conspiracy and fraud of the Defendants working in concert with Trustee Skolas that culminated in his transferring a valuable asset for less than 5% of its actual worth.

185.    Defendant Skolas breached his duty to the Trust Unit Holders not to consummate **any** transaction prematurely.

186.    Genaera's stockholders never were given a copy of the Trust Agreement, and were not informed as to critical provisions in that agreement about their voting for the Directors' recommendation.  Nor were they informed about accepting distributions from the Trustee when they were asked to approve the Directors' recommendation to transition to a Liquidating Trust.

187.    The proxy for the June 4, 2009 stockholders meeting and the Trust Agreement both allow for a three-year period for monetizing the Genaera assets.   Further, the Trust Agreement provides for possible extensions beyond the three-year period.

188.    By selling the IL9 Asset to Ligand (and, upon information and belief, setting it up for BVF), plus "certain of its affiliates", *just eleven months after* the Trust's establishment, Defendant Skolas misled and prevented all shareholders from receiving a share of the milestone payment that MedImmune was required to make with the formal start of a Phase 3 trial.

189.    The Purchase and Sale Agreement with Ligand strategically concealed the involvement of BVF, Genaera's second largest shareholder.  This was not an "oversight" because BVF was jointly participating as a partner with Ligand and because its partnership interest was approximately equal to that of Ligand.

## 2.    Ligand and BVF Conceal BVF's Involvement in the IL9 Sale

190.    Until August 2009, BVF, at that time Genaera's second largest stockholder, owned more than 15% ownership in Ligand common stock.

191.    Only 13 days after Genaera's assets and liabilities were transferred to the Genaera Liquidating Trust, BVF cut back on its Ligand position, and sold Ligand stock on four of five business days beginning on June 26, 2009.  BVF began its transition away from being a Ligand insider just 13 days after the Genaera Liquidating Trust was established.

192.    This reduction in stock was made in a key position that BVF had carefully accumulated six months earlier with an active buying campaign where it bought Ligand stock on twenty straight trading days from November 7, 2008 through December 5, 2008, and then added to that position in late January 2009.

193.    BVF stopped selling Ligand common stock when its position declined to a reported 9.99% of the Ligand outstanding common shares of stock.

194.    By cutting its position to just slightly under 10%, BVF evaded status as a *Ligand insider*, which clearly was in anticipation of the arrangement BVF was promoting for the

purchase of the Genaera's IL9 asset by using Ligand as a front for a 50/50 partnership with itself.

195.    Upon information and belief Defendant Skolas participated in the concealment that obscured the involvement that BVF has in the transaction.  In reality, BVF had a 50% direct interest in milestone payments and royalties, and BVF provided half the $2.75 million purchase price.

196.    BVF and Ligand could not have used the sham of their 50/50 joint venture being an arms-length deal as BVF was still an insider.

197.    BVF actually stood to gain more than **50%** of the economic benefit of this fraudulent transaction because it also owned almost 10% of *Ligand's* shares.

198.    Relative to the expected value of prospective royalties on several billion dollar sales, the $2.75 million purchase price was a *de minimis* amount

199.    Defendants Skolas (Trustee) and Lampert (President, BVF) conspired to transfer an asset of enormous value from Genaera's Unit Holders and to bestow a disproportionate benefit to BVF, Genaera's second largest shareholder.

200.    Moreover, Defendants Skolas and Lampert affected a fraudulent transfer from the Liquidating Trust to Ligand for a price that was insignificant relative to the value of the asset.

201.    Upon information and belief, Defendant Kaye (Genaera Director) provided Defendant Lambert (President, BVF) with advice and information that was appropriated from Genaera to facilitate this fraudulent transaction.

202.    The most compelling inference is that Defendant Skolas knowingly and willingly wanted to sell the IL9 Asset to the Ligand-BVF "partnership", even though he was fully aware that Ligand and BVF were partners.

G.    **The Self- Dealing Terms of the Sale of Pexiganan.**

203.    Pexiganan was a drug whose enormous potential was recognized by the director Defendants as well as the other Defendants.

