## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ALAN SCHMIDT, on behalf of himself and in a representative capacity on behalf of all others similarly situated and derivatively on behalf Genaera Corporation and on behalf of the Genaera Liquidating Trust, | Case No. 2:12-cv-03265-BMS |
| Plaintiff, | |
| -against- | **JURY TRIAL DEMANDED** |
| LEANNE KELLY<br>c/o Argyce, LLC<br>12 Lenape Ave.<br>New Hope, PA 18938 | |
| and | |
| ZOLA B. HOROVITZ, Ph.D.<br>6468 Enclave Way<br>Boca Raton, FL 33496 | |
| and | |
| JOHN L. ARMSTRONG, JR.<br>c/o Genaera Corporation<br>5110 Campus Drive<br>Plymouth Meeting, PA 19462 | |
| OSAGIE O. IMASOGIE<br>Phoenix IP Ventures<br>One Crescent Dr., Suite 400<br>Philadelphia, PA 19112 | |
| and | |
| MITCHELL D. KAYE<br>XMark Capital Partners, LLC<br>301 Tresser Boulevard, Suite 1320<br>Stamford, CT 06901 | |
| and | |

ROBERT F. SHAPIRO
Klingenstein, Fields
787 Seventh Ave, 6th Floor
New York, NY 10019-6016

  and

PAUL K. WOTTON
c/o Genaera Corporation
5110 Campus Drive
Plymouth Meeting, PA 19462

  and

ROBERT DELUCCIA
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

  and

DAVID LUCI
Dipexium Pharmaceuticals
22 Camelot Court
White Plains, NY 10603

  and

STEVE ROUHANDEH
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

  and

JEFFREY DAVIS
SCO Financial Group
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

  and

MARK ALVINO
c/o Griffin Securities LLC
18 State Street, 3rd Floor
New York, NY 10004

and

BIOTECHNOLOGY VALUE FUND, LP and
BIOTECHNOLOGY VALUE FUND II, L.P.
and BVF INC.
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

and

LIGAND PHARMACEUTICALS, INC.
11085 N. Torrey Pines Road
LaJolla, CA 92037

and

XMARK CAPITAL PARTNERS, LLC;
XMARK OPPORTUNITY FUNDS, L.P.,
XMARK OPPORTUNITY FUND LTD.
XMARK JV INVESTMENT PARTNERS
LLC, XMARK OPPORTUNITY PARTHERS,
LLC
301 Tresser Boulevard, Suite 1320
Stamford, CT 06901

and

ARGYCE LLC
12 Lenape Ave.
New Hope, PA 18938

and

SCO FINANCIAL GROUP
1325 Avenue of the Americas, 27th Floor
New York, NY 10019

and

3

JOHN A. SKOLAS
12 Lenape Ave.
New Hope, PA 18938

     and

DIPEXIUM PHARMACEUTICALS, LLC and
DIPEXIUM PHARMACEUTICALS, INC.
22 Camelot Court
White Plains, NY 10603

     and

MACROCHEM CORPORATION
116 Village Boulevard
Suite 200
Princeton, NJ 08540

     and

ACCESS PHARMACEUTICALS INC.
2600 Stemmons Freeway
Suite 176
Dallas, TX 75207-2107

     and

MARK N. LAMPERT
900 N. Michigan Ave., Suite 1100
Chicago, IL 60611

     and

JOHN L. HIGGINS
Ligand Pharmaceuticals
11085 N. Torrey Pines Road
LaJolla, CA 92037

                Defendants,

     and

GENAERA CORPORATION
5110 Campus Drive
Plymouth Meeting, PA 19462

     and

GENAERA LIQUIDATING TRUST
c/o ARGYCE LLC
P.O. Box 299
New Hope, PA 18938

       Nominal Defendants.

**SECOND AMENDED VERIFIED CLASS ACTION AND SHAREHOLDER
DERIVATIVE COMPLAINT FOR DAMAGES
<u>AND RESCISSION OF SALES OF ASSETS TO OHR AND DIPEXIUM</u>**

Plaintiff Alan Schmidt, on behalf of himself and (i) all other Shareholders of Nominal
Defendant Genaera Corporation; (ii) all other Unit Holders of Nominal Defendant Genaera
Liquidating Trust ("GLT"); and (iii) derivatively on behalf of Genaera Liquidating Trust by
and through his undersigned counsel, brings this civil action against Defendants John L.
Armstrong, Jr., Zola B. Horovitz, Ph.D., Osagie O. Imasogie, Mitchell D. Kaye, Robert F.
Shapiro, Biotechnology Value Fund, L.P., Biotechnology Value Fund II, L.P., BVF Inc.,
Ligand Pharmaceuticals, Incorporated, XMark Capital Partners, LLC, Argyce LLC, John A.
Skolas, Mark N. Lampert, John L. Higgins, Jack Armstrong, Leanne Kelly, Paul K. Wotton,
Robert DeLuccia, David Luci, Steven Rouhandeh, Jeffrey Davis, Mark Alvino, Dipexium
Pharmaceuticals, MacroChem corporation, and Access Pharmaceuticals jointly and
severally, and, in support thereof, says:

<u>**INTRODUCTION**</u>

1.     This is a class and derivative action brought on behalf of both the Genaera
Liquidity Trust and the public shareholders of Defendant Genaera Corporation ("Genaera" or

the "Company") and Unit Holders of Genaera Liquidating Trust  (the "Trust") asserting claims, *inter alia,* for breach of fiduciary  duty, including the duty of loyalty, against the officers and directors of Genaera, as well as other Defendants named herein in connection with, among other things, the use of a false and misleading proxy statement and illegal vote selling to coerce and otherwise manipulate a shareholder vote in favor of a needless and destructive dissolution of the Company and the self-dealing by Defendants in anticipation  of pushing Genaera through a liquidation process that led to the sale of various valuable Genaera assets for considerably less than their value to the Purchaser Defendants (defined herein), and their affiliated  entities  and persons.

2.     Genaera's officers and directors, along with other, related Defendant parties, caused loss and damage to stockholders and Unit Holders and the Company and Liquidating Trust itself, and engaged in certain transactions to enrich themselves and affiliates at the expense of the Company's shareholders.

3.     In 2009, Genaera had several valuable assets, including (a) its licensor interest in the Interlukin 9 antibody program for asthma (the "IL9 Program"); (b) its interest in rights to exploit a license requiring Pexiganan, a topical cream for the treatment of patients with mild diabetic foot infections; (c) the MSI 1436 program for obesity and diabetes; and (d) several squalamine antiangiogenic and other amino sterol compounds (the "Amino sterol Assets") (collectively the "Core Assets").  These were all valuable assets in which Genaera had invested large sums of money in their development over the previous decade.  Their development was funded in part by equity sales which diluted the common stockholders. Their true value was never reflected on Genaera's financial statements.  Moreover, the public

and Genaera's non-insider shareholders could not understand their true value at the time of

the vote for dissolution because relevant contracts were not disclosed publicly.

4.      Defendants the Biotechnology Value Funds, SCO Financial Group, XMark

Capital Partners, MacroChem, Access Pharmaceuticals, Ligand Pharmaceuticals, Inc. and

their principals, including Defendants Steven Rouhandeh, Mitchell  D. Kaye, Jeffery Davis,

Robert DeLuccia, David P. Luci, and Mark Alvino, began to scheme of a way to obtain

Genaera's valuable assets for themselves  or their related entities without  paying fair value.

5.      As early as 2007, the Defendants identified  in the paragraph 4 began to

position themselves to be ready to acquire the valuable assets of Genaera after its dissolution

for less than their fair value.

6.      After the dissolution of Genaera, its Liquidation Trustee, Defendant Argyce,

LLC (under the control of Genaera's former CFO who was previously terminated by the

company, Defendant John A. Skolas) sold Genaera's Core Assets at prices for less than their

fair value even considering the dissolution context.

7.      As Defendants knew, the dissolution context provided  a false "justification"

for the fire sale of Genaera's valuable assets to insiders and their affiliates.  Subsequent

events have established that, in the aggregate, the Core Assets transferred to insiders and their

affiliates were, at the *time of transfer,* far more valuable than the prices paid by insiders and

their affiliates.

8.      The insiders at Genaera, named as Defendants herein, aided and abetted by the

other Defendants, forced through a plan of liquidation by which Genaera dissolved and

formed a Liquidating Trust in order to appropriate the value of Genaera's assets for

themselves and, through control and management of the disposition of assets, for the benefit

of the insiders' affiliated parties.

9.      As a result of this wrongful course of conduct by Defendants, Genaera's

Shareholders, who later became Unit Holders, were deprived  of the true value of their stock

holdings and unit holdings and a fair share of the value of the Core Assets and their Genaera

stock and Trust Units.

## PARTIES

### A.    Plaintiff

10.     Plaintiff Alan Schmidt is an individual residing in Bondville, Vermont, and a

citizen of the State of Vermont, who is a Unit Holder of the Genaera Liquidating Trust and

former stockholder of Genaera since at least 2006.  Schmidt is a former investment

professional and a high-ranking former employee of Brown Brothers Harriman.  Schmidt

throughout the years has held many conversations with Genaera officers and directors

concerning the Core Assets, their value and the prospects for their commercial exploitation

and/or monetization. Schmidt has tangible contemporaneous evidence of incriminating

statements by certain Defendants regarding the facts and circumstances of the issues in this

case.

### B.    Nominal Defendants

11.     **Nominal Defendant Genaera  Corporation** ("Genaera") was, until its

dissolution in 2009, a company organized under the laws of Delaware with its principal place

of business in Plymouth Meeting, Pennsylvania.