204.    The Director Defendants knew or should have known the Center for Disease Control; and protection estimated that there were more than 24 million diabetics in the United States with 1.5 million new cases annually. One in four diabetics develops foot ulcers and 60% become infected.  Extrapolating from these statistics, the market for diabetic foot ulcer treatment is approximately 3.6 million diabetics with another 240,000 additional foot ulcer patients added each year. Director Defendants also knew that Genaera held a fully paid up license for Pexiganan which with extensions would not expire until late 2019 at the earliest and 2012 at the latest.

205.    Director Defendants also knew that only one new Phase III study was required to reach product launch and knew that time to launch was estimated as three years after funding and knew that total development funding from start to launch was estimated to be only $5 million to $7.5 million; director Defendants also knew that Pexiganan sales potential for Genaera was estimated to exceed $100 million annually with some estimates as high as $500 million per year.

206.    On January 11, 2010, the Trustee made it first public announcement of a solicitation for the IL9 program assets and the Pexiganan Assets. In the announcement, the Trustee set a February 12, 2010 deadline for bids. The trustee knew that the announcement and bidding procedures and deadlines would favor the Defendants named herein who were already intimately familiar with the Pexiganan asserts and their potential. In 2010, Defendant Skolas terminated the Pexiganan licensing agreement between Access and MacroChem and the Liquidating Trust so that MacroChem's insiders could acquire those same Pexiganan rights from the Trust on behalf of their new company, Dipexium. Outside potential bidders were at a disadvantage because critical information about the Pexiganan and IL9 assets was non-public.

42

Thus, outside bidders had only one moth from date of announcement to request, receive and review sign and return the Confidential Disclosure Agreement ("CDA") required by the Trustee. Then, the potential bidder would have to await receipt of the "confidential information package", review same, analyze the information, do a pharmacological and regulatory compliance and valuation analysis to determine the feasibility of the assets and their potential worth and thereafter devise a bidding strategy and submit a bid.

207.    Defendants DeLuccia and Luci are the co-founders of Defendant Dipexium, which, upon information and belief, was formed to acquire the rights to Pexiganan, for a pittance, and free of the royalty and milestone payment obligations that were part of the MacroChem licensing agreement.

208.    Although Defendant Skolas was administering the Trust under the pretense of safeguarding the interests of Unit Holders, he was actually working with insiders at other companies to get them a better deal in violation of his duties as the Liquidating Trustee.

209.    The rights acquired by Dipexium, as compared to the rights granted to MacroChem, are not limited to high concentrations of the active peptide for prescription indications, and evidently also include lower concentrations that can be used with a non-prescription over the counter product for acne, which more than doubles the available market compared with the original MacroChem license.

210.    Dipexium acquired the rights for a minor purchase price and free of the original 10% royalties and milestone payment obligations. Although the Pexiganan Asset was sold in 2010, the buyers were allowed by the conflicted Trustee to extend payment until early 2011.

211.    In selling the rights to Dipexium, the Trust stated that "it seeks to divest or otherwise monetize all its rights to Pexiganan…" The Trustee knew that Access had no intention

of initiating Phase III for Pexiganan and understood also that Access was acting in bad faith by

trying to sell the Pexiganan license it had received from Genaera rather than develop the product

as it was obliged to do under the license.

212.   Access and its directors acted in bad faith by refusing to surrender the Pexiganan

license to Genaera until 2010 when Defendants Luci, De Luccia and Dipexium were prepared to

acquire it from the Liquidating Trust.

213.   Soon after this transaction, the Dipexium website touted the arrangement with the

Trust as follows:

> With limited resource required to complete clinical development,
> [Dipexium] management believes Pexiganan has peak year sales potential
> of hundreds of millions of dollars in the U.S. and separately in the EU. . . .
>
> Dipexium believes it can leverage a modest amount of capital into a
> multifold financial return in a relatively short timeframe. . .
>
> With Pexiganan, several value-creating milestones have *already* been
> achieved internally and by our predecessors and several near-term value-
> inflection points exist on what we believe is a relatively short pathway to
> approval for an early-stage company.

214.   Approximately 90 days after Dipexium bought the Pexiganan Assets form the

Trust it was able to raise 1.07 million in funding and 90 days later it raised another 1.4 million .

215.   The ease with which Dipexium raised financing for completing the development

of Dipexium demonstrates that the Trustee and the Director Defendants breached their fiduciary

duties of loyalty to the Trust and Genaera respectively by failing to properly care for the assets.