8

12.     **Defendant Genaera Liquidating Trust** (the "Trust") is the successor in interest to Genaera Corporation as of June 9, 2009, and is organized and existing under the laws of the State of Delaware.

13.     **Defendant John L. Armstrong, Jr.** was at all times relevant herein a Director of Genaera Corporation. Defendant Armstrong joined Genaera in October 2003, and became acting CEO in late 2005.  He also served as Genaera's President after January 2006. He was made a Director in February 2006 and continued in that capacity through the dissolution.

14.     By virtue of his position as an Officer and Director, Armstrong was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

15.     **Defendant Leanne M. Kelly** was Genaera's Senior Vice President, Chief Financial Officer and Secretary at the time of dissolution.  Subsequent to the dissolution, Ms. Kelly became one of only three professionals employed at Argyce LLC.  By virtue of her officership, Kelly owed a fiduciary duty to Genaera and its stockholders.

16.     **Defendant Zola B. Horovitz, Ph.D.** was at all times relevant herein a Director of Genaera Corporation and has been since 1995, through the dissolution.  By virtue of his position as a Director, Horovitz was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

17.     **Defendant Osagie O. Imasogie** was at all times relevant herein a Director of Genaera Corporation and has been since January 2004, through the dissolution.  By virtue of his position as a Director, Imasogie was under a continuing duty to, among other things,

9

direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

18.     **Defendant  Robert F. Shapiro** was at all times relevant herein a Director of Genaera Corporation since September 2007, through the dissolution.  By virtue of his position as a Director, Shapiro was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate  operations.

19.     **Defendant Paul K. Wotton, Ph.D.** was at all times relevant herein a Director of Genaera Corporation since June 2008, through the dissolution.  By virtue of his position as a Director, Wooton was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.

20.     Defendants Shapiro, Imasogie and Horowitz constituted three of the five so-called "independent directors" of Genaera at the time of dissolution and owned no shares of Genaera common stock at the time of dissolution, only options.

21.     So-called "independent director" Horovitz owned no shares and no options of Genaera at the time of the dissolution.

22.     Defendant Armstrong, Jr. held 725,000 options in Genaera but only approximately 65,000 shares of Genaera at the time of dissolution.

23.     Defendants Armstrong, Kelly, Horovitz, Imasogie, Shapiro and Wotton are hereinafter referred to as the "Director Defendants".  The Director  Defendants did not own any stock holdings to align their interests with the interests of the stockholders or, in the case

of Armstrong and Kelly, were conflicted because of the prospect of receiving a large severance payment package upon Genaera's liquidation.

24.     **Defendant Mitchell D. Kaye** was at all times relevant  herein a Director of Genaera Corporation since September 2007 through the dissolution.  By virtue of his position as a Director, Kaye was under a continuing duty to, among other things, direct and control the operations of Genaera, to exercise due care and diligence in those operations and to oversee and review all corporate operations.  Further, Defendant Kaye was, at all relevant times herein, one of, if not the largest, individual shareholders of Genaera through his ownership and control of the XMark entities named herein and XMark Opportunity Partners LLC, a life sciences investment  Company with investments in Genaera.  Currently Defendant Kaye is Managing Director of BVF Partners, L.P.

25.     **Defendant Biotechnology Value Fund, L.P. and Biotechnology Value Fund II, L.P.,** are limited partnerships organized and existing under the laws of the State of Delaware with their principal places of business in Chicago, Illinois and San Francisco, California respectively.  Defendant BVF Inc. collectively with the limited partnerships above ("BVF"), is a Delaware corporation with its principal place of business in San Francisco, California.  BVF owed Genaera stock at all relevant times and post-dissolution purchased a 50% ownership interest in the IL9 asset.

26.     **Defendant Mark N. Lampert** is a principal of Defendant BVF.

27.     **Defendant Ligand Pharmaceuticals, Incorporated** ("Ligand") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in California.

28.     **Defendant John L. Higgins** is the President of Ligand Pharmaceuticals.

11

29.     **Defendant XMark Capital Partners, LLC** ("XMark") is a Delaware limited liability company organized and existing under the laws of the of the State of Delaware. XMark Capital is the managing member of XMark Opportunity Partners LLC which is the investment manager of Xmark Opportunity Fund L.P. and XMark Opportunity Fund Ltd. and XMark JV Investment Partners, LLC.

30.     **Defendant Argyce LLC** ("Argyce") is a Delaware Limited Liability Company organized and existing under the laws of the State of Delaware with its principle place of business in Pennsylvania.

31.     **Defendant John A. Skolas** is an individual who is domiciled in New Hope, Pennsylvania and a citizen of the Commonwealth of Pennsylvania.

32.     **Defendant SCO Financial Group, LLC** ("SCO") advertises itself as an investment company specializing as life sciences industry which is based in New York City and was founded in 1997.  Its chairman was at all relevant times Steve Rouhandeh. Through its investment arm, SCO Capital Partners, LLC, invested in Somanta Pharmaceuticals, Inc. ("Somanta").

33.     **Defendant MacroChem Corporation** is a formerly NASDAQ-listed specialty pharmaceutical company that used novel drug delivery technologies to develop pharmaceutical products to treat various medical conditions.

34.     **Defendant Access Pharmaceuticals Inc.** ("Access") is a company controlled by certain Defendants herein.  SCO controls Access by virtue of a Director Designation Agreement.  SCO owns 44% of all voting securities of Access.

35.     **Defendants Dipexium Pharmaceuticals, LLC and Dipexium Pharmaceuticals, Inc.** ("Dipexium") were founded in January 2010 to develop and

commercialize their pexiganan acetate cream – a treatment for mild infections of diabetic foot ulcers.  They were co-founded by Defendants Robert J. DeLuccia and David P. Luci for the express purpose of taking control of Genaera's valuable Pexiganan assets.  On March 18, 2014, Dipexium completed an initial public offering of 275 million shares of common stock raising over $35 million.

36.    **Defendant David P. Luci** is a co-founder and managing partner of Defendant Dipexium; prior thereto he was a member of the Access board and a member of the board of MacroChem as well as its President and Chief Business Officer.

37.    **Defendant Robert J. DeLuccia** was President and CEO and Chairman of MacroChem. He is a co-founder and managing partner of Dipexium.

38.    **Defendant Jeffrey Davis** is the president of SCO and has been employed there since 1997.  In 2005, Davis became a director of Access and its CEO on December 26, 2007.  Davis was a director of MacroChem since 2005 and a director of Virium.

39.    **Defendants Steven H. Rouhandeh, Mark Alvino** and **Jeffrey Davis** are/were all in executive positions at Access at times relevant to the events in this case.

40.    Defendant Rouhandeh became a director and Access Board Chairman on March 4, 2008.  Alvino became one of SCO's director designees to Access' board in March 2006. From 2007 until February 2009, he was a director of MacroChem.

## JURISDICTION AND VENUE

41.    The Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1332(a) and the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d).  The matter in controversy exceeds the sums specified by 28 U.S.C. § 1332, exclusive of interest and costs. The citizenship of Plaintiff and the Defendants is completely diverse.

13

42.     The action does not satisfy the exemptions to jurisdiction found in 28 U.S.C. § 1332(d)(4)(A) and (B).

43.     This action does not satisfy the exemptions  to jurisdiction found in 28 U.S.C. § 1332(d)(3).

44.     Venue is proper in this district pursuant to 28 U.S.C. §1391(b) because many of the acts, transactions and conduct constituting violations of law complained of in this Complaint occurred in this District and Defendants are subject to personal jurisdiction in this District.

## CLASS ACTION AND DERIVATIVE ACTION ALLEGATIONS

**A.     Class Claims On Behalf  Of Genaera Stockholders**

45.     Plaintiff brings the claims described herein individually and on behalf of all other similarly situated former shareholders of Genaera pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure.

46.     The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, Plaintiff is informed and believes that there are hundreds of Class members.

47.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

a. whether the director Defendants, aided and abetted by the other
   Defendants, breached fiduciary duties owed to Plaintiffs and other
   shareholders;

b. whether Plaintiff and the other Class members have been damaged by
   Defendants' conduct; and

14

c. the amount of damages suffered by Plaintiff and the Class.

48.     Plaintiff's claims are typical of the claims of the Class because Plaintiff's claims arise out of the same facts and events and relationships among class members, Genaera, and the Genaera Liquidating Trust.

49.     The representative Plaintiff will fairly and adequately protect the interests of the Class.

50.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**B.**     **Class Claims On Behalf Of Genaera Liquidating Trust Unit Holders**

51.     Plaintiff brings the claims described herein on behalf of all similarly situated Unit Holders of Genaera Liquidity Trust pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure.

52.     The persons in the Class are so numerous that joinder of all members is impracticable.  Although the precise number of such persons is unknown, Plaintiff is informed and believes that there are thousands of Class members.

53.     There are questions of law and fact common to the Class that predominate over any questions affecting only individual members, including:

a. whether Defendants breached their duties to Unit Holders;

b. whether the Defendant Trustee Argyce aided and abetted by the other Defendants, breached fiduciary duties owed to Plaintiff and other Unit Holders;

c. whether Plaintiff and the other Class members have been damaged by Defendants' conduct; and

15

d. the amount of damages suffered by Plaintiff and the Class.

54.     The claims of the Plaintiff are typical of the claims of the Class because Plaintiff's claims arise out of the same facts and events and relationships among class members, Genaera, and the Genaera Liquidating Trust.