216.   Defendant Skolas sold Pexiganan, a valuable asset, to Dipexium, a company

formed by Defendants Luci and DeLuccia solely for this purpose, free of the royalty and

milestone payment obligations owed to Genaera and the Unit Holders by MacroChem.

217.   Defendant Skolas cooperated with Defendants DeLuccia and Luci so that they

could replace MacroChem's license, limited to certain indications and having specified royalty

44

and milestone payment obligations, with an asset without any limitations, and free of all royalty and milestone payment obligations.

**H.**     **The Trust Sells The Aminosterol  Assets For Less Than Fair Value**

218.     On July 8, 2009, only *26 days after the Liquidating Trust was established*, Skolas accepted a $50,000 down payment for an agreement to sell another package of Genaera's assets (the "Aminosterol Assets") for an unacceptable $200,000 price that failed to reflect the asset's true value or the price that would have been obtained had  a legitimate sale been conducted.

219.     The Trustee did not make any public announcement of bidding for the Aminosterol Assets. Nor does it appear as if any objective appraisal of the asset was performed.

220.     On or about August 12, 2009, the Trustee publicly reported that the Aminosterol assets inventory had been sold for a nominal sum in May 2009. The Trustee described that prospective buyers had "expressed serious interest in the intellectual property remaining material and other assets associated with The Aminosterol Assets… albeit at liquidation prices" The Trustee failed to make any effort to market the Aminosterol Assets .

221.     Upon information and belief, the buyer, BBM Holdings, Inc. ("BBM Holdings"), had arranged for financing for the purchase *even before the formal vote* for the Plan of Dissolution.  As a non-operating shell company, BBM Holdings had no need and no use for funds, except for purchasing rights to assets.

222.     BBM Holdings' actions demonstrate advance planning with an understanding by those empowered to disperse Genaera's assets *before a formal vote*.  BBM Holdings, the buyer, had reason to be confident in completing its anticipated purchase when it arranged the financing on June 3, 2009  – *the day before* the stockholders' meeting, to formally approve the Directors' recommendation.

223.    Upon information and belief, BBM Holdings was a non-operating company, which had no recognizable use for the funds raised other than for the purchase of Genaera's Aminosterol Assets.

224.    Ohr's (the successor to BBM) complicity in the fiduciary breaches resulting in the sale of the Aminosterol Assets for less than their true value is demonstrated by its capital raising efforts in June 2009 even before the dissolution was voted or effected. It would not have been commercially reasonable for Ohr to commit to financing without assurances that Ohr was going to win the sale of the assets.

225.    Upon information and belief, Argyce and Skolas had the opportunity to sell the assets for a price higher than Ohr had agreed to pay according to the July 8, 2009 term sheet. But, in breach of their fiduciary duties, Argyce and Skolas bound the Trust prematurely to an agreement with Ohr in the Teem Sheet as a pretext to rebuff higher offer or to take the time to market the asset properly. Had Argyce and Skolas allowed the higher offer to emerge it would have raised the prices for all the other assets for sale.

226.    Ohr Pharmaceuticals acquired the Squalamine and Trodusquemine from the then dissolved Genaera in August 2009.  The Squalamine products are both: Phase 2 of FDA testing and approval process as of May 2012 with the Squalamine eye drops for wet age-related macular degeneration being guaranteed USFDA Fast Track Status.

227.    Ohr was organized on August 4, 2009 as a successor to BBM Holdings Inc.

228.    Ohr paid $200,000 cash for Squalamine, Trodsquemine and related compounds.

229.    The value of these assets is borne out by the fact that the Squalamine- based "Wet Age-Related Macular Degeneration" eye drops which Ohr purchased as part of the $200,000 asked of Genaera assets has been given "Fast-Track Status" by the FDA.

46

230.    In a May 2012 investor presentation, Ohr estimated a potential patient population of 1,750,000 U.S. patients with 200,000 new cases annually.  As a comparison, the current market leader Intravitreal Lucentis, is realizing worldwide revenues of $3.5 billion annually with only a 35% market share according to Ohr's estimates.

231.    These assets were conveyed to Ohr in a process tainted by self-dealing, fiduciary breaches and fraud.  Ohr knew or should have known of such breaches and fraud and self-dealing and is liable therefore as an active participant and an aider and abettor.