55.     The representative Plaintiff will fairly and adequately protect the interests of the Class.

56.     A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**C.    Shareholder And/Or Unit Holder Derivative Claims On Behalf Of Genaera Corporation And/Or The Genaera Liquidating Trust**

57.     Plaintiff brings the claims described herein derivatively, in the name of and for the benefit of Genaera Corporation and/or its successor Defendant Genaera Liquidating Trust pursuant to Federal Rule of Civil Procedure 23.1.

58.     Plaintiff has been a shareholder of Genaera continuously from approximately 1998 through June 12, 2009, the date of the dissolution of Genaera. Thereafter, Plaintiff became a Unit Holder of the Trust by operation of law and construes to be a Unitholder.

59.     Plaintiff has not made any demand on the Board of Genaera to institute this action. Demand is excused here because the Board has been disbanded. Demand has not been made with respect to the Trust because the Trust is under the sole control of the Trustee and its CEO, both of whom are named here as Defendants as wrongdoers. Demand on the Liquidating Trustee would be futile because it is incapable of exercising independent judgment on the question of whether to sue himself. Plaintiff will adequately and fairly

represent the interests of all unaffiliated shareholders similarly situated in enforcing the right of the corporation.

60.     This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

## BACKGROUND

### A.     Factual Background Relating To Genaera And Its Business

61.     Genaera was a biotechnology company in the business of developing certain pharmaceutical drugs, and held licenses to intellectual property, patents, technology, files of technical knowledge, materials, and know-how related to the development of certain pharmaceutical drugs.

62.     Since Genaera's inception, it funded its operations primarily through the proceeds of public and private placements of securities, through contract and grant revenues, research and development expense reimbursements, the sale of Pennsylvania research and development tax credit carry forwards and interest income.

63.     At all times relevant to this action, Genaera has owned the rights to its Core Assets (previously defined).  The Core Assets have the potential to earn high returns for Genaera and its stockholders.

64.     In communications with Plaintiff, various officers and directors of Genaera admitted  that Genaera's Core Assets were valuable and sought after by other companies.

### B.     XMark and Defendant Kaye Begin to Purchase a Controlling Interest In Genaera

65.     Defendant Lampert was president of Defendant BVF and a close acquaintance with Defendant Mitchell Kaye, the Chief Executive Officer of Defendant XMark.  Plaintiff

was told by Defendant Skolas that Defendant Lampert had introduced Defendant Kaye to Genaera.  Defendant BVF had been buying and selling large amounts of Genaera stock.  By mid-2003, BVF had accumulated a large position in Genaera common stock, but sold the majority thereof a few months later.

66.     In 2007, XMark began accumulating large amounts of Genaera's common stock.  On March 8, 2007, XMark filed a Form 13G that reported it owned 6.2% of Genaera, as of February 26, 2007, which included warrants.  XMark later reported, in a Form 13D, that, as of March 16, 2007, it owned 9.7% of Genaera's stock.

During this time, Kaye, XMark's CEO:

    a.  bought warrants  in private transactions;

    b.  knew, or should have known, that he could not exercise the warrants, and could only realize their value, if Genaera  were acquired;

    c.  knew, or should have known, that BVF owned warrants exercisable at $3.66 per warrant;

    d.  knew, or should have known, that the $3.66 warrants had no public market, and therefore could only be bought privately; and

    e.  knew, or should have known, that there was a very small number of warrant holders that could have sold warrants to XMark and/or BVF.

67.     Defendant Kaye was an investment partner with Defendant Rouhandeh, Davis and SCO in Somanta Pharmaceuticals ("Somanta").  Somanta was a company with inflated assets which allowed Rouhandeh to eventually merge Virium with MacroChem and Access acquire Somanta.  The merged Access and Macro Chem used that entity to push Genaera into liquidation.

68.     By September 28, 2007, Defendant Kaye's company, XMark, had accumulated 3,687,142 shares, or 21% of Genaera's stock.

69.     On September 28, 2007, Defendant Kaye was elected to Genaera's Board of Directors.  By June 2009, XMark was reported as owning 26.11% of Genaera's stock.

## C.     The Value of the IL9 Program to Genaera

70.     Since at least 2007, one of Genaera's principal assets was its licensor interest in the Interlukin 9 antibody program for asthma (the "IL9 Program"), which was licensed to MedImmune, LLC ("MedImmune"), a wholly-owned subsidiary of AstraZeneca Corporation.

71.     Interlukin 9 ("IL9") is a component of the immune system that is instrumental in the function  of several biological actions that combine to create what is often called the asthmatic cascade.  IL9 is primarily secreted by a type of T-cell called "Th2" cells, which are critical components of the immune system.  The Th2 cells are widely recognized as a key factor in the asthmatic response.  Asthma is a condition notable by inflammation and constriction of the airways, along with bronchial "hyperresponsiveness."

72.     Notably, IL9 is not found in the immune systems of healthy people.  The IL9 Program was designed to treat asthma and other respiratory  diseases through inhibiting the multifaceted activity of IL9.

73.     In December 2007, according to Genaera's proxy for the June 4, 2009 shareholder's meeting, "an investment firm" had been "identified as a potential purchaser of a portion of [Genaera's] rights to milestone and royalty payments" for the IL9 Program.  Upon information and belief, Genaera management proceeded to negotiate the terms of the investment "with input from our Board  of Directors".

74.     MedImmune conducted  research, with assistance from Genaera, and spent

several years developing the optimum antibody for IL9, which has been shown not to have

immunogenicity issues.  MedImmune also has conducted seven human clinical trials with the

new antibody.

75.     Based upon sales projections, Genaera, as licensor, could have received up to

$54 million in payments plus royalties from MedImmune once the IL9 Program reached

certain milestones.  By far, the most important provision of Genaera's license agreement with

MedImmune was the royalty requirement.  Various statements have described that amount to

be as "high single digit up to a certain sales level" (level not disclosed), and "low double

digits with increased sales."  In February  2008, at the Annual  BIO CEO and Investor

Conference, Defendant Armstrong, during a slide presentation, stated that the present value

of Genaera's IL9 Program was $48 million.  Defendant Armstrong reported that the $48

million assessment was made in the 4th quarter of 2007 by "independent third parties."

76.     In or around March 2008, without any notice or disclosure to the shareholders,

Genaera management terminated negotiations to sell a portion of the Company's rights to

milestone and royalty payments from the IL9 Program.

77.     On May 1, 2008, during a presentation at the Genaera Annual Meeting,

Defendant Armstrong commented on MedImmune's clinical program related to developing

the IL9 Program; Armstrong told investors that "we believe  firmly that one reason

AstraZeneca bought MedImmune was that they think IL9 is significant."  During the same

presentation, Defendant Armstrong also told investors that Genaera would be "worth

considerably more in 12 months", based in part on the success of the IL9 Program.

Defendant Armstrong told investors  and Genaera's Shareholders that Genaera was "highly

20

confident" that Medlmmune would reach a positive conclusion related to the IL9 Program and continue its work with the IL9 Program through the end of 2008.

78.     Upon information and belief, Defendant Armstrong was informed about MedImmune's plans for the IL9 Asset because Dr. Michael Gast, Genaera's Chief Medical Officer, was involved in the study design and protocol, was privy to MedImmune's proprietary and confidential information concerning the IL9 program, and would share it with Defendant Armstrong.

79.     Accordingly, at the time of the dissolution, Armstrong and the entire Board knew that Medlmmune was preparing to continue the Phase II studies that had been on clinical hold.

**D.     The Pexiganan Anti-Infective**

80.     As early as 1999, Genaera, and its predecessor, had developed Pexiganan, an anti-infective topical cream for the treatment of patients with diabetic foot infections.

81.     Pexiganan is a 22-amino acid linear peptide.  It is formulated as a cream and has a novel mechanism of action based on its ability to disrupt the integrity of bacterial cell membranes.  It has antimicrobial activity against Gram positive (methycillin resistant staphylococcus aureus (MRSA)) and Gram negative organisms that commonly infect skin and soft tissue.  It has a low potential for induction of resistance and no cross-resistance with existing therapeutic antibiotics as a consequence of its mechanism of action.  At the time Genaera was developing Pexiganan, no topical antimicrobials were specifically approved by the FDA for the treatment of diabetic foot infections.

82.     According to the Centers for Disease Control and Prevention (CDC), the estimated incidence of diabetes in the U.S. exceeds l.5 million new cases annually, with an

overall prevalence of nearly 24 million people (2008), or more than 7% of the US population. It is estimated that as many as one in four persons with diabetes will develop a foot ulcer in their lifetime of which about 60% become infected.

83.     Defendants Rouhandeh, SCO, Davis, DeLucia, and Alvino planned, conspired and acted on a plan to put Rouhandeh, SCO and other Defendants in a position to gain control of Pexiganan.

84.     In July 2007, Defendant MacroChem announced that it had purchased a 90-day exclusive right to enter into a license agreement with Genaera for Genaera's Pexiganan limited to prescription indications.  MacroChem paid Genaera $250,000 with the execution of the option agreement.  The agreement also included  a provision that it could be extended for an additional 90 days with payment of another $250,000.