232.    The sale clearly was premature relative to the time available to secure a fair price.

233.    Defendant Skolas deliberately encumbered himself from negotiating with another prospective buyer for more favorable terms with almost three years remaining for affecting a sale, and the fact that the sale was to a buyer not able or qualified to conduct any pharmaceutical development are evidence that this was a prearranged transaction.

234.    Upon information and belief, Ohr's management acknowledged that the company had "stolen" the Aminosterol Assets from the Liquidating Trust.

235.    Taken together, the fraudulent sale of the Aminosterol Assets, and the subsequent preferential sale of the IL9 Asset that also was the subject of early advanced planning, define a pattern of fraud and deceit by Defendant Skolas and other conspirators.

I.      **Argyce Enriched Itself Through Excessive Fees and Expenses Charged To The Trust**

236.    In 2011, Argyce publicly issued unaudited financial statements for the year ended December 31, 2010. In those financial statements the Trust reported without explanation or footnote or itemization that its "General And Administrative " expenses were $687,000.00 which was nearly one quarter of the $3.028 million in revenues realized by the Trust that year.  It was reported that 2010 revenues consisted of $2.75 million for the sale of the IL9 assets and the

Pexiganan assets. Thus it appears that Pexiganan was sold for approximately $252,000 .

### FIRST CAUSE OF ACTION

**(On Behalf Of The Stockholder Class Against The Director And
Officer Defendants For Breach Of Fiduciary Duties And Against
All Other Defendants For Aiding And Abetting Thereof)**

237.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

238.     The Director and Officer Defendants at all relevant times owed fiduciary duties of due care, candor and loyalty to Genaera and its shareholders.

239.     As directors and officers of a Delaware corporation, each of the Director Defendants owed and owes fiduciary duties to Genaera and its shareholders.  Moreover, as members of the Board, these Defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles. Pursuant to these duties, the Director Defendants specifically owed and owe Genaera the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the duties of candor, good faith, due care and loyalty.

240.     The Director and Officer Defendants breached said duties through their acts and omissions as set forth above.

241.     The actions and decisions of the Director and Officers Defendants are not protected by the business judgment rule for the reasons that the Director and Officer Defendants decisions were not (1) the product of informed judgment; (2) free from domination by a self-interested controlling shareholder or group thereof; (3) made with a good faith belief that the actions and decisions were in the best interests of the Genaera and its shareholders; and (4) the Director and Officer Defendants were motivated by conflicting self-interests.

242.   The transactions which are the subject of this cause of action were not the product of either fair price or fair process and thus the transaction do not pass the "entire fairness" test applicable under Delaware law.

243.   The Defendants other than the Director and Officer Defendants knew of the breaches of fiduciary duty of the Director and Officer Defendants and knowingly and willingly contributed to, and participated and aided and abetted such breach.

244.   As a result of the foregoing, Plaintiff and the Class have been damaged in the amount of losses sustained and in the amount of Defendants' profits from the transactions.

## SECOND CAUSE OF ACTION

**(On Behalf Of The Unitholder Class Against Defendant Skolas And Argyce For Breach Of Duties Of Trustee Under Common Law And The Applicable Trust Agreement And Against The Non Officer And Director Defendants For Aiding And Abetting Thereof)**

245.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

246.   Skolas and Argyce as trustees of the Liquidity Trust owed fiduciary duties to the Liquidity Trust and Unit Holders.

247.   Skolas and Argyce violated their fiduciary duties by failing to fully inform themselves of the true value of the assets of Genaera, and by failing to ensure that all dispositions of assets were made at arms-length with the singular goal of maximizing the value of the Trust assets and by aiding and abetting the self-dealing of other Defendants as described herein.

248.   As a result of the foregoing, Skolas and Argyce have breached their fiduciary duties and have caused loss and damage and diminution of value to the Trust and Unit Holders.

## THIRD CAUSE OF ACTION

**(On Behalf Of Nominal Defendant Genaera For Waste Of Corporate Assets Against All Officers And Director Defendants And All Other Defendants For Aiding And Abetting Thereof)**

249.     Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

250.     As directors and officers of a Delaware corporation, each of the Director Defendants owed and owes fiduciary duties to Genaera and its shareholders.  Moreover, as members of the Board, these Defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles.  Pursuant to these duties, the Director Defendants specifically owed and owe Genaera the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the duties of candor, good faith, due care and loyalty.