85.     In a press release, MacroChem stated that both Pexiganan and MacroChem's existing product, "Econail", which was in development for treating onychomycosis (fungal infection of the toenails), would be used to treat diseases of the foot predominantly treated by the same prescribing specialists, namely podiatrists. EcoNail was a lacquer which contains the antifungal econazole for treating the toenail fungus onychomycosis topically.  Thereafter, on October 3, 2007, MacroChem executed its second option and acquired exclusive worldwide rights for drug uses of Pexiganan.  The terms also included payments of approximately $7 million to Genaera upon the achievement of certain clinical and regulatory milestones through approval, sales-based milestones of up to $35 million, and 10% royalty payments on net sales.  In addition, MacroChem was to assume all clinical development, manufacturing and regulatory activities for Pexiganan.

86.     From all of MacroChem's actions and statements, it appeared MacroChem had the desire, and financial capacity and belief in the potential of the product to aggressively develop and market the product, that was what induced Genaera to partner with MacroChem.

87.     If Pexiganan had been developed, Genaera was poised to reap huge monetary benefits under its agreement with MacroChem.

88.     Under the terms of the license agreement, the following occurred:

   a.   MacroChem paid Genaera an initial $750,000 of a $1 million fee; the $250,000 balance was subsequently paid on February 1, 2008;

   b.   Along with the rights to Pexiganan, MacroChem received an active NDA, all Genaera research and clinical data, including the "Drug Master File", and a quantity of active peptide material; and

   c.   MacroChem received the rights to all prescription indications for Pexiganan.  Genaera retained the rights for products having low concentrations of the active peptide ingredient that can be sold over the counter without prescription for uses such as reducing acne.

89.     In October 2007, MacroChem announced that Michael Zasloff, M.D., Ph.D., had joined the company's Scientific Advisory Board.  Later Dr. Zasloff joined the Dipexium board.

90.     Dr. Zasloff had founded Genaera's predecessor Magainin Pharmaceuticals, Inc. ("Magainin") in 1989, and had discovered the peptide that his Magainin scientists modified and developed to become the above-mentioned Pexiganan.

23

91.     In or about April 2007, Access, then controlled by Rouhandeh, agreed to acquire Defendant Rouhandeh's other company, Somanta Pharmaceuticals, and closed that acquisition on or about January 4, 2006.  In 2005, Kaye and/or XMark provided Rouhandeh's closely held shell company, Somanta Pharmaceuticals, with $1 million in exchange for 46.5% of the Series A convertible preferred stock then being issued by Somanta.

92.     MacroChem merged with Virium, a nonpublic, development stage company, controlled by Rouhandeh and SCO, on April 18, 2008.  That transaction allowed  Rouhandeh and SCO to acquire a controlling interest in MacroChem.

93.     Upon information and belief, Defendant Mark L. Alvino, an associate of Defendant Rouhandeh and a Director of MacroChem, and his firm, Griffin Securities, aided and abetted the breaches herein by providing a sham "Fairness Opinion" in support of MacroChem's acquisition of Virium, stating that, as of the date of the opinion, "the Merger Consideration is fair from a financial point of view."

94.     However, a comparison of key financial data from both companies, including Virium's negative working capital, and MacroChem's positive shareholders' equity, show the Fairness Opinion to be a sham.  The so-called "Fairness Opinion", as will be described below, allowed MacroChem, Defendant Rouhandeh and others to carry out a complex manipulation to the detriment of Genaera and its shareholders and Unit Holders.

95.     Prior to merging with Virium, MacroChem had no involvement with oncology.  There was no compatibility of products in development between the companies at the time.  MacroChem used novel drug delivery technologies to develop pharmaceutical products to treat various medical conditions.

24

96.     The MacroChem merger with Virium was implemented for the real purpose of benefiting SCO with MacroChem liquidity instead of using MacroChem funds to advance the commercialization of Pexiganan.  This constituted bad faith by Defendants DeLuccia, Luci, Rouhandeh, Alvino, and Davis towards Genaera with whom it had an agreement to develop Pexiganan.

97.     The MacroChem/Access merger made possible the wrongful sale of the Pexiganan Assets to Dipexium.  That merger was accomplished through a Fairness Opinion which had no reasonable basis because of the wide economic and valuation disparities between Virium (with virtually no assets or business prospects) and MacroChem and was provided by Griffin which was controlled by Alvino who had severe conflicts of interest at the time.

98.     At the time of the Virium acquisition by MacroChem, Defendants Alvino and Davis both served on MacroChem's Board of Directors and both were managing directors at SCO.

99.     Defendant Davis was a Virium Director, as well as a MacroChem Director.

100.    Defendant Davis, in a January 7, 2008 press release, falsely stated that the acquisition of Somanta by Access brought "very exciting product candidates and one platform technology in the Access pipeline".

101.    Defendant Davis had a history of making false and misleading statements as when Davis stated in a January 7, 2008 press release that Somanta Pharmaceuticals had its sodium phenylbutarate ("PB") product "currently in Phase II clinical development."  In fact, as disclosed in subsequent SEC filings, Somanta had stated that it "intended" to initiate Phase II development.  Davis's statements were calculated to boost the prospects for a capital raise

by Access, which succeeded on February 4, 2008 when Access sold 2.725 million shares of preferred stock.  Also, in an 8-K issued six months after the Somanta acquisition, Access revealed that "immediately" after the acquisition closed, it had written the Somanta assets to zero.

102.     On June 5, 2008, MacroChem issued a press release and announced a presentation to be made by Dr. Zasloff, its leading Scientific Advisor, at a professional medical symposium in San Francisco.  Dr. Zasloff's presentation discussed "recent discoveries in innate immunity that explain the role of antimicrobial peptides in protecting human skin from infection."  At the symposium, Dr. Zasloff stated that "Pexiganan, like other antimicrobial peptides, has a very low potential for development  of antimicrobial resistance a problem associated with conventional agents and of particular concern in the long term management of the diabetic patient."

103.     The June 5, 2008 press release  stated *(inter alia),* "Pexiganan, currently being developed by MacroChem, has been evaluated in over 1000 diabetic patients and has already completed two Phase III clinical trials."  In the same press release, Defendant Robert DeLuccia, MacroChem's Chairman, commented "we believe the Pexiganan could fill an important unmet medical need and provide a significant commercial opportunity for our Company in an addressable market of millions of diabetic foot infections annually, which translates to a potential estimated one-half billion dollar market in just the US."

104.     MacroChem abruptly reversed course on Pexiganan and, despite all of the accolades and acclaim,  MacroChem spent only $45,110 to further the Pexiganan development in all of 2008.

26

105.    MacroChem's officers, including Defendants Luci and DeLuccia, acted with bad faith by allowing MacroChem to acquire a company, Virium Pharmaceuticals, which was controlled by Defendant Rouhandeh.

106.    Upon information and belief, during the same time period, MacroChem diverted approximately $6.8 million for the benefit of Defendant Rouhandeh through the following means, set forth below:

      a.    Some of the MacroChem funds were diverted directly to Rouhandeh.

      b.    Some of the MacroChem funds were used to pay Virium debt, which MacroChem assumed.

      c.    Some of the MacroChem funds were for "fees" and bonuses for associates and friends of Defendant Rouhandeh.

107.    Upon information and belief, Defendant Kaye knew about and encouraged MacroChem's actions.

108.    In July 2008, Defendant Access Pharmaceuticals, a biopharmaceutical company specializing in products for cancer and supportive care, announced that it was acquiring MacroChem.  That transaction closed on or around February 25, 2009.

109.    Access' acquisition of MacroChem closed in February 2009.  After the acquisition, Access announced, in a SEC filing, that "[t]he MacroChem board of directors did not engage a financial advisor to assist in the sale of MacroChem or to render a financial opinion as to the fairness.  The board of directors also considered the cost of obtaining a fairness opinion as prohibitively expensive in light of MacroChem's financial condition."

110.    Citing limited resources, Access ceased development of MacroChem's dermatology products, including Pexiganan by March 31, 2008.  The financial data, however, actually shows that MacroChem's cash situation resulted from the fraudulent manipulation by Defendants SCO/Rouhandeh rather than from MacroChem's own development activities (i.e., Pexiganan).  MacroChem had no long-term debt on March 31, 2008, but, 18 days later, after the acquisition of Virium, MacroChem was burdened with considerable debt.  Also, some MacroChem liquidity was used to pay down part of the Virium debt.

111.    The Director Defendants knew that Genaera had a right under the agreement with MacroChem to demand the return of the Pexiganan Assets by October 2009 if MacroChem would not develop  the drug.  However, in breach of their fiduciary duties, the Director Defendants refused or failed to take any action to protect Genaera's interests and instead steered Genaera into dissolution for their own self-dealing purposes and to aid the self-dealing of other Defendants herein.

**E.      In Anticipation of Dissolution, the Director Defendants Claim
They Are Trying To Save The Company But Suppress The Value
Of Genaera's Core Assets By Refusing to Protect Those Assets**

112.    In May 2008, Genaera announced various initiatives it would take to conserve its resources so that it could continue to develop its assets.  Among those initiatives to improve the company's cost structure were reductions in executive base compensations, forfeitures of cash incentives and bonuses to executives, reduction in the workforce, and streamlining of expenditures to focus on program specific needs.

113.    These initiatives were expected to provide Genaera with enough cash on hand to fund its operations through the second quarter of 2009.

114.     These initiatives included the development of MSI 1436 for diabetes and obesity which had already consumed millions and millions of dollars of Genaera's cash without yielding a marketable product.  Another core asset was the IL9 asthma antibody (described above) which required only modest legal expense to maintain patents while MedImmune was responsible for all development.  The aminosterol assets, including the antiangiogenic Squalamine; the mucoregulators; and the Pexiganan anti-infective were all valuable but not being fully developed by Genaera.