251.     Each of the Director and Officer Defendants consciously violated these duties. The Director Defendants had a duty to act in good faith and not knowingly violate the law.

252.     The action of the Director and Officer Defendants in approving the transactions described herein constituted a waste of corporate assets which are incapable of shareholder, company or trustee ratifications.

253.     The Director Defendants consciously violated their corporate responsibilities and fiduciary duties.

254.     As a direct and proximate result of the Director Officer Defendants' conscious failure to perform their fiduciary obligations, the Share Holders sustained significant damages.

## FOURTH CAUSE OF ACTION

**(On Behalf Of Genaera Stockholders As Of The Record Date Of The June 4, 2009
Shareholder Vote Against Defendant XMark And Kaye For Illegal Vote Selling)**

255.    Plaintiff repeats and realleges each and every allegation of set forth above as if fully set forth herein.

256.    Defendants XMark and Kaye voted their shares in favor of the dissolution on or before June 4, 2009.

257.    On June 5, 2009 or thereafter, Defendant XMark and Kaye sold a material amount of the outstanding shares of Genaera, in a pre-arranged sale at a premium to the recent 10 day average seller price of Genaera stock.

258.    Upon information and belief, Defendants XMark and Kaye sold their vote in exchange for the aforementioned premium purchase of their shares.

259.    The sale of votes constitutes a violation of Delaware law.

260.    As a result of the vote sale, the Dissolution was approved and subsequently, Genaera's assets were sold for a fraction of their recognized value.

261.    The dissolution and subsequent sale of assets caused loss and damage to Plaintiff and the shareholder class.

262.    As a result of the foregoing, Plaintiff and the shareholder Class suffered loss and damage in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION

**(On Behalf Of Genaera Against Defendant XMark And Kaye For Illegal Vote Selling
And For A Declaration That The Shareholder Vote On The Dissolution Be Voided)**

263.    Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

264.    Defendants XMark and Kaye voted their shares in favor of the dissolution on or before June 4, 2009.

265.    On June 5, 2009 or thereafter, Defendant XMark and Kaye sold a material amount of the outstanding shares of Genaera, in a pre-arranged sale at a premium to the recent 10 day average seller price of Genaera stock.

266.    Upon information and belief, Defendants XMark and Kaye sold their vote in exchange for the aforementioned premium purchase of their shares.

267.    The sale of votes constitutes a violation of Delaware law.

268.    As a result of the vote sale, the Dissolution was approved and subsequently, Genaera's assets were sold for a fraction of their recognized value.

The illegal vote selling scheme requires the vote of approval of the dissolution be voided and nullified.

As a result of the foregoing, Plaintiff and the shareholder Class suffered loss and damage in an amount to be determined at trial.

### SIXTH CAUSE OF ACTION

**(On Behalf Of Plaintiff And The Shareholder Class Against
Defendant XMark And Kaye For Illegal Vote Selling And For A
Declaration That The Shareholder Vote On The Dissolution Be Voided)**

269.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

270.    Defendants XMark and Kaye voted their shares in favor of the dissolution on or before June 4, 2009.

271.    On June 5, 2009 or thereafter, Defendant XMark and Kaye sold a material amount of the outstanding shares of Genaera, in a pre-arranged sale at a premium to the recent 10 day

average seller price of Genaera stock.

272.    Upon information and belief, Defendants XMark and Kaye sold their vote in exchange for the aforementioned premium purchase of their shares.

273.    The sale of votes constitutes a violation of Delaware law.

274.    The "sold" votes are tainted and should be nullified.

275.    The dissolution would not have been approved by a majority of untainted voting shares.

276.    As a result of the vote sale, the Dissolution was approved and subsequently, Genaera's assets were sold for a fraction of their recognized value.

277.    The illegal vote selling scheme requires the vote of approval of the dissolution be voided and nullified.

278.    As a result of the foregoing, Plaintiff and the shareholder Class are entitled to a declaration of this Court that the vote of June 4, 2009, in its entirety is null and void.

## SEVENTH CAUSE OF ACTION

### (On Behalf Of Genaera And/Or The Genaera Liquidating Trust For Disgorgement Of Insider Trading Profits Realized By XMark And/Or Kaye In Connection With Their 2009 Sale Of Genaera Securities)

279.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

280.    On or about June 5, 2009 a prearranged sale of Genaera stock was consummated and it resulted in XMark and Kaye receiving a premium price for the Genaera stock.