115.     The Director Defendants knew that Genaera's two largest shareholders wanted the Company to be dissolved so the Core Assets would come up for distress sale.

116.     The Director Defendants knew that MedImmune was preparing to restart the Phase II trials for the IL9 Program.

117.     Another important asset of the Company which Defendants deliberately failed to exploit and whose value was destroyed in the dissolution was the Genaera's Net Operating Loss ("NOL").

118.     The proxy also did not mention the idea of monetizing the NOL, which was significant at that time.  Genaera's NOL (as of December 31, 2008) was $206,349,000, which could have saved a purchasing company millions of dollars in taxes they would otherwise have to pay.

119.     Plaintiff previously discussed Genaera's large NOL with Defendant Armstrong; Dr. Gast; Leanne Kelly, Genaera's CFO; and Jennifer Bilotti, a Senior Vice President, because the present value of future tax savings would be of considerable economic value if Genaera were sold entirely to a large pharmaceutical company instead of being only partly sold via a partnership agreement for the various programs.

29

1.     **Genaera's Board of Directors Approves Genaera's
       Dissolution And Effects Same Through A Rigged Shareholder
       Vote And A False And Misleading Proxy Statement**

120.    In or around April 2009, upon information and belief, Genaera's Board of

Directors announced that the prospects of continuing as an ongoing business were not

promising and that dissolution and liquidation would return the greatest value to stockholders

as compared to other available strategic alternatives.

121.    At this time, XMark and BVF were reportedly the largest shareholders of

Genaera.

122.    On April 18, 2009, Genaera's Board of Directors (except Kaye who was

absent) (the "Directors") unanimously approved a Plan of Dissolution to dispose of all the

assets of the company, wind up its affairs, adequately provide for the payment of all the

company liabilities, and distribute to or for the benefit of its stockholders all of the company

assets, including establishing a liquidating trust to complete the liquidation of the company

and recommended that Genaera's stockholders vote to approve the plan.  Defendant Kaye was

absent from the most important meeting in the life of Genaera.

123.    Genaera's stockholders never were given a copy of the Trust Agreement, and

were not informed as to critical provisions in that agreement about their voting for the

Directors' recommendation.  Nor were they informed about accepting distributions from the

Trustee when they were asked to approve the Directors' recommendation to transition to a

Liquidating Trust.

124.    The proxy for the June 4, 2009 stockholders meeting and the Trust Agreement

both allow for a three-year  period for monetizing the Genaera assets.  Further, the Trust

Agreement provides for possible extensions beyond the three-year period.

30

125.    The Directors sought an expedited approval of the dissolution, so that they could resign and separate themselves from Genaera as quickly as possible.  By resigning, the Director Defendants would avoid liability for the sale of Genaera's assets for less than their fair value to interested conflicted parties.

126.    The Director Defendants breached their fiduciary duties by self-dealing and by aiding and abetting the self-dealing of other fiduciaries by failing and/or refusing to terminate the Pexiganan licensee to Access earlier than October 2009.  By at least mid-2008, the Director Defendants knew that although Access had sufficient funds to develop Pexiganan (until such funds were misappropriated by its controlling shareholders), Access had no interest in developing Pexiganan and that the Access controlling shareholders were intent on allowing the Pexiganan assets to stagnate awaiting the dissolution of Genaera so the assets could be acquired cheaply by the Defendants identified herein.

127.    At the time of the Directors' vote, the Directors knew, and failed to disclose in the Proxy Statement, the following:

    a.  The clinical hold status with the MedImmune program for developing the asthma drug under license from Genaera had been voluntarily initiated by MedImmune, that there was no problem with the drug itself, and that active development would resume later in 2009;

    b.  That MedImmune was planning an unusually large (and therefore unusually expensive) Phase 2B trial to begin when the clinical hold status ended and development  resumed;

31

c.  That the new Phase 2B trial would be one with an "adaptive design" structure and would transition into a formal phase 3 trial, probably before completing the planned Phase 2B trial;

d.  MedImmune was extremely confident that it would gain approval, which was reflected in the enormous expense of the unusually large scale in the Phase 2B trial (320 subjects instead of the more typical 100 - 150);

e.  That Dr. Gast, Genaera's Chief Medical Officer, was intimately involved with the MedImmune group developing the asthma drug ("MEDI 528"), and actually had participated in discussions with the group regarding the protocol design of the planned Phase 2B study.  Upon information and belief, everything that Dr. Gast knew about the MedImmune development activities and its future plans were communicated to Defendant Armstrong, as well as to the other Directors;

f.  That Genaera's management, as well as the Directors, held numerous conversations recognizing that the 1L9Asset value could best be preserved for all shareholders by transferring the 1L9Asset to a separate entity, such as a Royalty Trust, that then would distribute future milestone payments and royalties to all shareholders equitably;

g.  That Genaera's macular degeneration product was being eagerly sought by at least two active bidders, including the predecessor to Ohr Pharmaceuticals whose principals were well financed and prepared to commit to the developments to launch of the "Wet AMD" product;

32

h.   That Genaera had the right, but refused to exercise it, to demand the return of the Pexiganan assets since Access would not develop it and

1.   That Defendants Ligand Kaye, Access, Rouhandeh, Davis, Griffin, Alvino, SCO, Luci, DeLuccia and BVF had all coordinated their efforts to steering Genaera to dissolution so that its Core assets could be acquired cheaply at distress sale prices without the interference of the Director Defendants who would have been obligated by their fiduciary duties to maximize the value of the Core Assets.

128.   The proxy falsely stated that none of the Genaera officers or directors would profit from the dissolution.

129.   The proxy failed to describe the agreements to which the Core Assets were subject.

130.   The proxy failed to describe the valuation estimates of the core assets by independent parties.

131.   The April 18th vote was unanimous only among the Directors attending that meeting.  Defendant Kaye did not attend the April 18th meeting, and did not vote with the Directors at that meeting.  The Shareholders were never provided with an explanation as to why Defendant Kaye did not attend, even by telephone.

132.   Genaera issued a public announcement, on April 28, 2009, that the Board had recommended that the Company's Shareholders approve a "Plan of Dissolution."

133.   The proxy stated, in relevant part:

it is not currently anticipated that our liquidation and dissolution will result in any material benefit to any of our

executive officers or to directors *who participated in the vote to adopt the Plan of Dissolution.* [emphasis added].

134.    Because Defendant Kaye did not participate in the "vote to adopt the Plan of Dissolution", the material benefits to him of the dissolution process and subsequent asset transfers were not disclosed.

135.    In the proxy prepared for soliciting shareholder support for the Directors' recommendation to approve the liquidation and dissolution of the company, the Directors allowed the proxy to falsely assure shareholders "[s]ales of our assets will be made on such terms *as are approved by the Board of Directors . . . .*" (emphasis added).

136.    The above statement was misleading, and ultimately was proven to be totally false. There was no Board involvement, nor "approval" for the transactions that Defendant Skolas executed on his own initiative.

137.    The proxy failed to adequately disclose and explain that the Trustee, who had *already been selected* was a person who had connections to insiders and their affiliates. Nor did the proxy disclose that Trustee would be allowed to handle the sale of core assets even though his firm, Argyce had only two employees (Defendant Skolas and an administrative assistant). Moreover, the proxy failed to disclose that any shareholder that might vote in favor of the plan would lose his legal standing as a shareholder or that any shareholder that subsequently accepted distributions made from the Liquidating Trust would be deemed to waive his/her right to sue for remedial action.

138.    On April 29, 2009, the day following the announcement, the stock declined 32.7% on volume 96 times the average volume for the preceding ten days.

139.    On June 4, 2009, Genaera held a special meeting of Stockholders to vote on the Director's recommendation to adopt a Plan of Dissolution.

140.    At that meeting, the Plan of Dissolution was approved by the stockholders with the proxy votes representing a majority of the shares cast in favor of the resolution to approve the plan.

141.    At the time of the meeting, and at some time prior thereto, Genaera's management knew that with the proxy votes received, an affirmative vote was assured.

142.    Defendant Kaye, a Genaera Director and an officer of Genaera's largest shareholder, XMark, had previously indicated he would vote his shares for approval of the transition to a Liquidating Trust.

143.    On at least two occasions, Leanne Kelly, Genaera's CFO, acknowledged to Plaintiff Schmidt that the Board of Directors had enough votes to approve its own recommendation to transition into a Liquidating Trust. Although Ms. Kelly urged Plaintiff Schmidt to vote his shares in favor of the liquidation, she conceded that the Board already knew that the plan would be approved before the formal meeting.

144.    The very next day, June 5, 2009, after voting to dissolve and liquidate Genaera, XMark sold one-third of its shares of Genaera stock at a price that was inflated more than 162% over the average selling price for the ten preceding trading days.

145.    XMark sold 1,378,732 shares at $0.3095, which was more than 1.6 times the average ($0.19095) of the closing price for the ten preceding days.

146.    The volume of XMark's transaction - 1, 378,732 shares - was approximately equal to 21 times the average daily volume calculated from the volume of the ten preceding days.

147.    A major shareholder  seeking to sell a sizable block  of stock under the circumstances  of a corporate  liquidation  induced  by the company's  limited  cash should have entailed  a discount  from the $0.19 trading  level-  not a premium  that amounted  to an average price  162% over the prevailing  trading  level.

148.    Upon information  and belief, the XMark  sale on June 5, 2009 was a prearranged sale to a willing  buyer who had agreed to pay XMark  a substantial  premium for the shares.