281.    The prearranged sale was agreed and consummated while XMark and Kaye were in possession of material non-public information.

282.    As a result of the foregoing, XMark and Kaye profited from their

53

misappropriations of insider information and any profits therefrom are the property of Genaera and if the dissolution vote is not nullified, the Liquidating Trust.

283.    XMark's and Kaye's use of confidential material information was a misappropriation of insider information.  All profits generated in connection with such misappropriation belong to Genaera or the Liquidating Trust and must be disgorged either to Genaera or the Liquidating Trust.

## EIGHTH CAUSE OF ACTION

### (On Behalf Of Genaera Against All Director Defendants For Violation Of Section 14(A) Of The Securities Exchange Act Of 1934)

284.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

285.    This claim is brought by Plaintiff derivatively on behalf of nominal Defendant Genaera and on behalf of the shareholder class pursuant to Section 14(a) of the Securities Exchange Act of 1934.

286.    On or about May 14, 2009, the director Defendants caused Genaera to file a materially false and misleading proxy statement in connection with a vote of stockholders meeting of stockholders scheduled for June 4, 2009 which recommended that shareholders approve the dissolution of Genaera.

287.    The dissolution was approved by Genaera stockholders as a result of the false and misleading proxy statement used to solicit Plaintiff's and other stockholders' vote in favor of the dissolution.

288.    The proxy statement was materially false and misleading by virtue of its failure to disclose all material facts necessary for stockholders to make a fully informed, uncoerced vote on dissolution.

289.   If Genaera stockholders not affiliated with any Defendants had been informed of the material undisclosed information, they would not have voted to approve the dissolution.

290.   Genaera has been damaged by the violation of Section 14(a) alleged in this claim for relief.

291.   The Director Defendants are the cause of such damage and are liable for all loss and damage and any benefits they received from the dissolution should be returned to Genaera or the Liquidating Trust.

## NINTH CAUSE OF ACTION

**(Against Defendants Kaye, XMark And BVF For Breach Of Fiduciary Duties Owed By Majority/Controlling Shareholders To Plaintiff And Members Of The Shareholder Class And For Aiding And Abetting Thereof By All Other Defendants)**

292.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

293.   At relevant times Defendants XMark, Kaye and BVF were acting in concert and as a group pursuant to Section 13 of the Securities Exchange Act.

294.   Defendants XMark, Kaye and BVF fraudulently failed to make the filings required under SEC regulations for shareholders acting as a "group" who collectively own more than 10% of the outstanding common stock of a company such as Genaera which was registered as a reporting company with the SEC until it was dissolved.

295.   Defendants XMark, Kaye and BVF were at all relevant times the majority and/or controlling shareholders of Genaera and as such owed fiduciary duties to the Plaintiff and shareholder Class members, as minority shareholders.

296.   Xmark, Kaye and BVF breached their fiduciary duties by abusing their positions of control to their personal advantage to the exclusion of, and out the expense of, the minority

shareholders and Genaera.

297.    Xmark, Kaye and BVF were aided and abetted by the other Defendants who knew that these Defendants were majority/controlling shareholders of Genaera and were, through the actions described herein, breaching their fiduciary duties.  The other Defendants, knowingly aided and abetted the breach of fiduciary duties.

298.    As a result of the foregoing, Plaintiff and stockholders Class and Genaera have suffered loss and damage in an amount to be determined at trial.

## TENTH CAUSE OF ACTION

### (Against all Defendants For Punitive Damages)

299.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

300.    Plaintiff also alleges that each act described above and/or anyone of them individually and/or any combination of them constituted individual and/or collective acts of willful, intentional, reckless, and wanton acts against Plaintiff and stockholders Class.

301.    For these reasons, Defendants should be held liable and punished for their willful, intentional, reckless, and wanton acts.

302.    As a result of the foregoing, Plaintiff and stockholders Class and Genaera have suffered loss and demand punitive damages in an amount which will appropriately penalize Defendants for their intentional, reckless, willful, and wanton acts.

## ELEVENTH CAUSE OF ACTION

### (Against Ohr Pharmaceuticals LLC For Rescission Of The Sale Of Genaera's Aminosterol Assets To Ohr)

303.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

304.    As a result of the conduct of the Defendants herein, Ohr's purchase of the Aminosterol Assets was the product of unlawful actions on the parts of both the buyers and sellers.