149.    Upon information  and belief, the sale reported  with the Form 4 filing was the result  of manipulated  and illegal trading  activity,  which defendant directors knew or should have known  about.

150.    On June  12, 2009,  Genaera  filed Articles  of Dissolution  with the Delaware Secretary  of State.  All the Company's  assets and liabilities  were transferred  to the Genaera Liquidating  Trust (the "Liquidating   Trust").

151.    Argyce  LLC was named Trustee  of the Genaera  Liquidating  Trust effective upon the filing of Genaera's  Certificate  of Dissolution.  Under Delaware  law, the Trust became  the successor  in interest  to the Company's.

**2.    Formation of the Genaera Liquidating Trust**

152.    Simultaneous with the dissolution, Genaera transitioned from a fully functioning company to a Liquidating Trust naming John Skolas, through his company Argyce LLC, as the Trustee of the Genaera Liquidating Trust.

153.    Defendant John A. Skolas, who previously served as Genaera's Chief Financial Officer, Secretary and General Counsel, executed the Agreement as President of Argyce LLC.

36

154.    Defendant  Skolas and his company,  Argyce,  were selected  as the Trustee by Genaera's   Board despite  a troubled  past in business,  including  being terminated  from Genaera  in April 2007 by Defendant  Jack Armstrong  and having  been an individual Defendant  in a securities  class action  suit.  *See In re Musicmaker.  com Securities Litigation,*  Civ. A. Mo. 002018 (C.D. Cal.).  This earlier suit was settled in October 2002 in favor of the Plaintiffs in that litigation.

155.    Thus, approximately two years after being fired from his role as the company's CFO by Genaera's CEO, Skolas was rehired by that same Board to serve as Trustee of the company's assets.

156.    Pursuant to Delaware statute, the Trust became the successor in interest to Genaera following its dissolution.

157.    The Trust was created to dispose of all the assets of Genaera, to wind up Genaera's affairs, to adequately provide for the payment of all of Genaera liabilities, and distribute to or for the benefit of its Unit Holders all of Genaera's assets.

158.    Upon the effective date of the Trust Agreement, all outstanding shares of the Genaera's common stock were automatically deemed cancelled.

159.    In accordance with the Trust provisions, each Genaera stockholder became the owner of one unit of beneficial interest in the Trust for each share of Genaera common stock then held of record by the stockholder.

**F.    Skolas And Argyce Violated Their Duties As Trustees Of GLT**

160.    Defendant Skolas, as Trustee of the Liquidating Trust, and Argyce, as Trustee, had fiduciary obligations and trust obligations to ensure that all the Trust's assets were disposed of in the best interests of the Trust and to take all steps to ensure that all asset values

were maximized and to exercise due care and perform the Trustee duties with the requisite skill of a skilled professional in Trustees' positions.

161.     Under the Trust provisions, the Trustee had three years from the date the Trust was created to sell Genaera assets and possible further extensions beyond that three year period.

162.     Defendants Argyce and Skolas sold assets for prices far below their worth, and absent any royalty provisions.

**G.     Argyce And Skolas Allowed Ligand And BVF**
**To Purchase IL9 Assets For Less Than Their True Value**

163.     Defendants Argyce and Skolas and the Board of Directors created the Liquidating Trust mechanism in 2009 so that the IL9 Asset could be sold to BVF in a preferential deal.

164.     In its Annual Report for the year ended December 31, 2008, Astra Zeneca described Genaera's IL9 program as one of the  five "in the pipeline" respiratory studies it highlighted that it was conducting out of a total of 22 compounds in the respiratory therapy area that it was testing/ developing.

165.     Following Genaera's dissolution, Defendants Argyce and  Skolas, as Trustees, were responsible for selling the remaining Genaera assets, including the IL9 asset, for the benefit of *all* the Unit Holders, without specifically favoring one or more of the Unit Holders to the detriment of the others.

166.     Jennifer Bilotti, a Senior Vice President at Genaera, told Plaintiff Schmidt, in a March 2009 telephone conversation, that the IL9 Program could be "put into a shell company for which the shareholders would still get benefit from that when it reaches the market and royalties are received."

38

167.    Moreover, on May 27, 2009, Defendant Leanne M. Kelly, the Chief Financial Officer of Genaera, and later a principal of Defendant Argyce, told Plaintiff Schmidt that the Trust could hold the IL9 Program and distribute royalties to shareholders.

168.    In October 2009, Medimmune acting under the agreements with Genaera, commenced a new 320- subject Phase IIb study. As a result, according to Argyce's November 2009 executive summary," the potential launch date is further away but more credibly stated."  Argyce unfairly favored insiders Ligand and BVF as bidders by opining that "the trust believes the probability adjusted net present value [of Genaera's license interest] is now a . . . . fraction of earlier valuation of [33 to 43 million]."

169.    Argyce's valuation had no reasonable basis given the independent market valuations of minimum product sales of 1.5 billion up to 3-4 billion per year.

170.    The IL9 Asset constituted a significant asset in Genaera's drug development portfolio and could realize an   increase in value in the hands of a new buyer with a modest expense  of money  and management  resources.

171.    To avoid being a 10% holder at the time of the deal, BUF systematically disposed of its holdings in Ligand until its position fell below the statutory insider threshold of 10%.

172.    On May 18, 2010, Defendant  Skolas executed  a Purchase  and Sale agreement with Defendant Ligand for the IL9 Asset in its entirety.

173.    Ligand purchased  the IL9 Asset for $2.75 million,  which  is a fraction  of the value previously  given to it by Genaera's  management  and an unconscionably  low amount of money. Ligand  then sold a half interest  in IL9 to BVF.  Importantly,  the conspirators,

Ligand and Skolas, kept BVF unidentified, and BVF was not mentioned or cited in any way in the purchase agreement.

174.    Indeed, Defendant Skolas had previously stated to Plaintiff Schmidt, among other things, that:

> a. the IL9 Asset "ha[s] blockbuster potential, $3 to $4 billion peak year sales";
>
> b. in referring to the prospect of selling a portion of the IL9 rights, Defendant Skolas claimed that it offered "outsized return potential relative to risk"; and
>
> c. "I would like to do something meaningful with the IL-9 program".

175.    By selling the IL9 Asset for such a low price:

> a. Defendant Skolas ignored the repeated recognition by management and Directors that the fair thing to do for the benefit of ***all*** shareholders was to place the IL9 Asset in a royalty trust or some similar continuing entity that can distribute future milestone payments and royalties equitably to Genaera shareholders.
>
> b. Defendant Skolas also ignored the significant increase in the IL9 program's value identified by the several updates MedImmune posted on the website, www.clinicaltrials.gov. during March and April 2010.

176.    At the time, the MEDI-528 program had recently come off its clinical hold and Medimmune began new Phase II studies. The sale of Ligand was orchestrated by BVF as was, presumably, the subsequent sale of half interest to BVF. Thus BVF accomplished indirectly what it could not do directly because of actual conflicts of interest – purchase an interest in the IL-9 antibody program.

177.     The purchase  by Ligand in May 2010 included  the assignment  to Ligand  of the collaboration   and License  Agreement  between  Medimmune  (now a subsidiary  of Astra Zeneca) and Genaera  in 2011.

178.     Ligand  and BVF acted together  to secure the IL9 Asset with high confidence that the IL9 Asset would be commercially successful.

179.     Upon information  and belief, that knowledge  was conveyed  to Ligand  and BVF by Defendant  Kaye, which  was *information improperly appropriated from Genaera.*

180.     This information  was used as the basis for the Defendants   working  in concert  with Trustee  Skolas that culminated  in his transferring  a valuable asset  for less than 5% of its actual worth.

181.     Defendants Argyce and Skolas breached their duty due to the Trust and Trust Unit Holders not to consummate **any** transaction  prematurely.

182.     By selling the IL9 Asset to Ligand  (and, upon information  and belief,  setting it up for BVF),  plus "certain  of its affiliates",  *just  eleven months after* the Trust's establishment, Defendant Skolas misled and prevented all shareholders from receiving a share of the milestone payment that Medlmmune was required to make with the formal start of a Phase 3 trial.

183.     Relative  to the expected  value of prospective  royalties  on several billion dollar sales, the $2.75 million  purchase  price was a *de minimis* amount.  Defendants  Skolas and Lampert  affected  a transfer  from the Liquidating  Trust to Ligand  for a price that was insignificant  relative  to the value of the asset.

41

184.    Defendants Argyce and Skolas (Trustee) and Lampert (President, BVF) conspired to transfer an asset of enormous value from Genaera's Unit Holders and to bestow a disproportionate benefit to BVF, Genaera's second largest shareholder.

185.    Upon information and belief, Defendant Kaye (Genaera Director) provided Defendant Lambert (President, BVF) with advice and information that was appropriated from Genaera to facilitate this fraudulent transaction.

## H.    **The Self-Dealing Terms of the Sale of Pexiganan.**

186.    Pexiganan was a drug whose enormous potential was recognized by the director Defendants as well as the other Defendants.

187.    The Director Defendants knew or should have known the Center for Disease Control estimated that there were more than 24 million diabetics in the United States with 1.5 million new cases annually. One in four diabetics develops foot ulcers and 60% become infected. Extrapolating from these statistics, the market for diabetic foot ulcer treatment is approximately 3.6 million diabetics with another 240,000 additional foot ulcer patients added each year. Director Defendants also knew that Genaera held a patent(s) for Pexiganan which with extensions would not expire until late 2019 at the earliest and 2021 at the latest.