305.    Such wrongful conduct by the buyer includes the knowing aiding and abetting of other Defendants' fraud, self-dealing and Defendants' breach of fiduciary duty owed to Genaera and/or the Liquidating Trust and the active participation in the self-dealing, fraud and fiduciary breaches.

306.    The wrongful conduct by the seller, Argyce, LLC and Skolas, purportedly acting on behalf of the Liquidating Trust was the knowing participation and facilitation of other Defendants' fiduciary breaches, fraud and self-dealing and the active malfeasance of Argyce and Skolas in intentionally failing to conduit a free and open auction for the Aminosterol Assets.

307.    As a result of the foregoing, the  Aminosterol Assets  sale must be rescinded and returned to the Liquidating Trust and all of Dipexium's rights, title and interest in Aminosterol Assets should be voided.

308.    Plaintiff seeks an accounting from Dipexium.

### TWELFTH CAUSE OF ACTION
#### (Against Dipexium Pharmaceuticals LLC For Rescission Of The Sale Of Genaera's Pexiganan Assets To Dipexium)

309.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

310.    As a result of the conduct of the Defendants herein, Dipexium's purchase of the Pexiganan Assets was the product of unlawful actions on the parts of both the buyers and sellers.

311.    Such wrongful conduct by the buyer (Dipexium) includes the knowing aiding and abetting of other Defendants fraud, self-dealing and Defendants' breach of fiduciary duty owed

to Genaera and/or the Liquidating Trust and the active participation in the self-dealing, fraud and fiduciary breaches by the executives of Dipexium, *i.e.* Defendants DeLuccia and Luci.

312.    The wrongful conduct by the seller, Argyce, LLC and Skolas, purportedly acting on behalf of the Liquidation Trust was the knowing participation and facilitation of other Defendants' fiduciary breaches, fraud and self-dealing and the active malfeasance of Argyce and Skolas in intentionally failing to conduct a free and open auction for the Aminosterol Assets.

313.    As a result of the foregoing, the Aminosterol sale to Ohr must be rescinded and the assets  returned to the Liquidating Trust and all of Ohr's rights, title and interest in the Aminosterol assets should be voided.

314.    Plaintiff seeks an accounting from Ohr.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alan W. Schmidt, in his representative capacities, prays for judgment as follows:

A.    That this action be certified as a Class action on behalf of the proposed Classes defined in this Complaint;

B.    That the named Plaintiff be designated as the representative of the Class, and that named counsel be designated as Class counsel;

C.    That Plaintiff and the Class have judgment against Defendants on the Causes of Action asserted on their behalf and that they recover all allowable damages from Defendants under each applicable case of action, with interest thereon;

D.    That Genaera and/or the Liquidity Trust have judgment against the Defendants on their causes of Actions asserted on their behalf;

58

E.  That Genaera have judgment against the Defendants on the causes of action asserted on its behalf;

F.  That Plaintiff, the Classes and the Liquidating Trust and/or Genaera be awarded punitive damages in an amount of at least $1,000,000,000.00 (One Billion Dollars);

G.  That all Defendants be required to disgorge to the Liquidating Trust any distribution they received from the Liquidating Trust and that all Defendants' claims to the assets of the Liquidating Trust be subordinated to the claims of the non-Defendant Unit Holders;

H.  That the sales of the Dipexium and Aminosterol assets be rescinded;

I.  That the cost of this action be taxed to Defendants;

J.  Awarding Plaintiff and their counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

K.  Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands a trial by jury as to all issues to triable.

**SHELLER, P.C.**

Dated: 12/19/10

Stephen A. Sheller, Esquire
Brian J. McCormick, Jr., Esquire
1528 Walnut Street, Floor 4
Philadelphia, PA 19102
Tel.: (215) 790-7300
Fax: (215) 546-0942
sasheller@sheller.com
bjmccormick@sheller.com

**SQUITIERI & FEARON, LLP**
Lee Squitieri
Garry T. Stevens, Jr.
32 East 57th Street
New York, New York 10022
Tel:  (212) 421-6492
Fax: (212) 421-6553
lee@sfclasslaw.com
garrytstevens@gmail.com

Attorneys for Plaintiffs