188.    Director Defendants also should have known that only one new Phase III study was required to reach product launch and knew that time to launch was estimated as no more than three years after funding and knew that total development funding from start to launch was estimated to be only $5 million to $7.5 million; director Defendants also knew that Pexiganan sales potential for Genaera was estimated to exceed $100 million annually with some estimates as high as $500 million per year.

189.   On October 20, 2009, the Trust notified Access Pharmaceutical and Macrochem Corp. that the licensing agreement would terminate November 20, 2009 and that the program assets are to be returned to the Trust.

190.   Instead of preparing the Pexiganan asset for sale immediately and soliciting interest and providing public notice of sale with plenty of lead time to allow potential bidders to conduct adequate due diligence, Argyce and Skolas instead spent October, November and December 2010 negotiating termination agreements and Access skewed heavily in favor of Access and the imminent inside bidders, Dipexium, Luci and DeLuccia.

191.   On January 11, 2010, the Trustee made its first public announcement of a solicitation for the IL9 program assets and the Pexiganan Assets. In the announcement, the Trustee set a February 12, 2010 deadline for bids. The trustee knew that the announcement and bidding procedures and deadlines would favor the Defendants named herein who were already intimately familiar with the Pexiganan assets and their potential. In late 2009, Defendant Skolas terminated the Pexiganan licensing agreement between Access and MacroChem and the Liquidating Trust thus allowing MacroChem's insiders to acquire those same Pexiganan rights from the Trust on behalf of their new company, Dipexium at a 5% royalty rate instead of the 10% rate due to GLT from Access. Outside potential bidders were at a disadvantage because critical information about the Pexiganan and IL9 assets was non-public. Thus, outside bidders had only one month from date of announcement to request, receive and review/sign and return the Confidential Disclosure Agreement ("CDA") required by the Trustee. Then, the potential bidder would have to await receipt of the "confidential information package", review the same, analyze the information, do a pharmacological and regulatory compliance and valuation analysis to determine the

feasibility of the assets and their potential worth and thereafter devise a bidding strategy and submit a bid.

192.    Dipexium was originally organized on January 14, 2010, according to its IPO registration statement.

193.    Defendants DeLuccia and Luci are the co-founders of Defendant Dipexium, which, upon information and belief, was formed only three days after the January 11, 2010 announcement of the offer for sale of the Pexiganan assets. Dipexium acquired the rights to Pexiganan for a pittance and free of the royalty and milestone payment obligations that were part of the MacroChem licensing agreement.

194.    The rights acquired by Dipexium, as compared to the rights granted to MacroChem, are not limited to high concentrations of the active peptide for prescription indications, and evidently also include lower concentrations that can be used with a non-prescription over the counter product for acne, which more than doubles the available market compared with the original MacroChem license.

195.    Dipexium acquired the rights for a minor down payment of $50,000.00 on the merger purchase price of $272,500.00 and free of the original 10% royalties and milestone payment obligations.

196.    The Trustee sold the Pexiganan assets in two separate sales according to Dipexium's initial public offering Registration Statement issued March 13, 2014. The first sale occurred on April 8, 2010 when it purchased "the intellectual property and other rights relating to" Pexiganan. The second sale occurred on March 21, 2011 when Dipexium "exercised its right to purchase the Trust's rights to milestone payments and royalties.

According to Dipexium's IPO Registration Statement, Dipexium paid a total of $272,500.00 in the aggregate.

197.    In selling the rights to Dipexium,  the Trust stated that "it seeks to divest or otherwise  monetize  all its rights to Pexiganan ... " The Trustee knew that Access had no intention of initiating  Phase III for Pexiganan  and understood  also that Access was acting in bad faith by trying  to sell the Pexiganan  license it had received  from Genaera  rather than develop  the product as it was obliged  to do under the license.

198.    Access  and its directors  acted in bad faith by refusing  to surrender  the Pexiganan license  to Genaera  until late 2009 when Defendants  Luci, De Luccia  were forming Dipexium to prepare  to acquire Pexiganan from the Liquidating  Trust.

199.    Soon after this transaction,  the Dipexium  website  touted the arrangement with the Trust  as follows:

> With  limited  resource  required  to complete  clinical development, [Dipexium]  management  believes  Pexiganan has peak year sales potential of hundreds  of millions  of dollars in the U.S. and separately  in the EU ....
>
> Dipexium  believes  it can leverage  a modest  amount  of capital  into  a multifold  financial  return in a relatively  short timeframe ...
>
> With  Pexiganan,  several  value-creating  milestones  have *already*  been achieved internally and by our predecessors and several near-term value- inflection points exist on what we believe is a relatively short pathway to approval for an early-stage company.

200.    Almost immediately following the purchase, in mid 2010, Dipexium was able to raise $1.42 million from 27 investors.  On March 20, 2011, Dipexium raised an additional 670,000 from 22 investors.  On October 14, 2011, Dipexium raised $767,500.00 from 23

investors.  Thereafter, in 5 private placements through November 2013, Dipexium raised approximately $6.6 million.

201.    The ease with which Dipexium raised financing for the development of Dipexium demonstrates that the Trustees and the Director Defendants breached their fiduciary duties of loyalty to the Trust and Genaera respectively by failing to properly care for the assets.

202.    Defendant Skolas sold Pexiganan, a valuable asset, to Dipexium, a company formed by Defendants Luci and DeLuccia solely for this purpose, free of the royalty and milestone payment obligations owed to Genaera and the Unit Holders by MacroChem.

203.    Defendant Skolas cooperated with Defendants DeLuccia and Luci so that they could replace MacroChem's license, limited to certain indications and having specified royalty and milestone payment obligations, with an asset without any limitations, and free of all royalty and milestone payment obligations.

204.    On March 18, 2014, Defendant Dipexium closed its initial public offering raising approximately $38 million at a price of $12.00 per share.

I.      **The Trust  Sells The Aminosterol   Assets For Less Than  Fair Value**

205.    On July 8, 2009,  only 26 *days after the Liquidating  Trust was established,* Skolas accepted  a $50,000  down payment  for an agreement  to sell another package  of Genaera's assets (the "Aminosterol   Assets")  for an unacceptable  $200,000  price that failed to reflect the asset's true value or the price that would have been obtained  had  a legitimate  sale been conducted.

206.    Skolas knew other bids could be forthcoming but instead unfairly and unnecessarily refused to allow other bidders sufficient time to meet Trustee's arbitrarily

imposed bid requirements deadlines.  Skolas has received communications and expressions

of interest from other financially qualified bidders before precipitously closing the bidding

window in favor of Ohr for a purchase price of $200,000.00.  Skolas accepted that purchase

price without making any public announcements of the offering of Genaera assets for sale.

Moreover, before agreeing to the $200,000.00 sale price Skolas had not received or requested

any appraisals of the value of the Aminosterol  assets.  Nor had Skolas tried to encourage a

bidding war for Aminosterol assets despite the presence of multiple interested parties.

207.    The Trustee  did not make any public  announcement  of bidding  for the

Aminosterol   Assets. Nor does it appear as if any objective  appraisal  of the asset was

performed.

208.    On or about August 12, 2009,  the Trustee publicly  reported  that the

Aminosterol assets  inventory  had been sold for a nominal  sum in May 2009. The Trustee

described  that prospective   buyers  had "expressed  serious interest  in the intellectual

property  remaining  material and other assets associated  with The Aminosterol  Assets ...

albeit at liquidation  prices."  The Trustee  failed to make any effort to market the

Aminosterol  Assets.

209.    Upon information  and belief,  the buyer, BBM Holdings,  Inc. ("BBM

Holdings"), had arranged  for financing  for the purchase  *even before the formal  vote* for the

Plan of Dissolution.   As a non-operating   shell company,  BBM Holdings  had no need and

no use for funds,  except  for purchasing  rights to assets.

210.    BBM Holdings'  actions demonstrate  advance  planning  with an

understanding   by those  empowered  to disperse  Genaera's  assets *before a formal   vote.*

BBM Holdings,  the buyer, had reason  to be confident  in completing  its anticipated

47

purchase when it arranged the financing on June 3, 2009 - *the day before* the stockholders' meeting, to formally approve the Directors' recommendation.

211.    The fiduciary breaches resulting in the sale of the Aminosterol Assets for less than their true value is demonstrated by Ohr's capital raising efforts in June 2009 even before the dissolution was voted or effected. It would not have been commercially reasonable for Ohr to commit to financing without assurances that Ohr was going to win the sale of the assets.

212.    Upon information and belief, Argyce and Skolas had the opportunity to sell the assets for a price higher than Ohr had agreed to pay according to the July 8, 2009 term sheet. But, in breach of their fiduciary duties, Argyce and Skolas bound the Trust prematurely to an agreement with Ohr in the Teem Sheet as a pretext to rebuff higher offer or to take the time to market the asset properly. Had Argyce and Skolas allowed the higher offer to emerge it would have raised the prices for all the other assets for sale.

213.    Ohr Pharmaceuticals acquired the Squalamine and Trodusquemine from the then dissolved Genaera in late August 2009. The Squalamine products are both: Phase 2 of FDA testing and approval process as of May 2012 with the Squalamine eye drops for wet age-related macular degeneration being guaranteed USFDA Fast Track Status.

214.    Ohr was organized on August 4, 2009 as a successor to BBM Holdings Inc.

215.    Ohr paid $200,000 cash for Squalamine, Trodsquemine and related compounds.

216.    The value of these assets is borne out by the fact that the Squalamine- based "Wet Age-Related Macular Degeneration" eye drops which Ohr purchased as part of the $200,000 asked of Genaera assets has been given "Fast-Track Status" by the FDA.

48

217.    In a May 2012 investor presentation, Ohr estimated a potential patient population of 1,750,000 U.S. patients with 200,000 new cases annually. As a comparison, the current market leader Intravitreal Lucentis, is realizing worldwide revenues of $3.5 billion annually with only a 35% market share according to Ohr's estimates.

218.    The sale clearly was premature relative to the time available to secure a fair price.

219.    Defendant Skolas deliberately encumbered himself from negotiating with another prospective buyer for more favorable terms with almost three years remaining for affecting a sale, and the fact that the sale was to a buyer not able or qualified to conduct any pharmaceutical development are evidence that this was a prearranged transaction.

220.    Upon information and belief, Ohr's management acknowledged that the company had "stolen" the Aminosterol Assets from the Liquidating Trust.

## J.  Argyce Enriched Itself Through Excessive Fees and Expenses Charged To The Trust

221.    In 2011, Argyce publicly issued unaudited financial statements for the year ended December 31, 2010. In those financial statements the Trust reported without explanation or footnote or itemization that its "General And Administrative" expenses were $687,000.00 which was nearly one quarter of the $3.028 million in revenues realized by the Trust that year. It was reported that 2010 revenues consisted of $2.75 million for the sale of the IL9 assets and the Pexiganan assets. Thus it appears that Pexiganan was sold for approximately $252,000.

## FIRST CAUSE OF ACTION

**(On Behalf Of The Stockholder Class Against The Director And Officer Defendants For Breach Of Fiduciary Duties And Against All Other Defendants For Aiding And Abetting Thereof)**

222.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

223.    The Director and Officer Defendants at all relevant times owed fiduciary duties of due care, candor and loyalty to Genaera and its shareholders.

224.    As directors and officers of a Delaware corporation, each of the Director Defendants owed and owes fiduciary duties to Genaera and its shareholders. Moreover, as members of the Board, these Defendants had specific fiduciary duties as defined by the Company's key corporate governance documents and principles. Pursuant to these duties, the Director Defendants specifically owed and owe Genaera the highest obligation of good faith and loyalty in the administration of the affairs of the Company, including the duties of candor, good faith, due care and loyalty.

225.    The Director and Officer Defendants breached said duties through their acts and omissions as set forth above.

226.    The actions and decisions of the Director and Officers Defendants are not protected by the business judgment rule for the reasons that the Director and Officer Defendants decisions were not (1) the product of informed judgment; (2) free from domination by a self- interested controlling shareholder or group thereof; (3) made with a good faith belief that the actions and decisions were in the best interests of the Genaera and its shareholders; and (4) the Director and Officer Defendants were motivated by conflicting self-interests.

227.    The transactions  which are the subject of this cause of action were not the product of either fair price or fair process  and thus the transaction  do not pass the "entire fairness" test applicable  under Delaware  law.

228.    The Defendants  other than the Director  and Officer Defendants  knew of the breaches  of fiduciary  duty of the Director  and Officer Defendants  and knowingly  and willingly contributed  to, and participated  and aided and abetted  such breach.

229.    As a result of the foregoing,  Plaintiff  and the Class have been damaged  in the amount  of losses sustained  and in the amount  of Defendants'  profits  from the transactions.

## SECOND CAUSE OF ACTION

**(On Behalf Of The Unitholder Class And On Behalf Of GLT Against Defendant Skolas And Argyce For Breach Of Duties Of Trustee Under Common Law And The Applicable Trust Agreement And Against The Officer And Director Defendants And Dipexium, Ligand And BVF, For Aiding And Abetting Thereof)**

230.    Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

231.    Skolas and Argyce as trustees of the Liquidity Trust owed fiduciary duties to GLT and Unit Holders and duties to execute the disposition of GLT assets with the care and skill of similar professionals.

232.    Argyce was formed in 2009, initially with two employees:  Defendants Skolas and Kelly.  At present Argyce has only three employees.

233.    Argyce had no prior operations before accepting the GLT engagement.

234.    The Defendant Directors had no reasonable basis upon which to believe Argyce and Skolas could maximize the value of GLT assets for the benefit of Unitholders.

51

235.    Defendants Argyce or Skolas did not perform, or commission any appraisal or other professional estimate of the value of GLT assets.

236.    Neither Argyce or Skolas had the skill, experience or training to estimate the value of the GLT assets.

237.    Argyce and Skolas failed to properly market GLT assets.

238.    At no time prior to 2012 was Schmidt or any other person able to ascertain whether the GLT or any beneficiary of GLT had suffered any injury or whether any wrongful conduct had occurred.  With respect to claims arising out of the sale of Pexiganan such claims could not have accrued until the sale was completed in 2011.

239.    Argyce and Skolas issued periodic reports but failed to reveal anything about the sale of Aminosterol assets at or about the time of the closing of the sale to Ohr.  Argyce and Skolas' reports about the sale process and sale of Pexiganan were similarly bereft of detail and uninformative, failing to reveal that Dipexium paid only $50,000 to get full possession of GLT's right title and interest in all the Pexiganan assets and that ultimately Dipexium would pay only $272,000 for Pexiganan.

240.    Skolas and Argyce violated their fiduciary duties and acted with gross negligence by failing to fully inform themselves of the true value of the assets of Genaera, and by failing to ensure that all dispositions of assets were made at arms-length with the singular goal of maximizing the value of the Trust assets and by aiding and abetting the self-dealing of other Defendants as described herein.

241.    As a result of the foregoing, Skolas and Argyce have breached their fiduciary duties and have caused loss and damage and diminution of value to the Trust and Unit Holders and were aided and abetted by the Defendants named in this Count.

## THIRD CAUSE OF ACTION

### (Against all Defendants For Punitive Damages)

242.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

243.   Plaintiff also alleges that each act described above and/or anyone of them individually and/or any combination of them constituted individual and/or collective acts of willful, intentional, reckless, and wanton acts against Plaintiff and stockholders/unitholder Class.

244.   For these reasons, Defendants should be held liable and punished for their willful, intentional, reckless, and wanton acts.

245.   As a result of the foregoing, Plaintiff and stockholders Class and Genaera have suffered loss and demand punitive damages in an amount which will appropriately penalize Defendants for their intentional, reckless, willful, and wanton acts.

## FOURTH CAUSE OF ACTION

### (Against Dipexium Pharmaceuticals LLC For Rescission Of The Sale Of Genaera's Pexiganan Assets To Dipexium And The Settlement Agreement)

246.   Plaintiff repeats and realleges each of the allegations set forth above as if fully set forth herein.

247.   As a result of the conduct of the Defendants herein, Dipexium's purchase of the Pexiganan Assets was the product of unlawful actions on the parts of both the buyers and sellers.

248.   Such wrongful conduct by the buyer (Dipexium) includes the knowing aiding and abetting of other Defendants' fraud, self-dealing and Defendants' breach of fiduciary duty

owed to Genaera and/or the Liquidating Trust and the active participation in the self-dealing, fraud and fiduciary breaches by the executives of Dipexium, *i.* e. Defendants DeLuccia and Luci.

249.     The wrongful conduct by the seller, Argyce, LLC and Skolas, purportedly acting on behalf of the Liquidation Trust was the knowing participation and facilitation of other Defendants' fiduciary breaches, fraud and self-dealing and the active malfeasance of Argyce and Skolas in intentionally failing to conduct a free and open auction for the Aminosterol Assets.

250.     As a result of the foregoing, the sale of assets to Dipexium must be rescinded and the assets returned to the Liquidating Trust and all of Dipexium's rights, title and interest in the assets should be voided.

251.     Plaintiff seeks an accounting from Dipexium.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Alan W. Schmidt, in his representative capacities, prays for judgment as follows:

A.     That this action be certified as a Class action on behalf of the proposed Class defined in this Complaint;

B.     That the named Plaintiff be designated as the representative of the Class, and that named counsel be designated as Class counsel;

C.     That Plaintiff and the Class have judgment against Defendants on the Causes of Action asserted on their behalf and that they recover all allowable damages from Defendants under each applicable case of action, with interest thereon;

D.      That Genaera and/or the Liquidation Trust have judgment against the Defendants on their causes of Actions asserted on their behalf;

F.      That Plaintiff, the Classes and the Liquidating Trust and/or Genaera be awarded punitive damages in an amount of at least $1,000,000,000.00 (One Billion Dollars);

G.      That all Defendants be required to disgorge to the Liquidating Trust any distribution they received from the Liquidating Trust and that all Defendants' claims to the assets of the Liquidating Trust be subordinated to the claims of the non-Defendant Unit Holders;

H.      That the sales of Pexiganan Assets to Dipexium be rescinded;

I.      That the cost of this action be taxed to Defendants;

J.      Awarding Plaintiff and their counsel reasonable attorneys' fees, expert fees and other reasonable costs and expenses; and

K.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff  hereby  demands  a trial by jury  as to all issues to triable.

Dated: February 3, 2015

### SHELLER,  P.C.

/s/Stephen A. Sheller
Stephen A. Sheller, Esquire
1528 Walnut  Street, Floor 4
Philadelphia,  PA   19102
Tel.: (215) 790-7300
Fax: (215) 546-0942
sasheller@sheller.com

**SQUITIERI & FEARON, LLP**
Lee Squitieri
32 East 57th Street
New York, New York  10022
Tel:  (212) 421-6492
Fax: (212) 421-6553
lee@sfclasslaw.com

Attorneys for Plaintiff