# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN W. SCHMIDT, on behalf of himself | : | |
| and in a representative capacity on behalf | : | |
| of all others similarly situated and | : | |
| derivatively on behalf of Genaera | : | |
| Corporation and on behalf of the | : | |
| Genaera Liquidating Trust | : | |
|     Plaintiffs, | : | CIVIL ACTION |
| | : | |
|     v. | : | |
| | : | |
| JOHN A. SKOLAS, et al., | : | No. 12-3265 |
|     Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                    **November 10, 2015**

    Alan Schmidt is a former shareholder of Genaera Corporation ("Genaera") and a unitholder of the Genaera Liquidating Trust ("GLT"). Following remand from the Third Circuit, he filed the Second Amended Complaint ("SAC") on behalf of himself, other Genaera shareholders and unitholders, and derivatively on behalf of Genaera and GLT, against: John A. Skolas; Leanne Kelly; Zola B. Horovitz; John L. Armstrong, Jr.; Osagie O. Imasogie; Mitchell D. Kaye; Robert F. Shapiro; Paul K. Wotton; Robert DeLuccia; David Luci; Steve Rouhandeh; Jeffrey Davis; Mark Alvino; Biotechnology Value Fund, LP, Biotechnology Value Fund II, L.P., and BVF Inc. (collectively, "BVF"); Ligand Pharmaceuticals, Inc. ("Ligand"); XMark Capital Partners, LLC, XMark Opportunity Funds, L.P., XMark Opportunity Fund Ltd., XMark JV Investment Partners LLC, XMark Opportunity Partners, LLC (collectively, "XMark"); Argyce LLC ("Argyce"); SCO Financial Group ("SCO"); Dipexium Pharmaceuticals, LLC ("Dipexium"); MacroChem Corporation ("MacroChem"); Access Pharmaceuticals, Inc. ("Access"); Mark N. Lampert; John L. Higgins; and nominal defendants Genaera Corporation

and Genaera Liquidating Trust for breach of their fiduciary duties, as well as aiding and abetting thereof, arising out of the liquidation of Genaera.

Seven groups of Defendants have moved to dismiss the Second Amended Complaint: (1) Directors and Officers Kelly, Armstrong, Horovitz, Imasogie, Shapiro, and Wotton ("D&O Defendants"); (2) Trustee Argyce and Skolas ("Trust Defendants"); (3) XMark and Kaye ("XMark Defendants");[1] (4) Dipexium, DeLuccia, and Luci ("Dipexium Defendants"); (5) BVF and Lampert ("BVF Defendants"); (6) Ligand and Higgins ("Ligand Defendants"); and (7) MacroChem, Access, SCO, Rouhandeh, Davis, Alvino ("Access Defendants"). For the reasons that follow, the Court grants Defendants' motions to dismiss.

I.      BACKGROUND

This action stems from the dissolution of Genaera, a biotechnology company that developed pharmaceutical drugs and held licenses to intellectual property and patents. (Second Am. Compl. ¶ 63.) Genaera was a Delaware corporation whose principal place of business was in Pennsylvania. (*Id.* ¶ 11.) It was dissolved on June 12, 2009, and its assets were transferred to GLT, a Delaware trust, which was managed by Defendant Argyce as trustee. (*Id.* ¶¶ 150–52, 158.) At that time, all shares of Genaera stock were canceled, and each stockholder became a unitholder of GLT. (*Id.* ¶¶ 158–59.) Plaintiff's allegations in the SAC revolve around two events: the D&O Defendants' participation in a scheme to wrongfully dissolve Genaera and the Trust Defendants' sale of the assets in GLT for less than their fair value to Genaera insiders and their affiliates, at the expense of Genaera shareholders. The other Defendants named in the SAC allegedly aided and abetted the D&O Defendants and Trust Defendants in breaching their

---

[1] In this Memorandum, the term "D&O Defendants" includes Mitchell Kaye, who was a Genaera Director during the relevant time period, but does not include his company, Xmark.

fiduciary duties. The following summarizes the factual allegations in the Second Amended Complaint.

### A.    Dissolution of Genaera

The SAC traces the conspiracy to dissolve Genaera back to 2007, when XMark began to purchase large amounts of Genaera common stock. (*Id.* ¶¶ 5, 66.) By September 28, 2007, when Mitchell Kaye, XMark's CEO, was elected to Genaera's Board of Directors, XMark owned 21% of Genaera's stock. (*Id.* ¶ 65, 68–69.) At that time, Kaye was a co-investor in Somanta Pharmaceuticals with Defendants Rouhandeh, Davis, and SCO. (*Id.* ¶ 67.)

In May 2008, Genaera announced various initiatives to reduce costs in order to maintain sufficient resources to continue to develop its assets. (*Id.* ¶ 112.) However, in April 2009, Genaera's Board of Directors announced that the company's prospects were not promising and stated that dissolution and liquidation would return the greatest value to stockholders. (*Id.* ¶ 120.) On April 18, 2009, the Board unanimously approved—and recommended that shareholders vote to approve—a plan to dispose of all of the company's assets and to make distributions to stockholders. (*Id.* ¶ 122.) Defendant Kaye did not attend this meeting. (*Id.*) Genaera's stock price declined dramatically following the announcement that the Board had approved the plan of dissolution. (*Id.* ¶ 138.)

In anticipation of the shareholder vote on the plan of dissolution, the Directors issued a proxy statement that the SAC alleges falsely asserted that no Genaera directors or officers would profit from dissolution. (*Id.* ¶ 128.)  The SAC also alleges that the proxy statement failed to mention that Defendant Argyce had already been selected as trustee, omitted important details that would have shown that some of Genaera's assets were quite promising, and failed to explain that Genaera's large net operating loss could only have been monetized by selling the company

as a whole. (*Id.* ¶¶ 118, 127, 137.)  At a special meeting on June 4, 2009, the shareholders—the two largest of which were XMark and BVF—approved the Board's recommendation to adopt the plan of dissolution. (*Id.* ¶¶ 121, 140.) The next day, XMark sold one-third of its shares of Genaera at a price of $0.3095 per share, which was more than 1.6 times the average closing price over the ten preceding days. (*Id.* ¶ 144–45.)

Genaera filed articles of dissolution with the Delaware Secretary of State on June 12, 2009, and the company's assets and liabilities were transferred to GLT. (*Id.* ¶ 150.) Argyce LLC was named Trustee, despite the fact that its President and CEO, Skolas, had been fired as Genaera's CFO in 2007. (*Id.* ¶¶ 152, 154). Thereafter, each outstanding share of Genaera common stock was canceled and replaced by a unit in GLT. (*Id.* ¶¶ 158–59.) Under the Trust Agreement, the Trustee would have three years to "monetiz[e]" Genaera's assets. (*Id.* ¶ 124.) In 2010, the Trust reported "General and Administrative" expenses of $687,000.00, which was nearly 25% of the Trust's total revenue of $3.028 million that year. (*Id.* ¶ 221.)

**B.    Genaera's Assets**

*1.    Aminosterol Assets*

At the time of its dissolution, Genaera owned the rights to Squalamine and Trodusquemine compounds ("Aminosterol Assets"), some of which are used in eye drops that treat wet age-related macular degeneration. (*Id.* ¶ 213.) On July 8, 2009, twenty-six days after GLT was established, the Trustee accepted a $50,000 down payment on the sale of the Aminosterol Assets for $200,000 to BBM Holdings, Inc., the predecessor to Ohr Pharmaceuticals. (*Id.* ¶¶ 205, 214.) On August 12, 2009, the Trustee publicly reported that the Aminosterol Assets had been sold in May 2009. (*Id.* ¶ 208.) According to the SAC, the Trustee

4

"had the opportunity to sell the assets" for a higher price, and there was no public announcement of bidding for the assets. (*Id.* ¶¶ 207, 212.)

### 2. *Pexiganan Asset*

Pexiganan is a topical cream for the treatment of diabetic foot infections that Genaera and its predecessor initially developed. (*Id.* ¶ 80.) In 2007, MacroChem licensed the right to develop Pexiganan from Genaera for an initial fee of $1 million. (*Id.* ¶¶ 85, 87.) Under the license agreement, Genaera could earn payments up to $35 million from MacroChem based on various sales-based milestones, as well as ten percent royalty payments based on net sales. (*Id.* ¶ 85.) In April 2008, MacroChem merged with Virium, a nonpublic company controlled by Defendants Rouhandeh and SCO. (*Id.* ¶ 92.) Defendant Alvino was then a director of MacroChem, and the SAC alleges that his firm Griffin Securities provided a "sham" fairness opinion in support of the merger. (*Id.* ¶ 93.) MacroChem allegedly diverted funds that should have been used to develop Pexiganan to Rouhandeh and Virium. (*Id.* ¶ 106.) Despite publicly praising Pexiganan's potential, MacroChem only spent $45,110 to develop the drug in 2008. (*Id.* ¶ 104.) In February 2009, Access acquired MacroChem and "ceased development of MacroChem's dermatology products, including Pexiganan." (*Id.* ¶¶ 108, 110.) The SAC alleges that the D&O Defendants knew that Genaera had a right under the licensing agreement with MacroChem to demand that MacroChem return the Pexiganan assets by October 2009 if MacroChem refused to develop the drug, but the Defendants did not make any such demand. (*Id.* ¶ 111.)

After Genaera's dissolution, GLT terminated the licensing agreement and the Pexiganan assets were returned to the Trust. (*Id.* ¶ 189.) On January 11, 2010, the Trustee publicly solicited bids for Pexiganan, with a deadline for bids of February 12, 2010. (*Id.* ¶ 191.) During that time, potential bidders were required to request and sign a confidential disclosure agreement in order

to receive information about the asset. (*Id.*) Ultimately, GLT sold Pexiganan to Dipexium in two separate sales on April 8, 2010, and March 21, 2011, for a total price of $272,500. (*Id.* ¶ 196.) Dipexium had been formed in January 2010 by Defendants DeLuccia and Luci. After the purchase of Pexiganan, Dipexium was able to raise $1.42 million from twenty-seven investors. (*Id.* ¶ 192–93.) Whereas MacroChem's Pexiganan license had required royalty and milestone payments, the SAC alleges that the Trustee helped DeLuccia and Luci to acquire the rights to Pexiganan free from royalty and milestone payment obligations. (*Id.* ¶ 203.)

3.    *Interlukin 9 ("IL9") Asset*

Since 2007, Genaera had owned a licensor interest in the IL9 antibody program for asthma, which it licensed to MedImmune, LLC ("MedImmune"). (*Id.* ¶ 70.) According to the SAC, Genaera could have received up to $54 million in payments from MedImmune in addition to royalties, if MedImmune reached certain milestones in the development of IL9. (*Id.* ¶ 75.) In 2008, Defendant Armstrong, as President of Genaera, made several public comments about the value of the IL9 Program. (*Id.* ¶¶ 13, 75, 77.) The SAC further alleges that Dr. Michael Gast, Genaera's Chief Medical Officer, periodically shared MedImmune's confidential information about MedImmune's development of the IL9 asset with Armstrong. (*Id.* ¶ 78.) The SAC infers from these facts that the Genaera Board of Directors knew at the time of dissolution that MedImmune was preparing to continue studies of the IL9 program that had been on clinical hold. (*Id.* ¶ 79.)

On May 18, 2010, Trust Defendants sold IL9 to Ligand for $2.75 million, far less than previous estimates of its value. (*Id.* ¶¶ 172–73.) Ligand then sold half of its interest in IL9 to BVF. (*Id.* ¶ 173.) In anticipation of this transaction, BVF had sold off some of its stock in Ligand, so that it owned less than a 10% interest, which the SAC alleges was the statutory

threshold for insiders. (*Id.* ¶ 171.) The sale to BVF was not mentioned in GLT's purchase agreement with Ligand. (*Id.* ¶ 173.) The SAC also alleges that Kaye provided confidential information about the IL9 asset to Defendant Lampert, President of BVF. (*Id.* ¶ 185.)

### C.  Plaintiff's Lawsuit

Schmidt, a former investment professional and high-ranking employee of Brown Brothers Harriman, was a stockholder of Genaera from approximately 1998 until its dissolution on June 12, 2009, and thereafter became a unitholder of GLT by operation of law. (*Id.* ¶¶ 10, 58.) "[T]hroughout the years, [Schmidt] has held many conversations with Genaera officers and directors" regarding the assets at issue and their values and prospects. (*Id.* ¶ 10.) He filed this lawsuit on June 8, 2012, on behalf of himself, all former shareholders of Genaera, and all unitholders of GLT, and derivatively on behalf of Genaera and GLT. (*Id.* ¶¶ 45, 51, 57.) After Schmidt filed an Amended Complaint, this Court granted Defendants' motions to dismiss on the ground that the statute of limitations barred Plaintiff's claims, and dismissed Defendant Ohr Pharmaceuticals for lack of personal jurisdiction. (Aug. 12, 2013 Mem. at 11, 14.) Plaintiff appealed, and the Third Circuit reversed in part and remanded, holding that it was premature to dismiss based on the statute of limitations. *Schmidt v. Skolas*, 770 F.3d 241, 253 (3d Cir. 2014). Following remand, the Court held oral argument on the remaining Motions to Dismiss on February 3, 2015, prior to which Plaintiff filed the SAC. The counts alleged in the SAC are against: (1) the D&O Defendants for breach of fiduciary duty, and all other Defendants for aiding and abetting; (2) the Trust Defendants for breach of fiduciary duty, and all other Defendants for aiding and abetting; (3) all Defendants for punitive damages; and (4) Dipexium for recission of the sale of Pexiganan. The Court held an additional oral argument on Defendants' motions to dismiss the SAC on September 30, 2015.

## II.     STANDARD OF REVIEW

In reviewing a motion to dismiss for failure to state a claim, a district court must accept as true all well-pleaded allegations and draw all reasonable inferences in favor of the non-moving party. *See Powell v. Weiss*, 757 F.3d 338, 341 (3d Cir. 2014). A court need not, however, credit "bald assertions" or "legal conclusions" when deciding a motion to dismiss. *Anspach ex rel. Anspach v. City of Phila., Dep't of Pub. Health*, 503 F.3d 256, 260 (3d Cir. 2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

"Factual allegations [in a complaint] must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To survive a motion to dismiss, a complaint must include "enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. Although the Federal Rules of Civil Procedure impose no probability requirement at the pleading stage, a plaintiff must present "enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element[s]" of a cause of action. *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Simply reciting the elements will not suffice. *Id.* (holding that a pleading that offers labels and conclusions without further factual enhancement will not survive a motion to dismiss); *see also Phillips*, 515 F.3d at 231. In deciding a motion to dismiss, the court may consider "allegations contained in the complaint, exhibits attached to the complaint and matters of public record." *Schmidt*, 770 F.3d at 249.

The Third Circuit has established a two-part analysis for reviewing a motion to dismiss for failure to state a claim. First, the factual allegations of the claim must be separated from the

legal conclusions. The well-pleaded facts are accepted as true and any legal conclusions are disregarded. *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009). Second, the court must make a common sense determination as to whether the facts alleged in the complaint are sufficient to state a plausible claim for relief. *Id.* at 211. If the court can only infer the possibility of misconduct, the complaint must be dismissed because it has alleged—but failed to show—that the pleader is entitled to relief. *Id.*

## III.   DISCUSSION

### A.   Breach of Fiduciary Duty Claims Against Director and Officer Defendants

Under Delaware law, corporate directors and officers owe fiduciary duties of care and loyalty to the corporation and its shareholders.[2] *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1280 (Del. 1989). Plaintiff alleges breaches of these fiduciary duties based on two related, but distinct, courses of conduct: (1) wrongful dissolution of Genaera; and (2) misrepresentations in the shareholder proxy.

#### 1.   Wrongful Dissolution

The core of Plaintiff's first claim is that the D&O Defendants mismanaged Genaera's assets and unnecessarily steered the company toward dissolution to facilitate the sale of the assets to Genaera insiders at unreasonably low prices. (Second Am. Compl. ¶ 1.) Under Delaware law, courts faced with claims of breach of fiduciary duty by a corporation's directors and officers apply the business judgment rule. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 360–61 (Del. 1993). While the business judgment rule is an affirmative defense that cannot generally form the basis of a Rule 12(b)(6) dismissal, it can be considered in evaluating a motion

---

[2] The parties agree that Delaware substantive law applies to this dispute pursuant to Pennsylvania's statutory "internal affairs doctrine," which requires federal courts sitting in Pennsylvania to look to the law of the state of incorporation to resolve disputes involving the corporation's internal affairs. *Banjo Buddies, Inc. v. Renosky*, 399 F.3d 168, 170 n.10 (3d Cir. 2005).

to dismiss if the unanswered affirmative defense appears on the face of the complaint. *In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005). As in *Tower Air*, the SAC states that the business judgment rule does not negate Plaintiff's claims, and therefore Plaintiff must plead around the rule. *See id.*; (Second Am. Compl. ¶ 226 ("The actions and decisions of the Director and Officer Defendants are not protected by the business judgment rule . . . .").)

The business judgment rule is a presumption that the board of directors makes its decisions "on an informed basis, in good faith, and in the honest belief that the action taken was in the best interests of the company." *Reis v. Hazlett Strip-Casting Corp.*, 28 A.3d 442, 457 (Del. Ch. 2011) (quoting *Aronson v. Lewis*, 473 A.2d 805, 812 (Del. 1984)). As long as this presumption applies, a board action will be upheld unless it cannot be justified by any rational business purpose. *Cede & Co*, 634 A.2d at 361. The shareholder has the initial burden of rebutting the presumption by showing either a breach of the duty of loyalty or a breach of the duty of care. *Id.* If the shareholder rebuts the presumption, the directors must prove the entire fairness of the transaction. *Id.* If the shareholder fails, however, to rebut the presumption, he must show that the directors' decision was irrational. *Reis*, 28 A.3d at 457. Plaintiff argues that the D&O Defendants breached both their duty of loyalty and their duty of care.

a.   Breach of the Duty of Loyalty

To show a breach of the duty of loyalty, Plaintiff must allege that the directors were either interested in the transaction at issue or lacked independence. *Orman v. Cullman*, 794 A.2d 5, 22 (Del. Ch. 2002). A director is interested in a transaction when, for example, she appears on both sides of the transaction or receives some personal benefit not shared by the corporation's shareholders. *Cede & Co.*, 634 A.2d at 362.  If less than a majority of the board members has a financial interest in the transaction, the presumption of the business judgment rule is only

rebutted if: (1) the interested director fails to disclose his interest to the rest of the board; or (2) the other members are "dominated or controlled by a materially interested director." *Orman*, 794 A.2d at 23. A director lacks independence when he is influenced by personal or external considerations not limited to the corporate merits of the transaction. *Cede & Co.*, 634 A.2d at 362.

Plaintiff does not allege facts sufficient to give rise to an inference of disloyalty. First, he fails to show that Mitchell Kaye, who served concurrently as a director of Genaera and as CEO of XMark, one of Genaera's two largest shareholders, was either interested or otherwise lacked independence with respect to Genaera's dissolution. Plaintiff alleges that Kaye was interested in the decision to dissolve because he had prearranged to sell a portion of XMark's stock the day after the shareholder vote. (*Id.* ¶¶ 144–48.) However, he neglects to identify to whom XMark sold its shares or, more importantly, to explain why that party would condition the sale on Genaera's dissolution. Therefore the fact that the sale of XMark's stock was prearranged does not show that he received a personal benefit that would make him interested in the dissolution. *See Iqbal*, 556 U.S. at 678 (noting that pleading facts that are "merely consistent with" liability falls short of the requirements of Rule 8).

Plaintiff also alleges that Kaye lacked independence because he was an investment partner in Somanta with Rouhandeh, Davis, and SCO, and because he was an acquaintance of Lampert, the President of BVF. (Second Am. Compl. ¶¶ 65, 67). However, mere personal or professional relationships do not give rise to an inference that a director lacks independence. *See Chaffin v. GNI Grp., Inc.*, Civ. A. No. 16211, 1999 WL 721569, at *5 & n.12 (Del. Ch. Sept. 3, 1999). Plaintiff fails to allege any specific facts that suggest that Rouhandeh, Davis, or Lampert took any actions to influence Kaye's decisions or provide a motive for why Kaye would sabotage

11

Genaera for their benefit. Plaintiff's only specific allegation of collusion between Kaye and the outside Defendants was that Kaye provided Ligand and BVF with confidential information about the IL9 program during the bidding process. (Second Am. Compl. ¶ 179.) However, this would have occurred after Genaera's dissolution, when Kaye and the other D&O Defendants were no longer directors or officers. Moreover, this allegation is made "upon information and belief." (*Id.*) While pleading based on information and belief is permissible, it must be based on facts that make the inference plausible. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). Aside from alleging that Kaye was a "close acquaintance" of Lampert, Plaintiff fails to plead any facts to support the inference that Kaye colluded with Ligand and BVF. (Second Am. Compl. ¶ 65.) Plaintiff therefore fails to meet the plausibility standard required to survive a motion to dismiss. *See Arista Records*, 604 F.3d at 120.

Plaintiff pleads even fewer facts in support of his allegations against the remaining D&O Defendants. Plaintiff argues that Armstrong and Kelly, as employees of Genaera, were interested in the company's dissolution because they would receive large severance packages upon their discharge. (Second Am. Compl. ¶ 23.) However, Delaware law does not view the possibility of payment upon change of control of a company as a disqualifying interest when this payment is to be made under a preexisting employment agreement. *In re Novell, Inc. S'holder Litig.*, Civ. A. No. 6032, 2013 WL 322560, at *11 & n.148 (Del. Ch. Jan. 3, 2013).

Additionally, he infers that the other D&O Defendants were beholden to Kaye because they made various decisions that allegedly benefitted Kaye and hurt the company. In particular, Plaintiff claims that the D&O Defendants allowed Kaye to "benefit from the liquidation status of the assets" by failing to maximize the value of Genaera's assets, failing to disclose material information in the proxy, and hiring Skolas as the Trustee. (Mem. of Law in Opp'n to D&O

Defs. Mot. to Dismiss Second Am. Compl. at 13.) Plaintiff fails to allege how these choices actually benefitted Kaye. Moreover, he argues, in effect, that the D&O Defendants must have lacked independence because, in his view, these decisions were ill-advised.  However, this argument turns the business judgment rule on its head. Delaware law requires the Court to presume that these business decisions were rational *unless* Plaintiff can show that the directors lacked independence. While acquiescing to another's wishes in contravention of sound business judgment may constitute a breach of the duty of loyalty, *see Tower Air*, 416 F.3d at 241, Plaintiff alleges no facts to suggest that such acquiescence occurred. Plaintiff's allegations that the other directors and officers were beholden to Kaye and Kaye's business acquaintances are thus conclusory, and are not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 680–81. Plaintiff is unable to show a breach of the duty of loyalty.

b.   Breach of the Duty of Care

A plaintiff may also overcome the business judgment rule by showing that the directors failed to inform themselves of all material information reasonably available to them and to act on the basis of that information. *Cede & Co.*, 634 A.2d at 367. Directors breach the duty of care when they consciously and intentionally fail to make a good faith effort to be informed and exercise judgment. *Tower Air*, 416 F.3d at 240.

Plaintiff argues that the D&O Defendants breached the duty of care by failing to fully inform themselves of the alternatives to dissolution, including selling the company as a whole, by mismanaging Genaera's assets, and by appointing Skolas's firm Argyce as Trustee of GLT, a position for which it was unqualified. (Mem. of Law in Opp'n to D&O Defs. Mot. to Dismiss Second Am. Compl. at 20–21.) However, the SAC does not allege facts sufficient to show that the D&O Defendants failed to inform themselves about alternatives. Plaintiff does not allege, for

example, that the D&O Defendants "failed to establish an information and reporting system" or otherwise deliberately declined to gather necessary information about alternatives to dissolution prior to the Board vote. *See Tower Air*, 416 F.3d at 238. In fact, Plaintiff alleges that he discussed several of his preferred alternatives to dissolution with certain D&O Defendants and other Genaera officers. (Second Am. Compl. ¶¶ 119, 166). At oral argument, Plaintiff's attorney asked the Court to infer a breach of the duty of care from allegations that the D&O Defendants omitted relevant alternatives to dissolution from the shareholder proxy. (Sept. 30, 2015 Transcript at 25.) However, Plaintiff alleges that the D&O Defendants *were* aware of the alternatives to dissolution and deliberately failed to disclose that information in the proxy. (*See* Second Am. Compl. ¶¶ 117–19, 127.) Moreover, Directors are free to consider alternative courses of action and then exclude them from the proxy, so a particular option's absence from the proxy does not give rise to an inference that the D&O Defendants did not consider it at all. *See Dent v. Ramtron Int'l Corp.*, Civ. A. No. 7950, 2014 WL 2931180, at *15 (Del. Ch. June 30, 2014).

Plaintiff's additional arguments that the D&O Defendants mismanaged Genaera's assets and appointed a trustee who was unqualified for the position are equally ineffective in establishing breach of the duty of care. These are business judgments that, even if ill-advised, do not give rise to a plausible inference that the D&O Defendants were uninformed. Thus, Plaintiff fails to allege facts sufficient to show breach of the duty of care.

### c.  Rationality

When, as here, the business judgment rule's presumption applies, a court will uphold the decisions in question unless they cannot be attributed to any legitimate business rationale. *Reis*, 28 A.3d at 257. A plaintiff must allege that the conduct in question is "so far beyond the bounds

of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith." *Parnes v. Bally Entm't Corp.*, 722 A.2d 1243, 1246 (Del. 1999). Tellingly, Plaintiff does not argue that he has met this standard. While he questions the wisdom of several of the D&O Defendants' choices, he does not allege that they were inherently irrational. Since the SAC does not show that dissolution was irrational, the business judgment rule requires the dismissal of Plaintiff's claim for breach of fiduciary duty by wrongful dissolution.

### 2.   *Misrepresentation in the Shareholder Proxy*

In addition to his wrongful dissolution claim, Plaintiff argues that the D&O Defendants breached their duty of disclosure by making various misrepresentations and omissions in the shareholder proxy issued prior to the June 4, 2009 special meeting, when stockholders voted on the plan of dissolution. (Second Am. Compl. ¶¶ 127–39.) To state a claim for breach of the duty of disclosure on the basis of an affirmative misrepresentation, a plaintiff must allege facts showing "(1) a material statement or representation in a communication contemplating stockholder action (2) that is false." *Pfeffer v. Redstone*, 965 A.2d 676, 685 (Del. 2009). To state a claim on the basis of an omission, a plaintiff must show "(1) material, (2) reasonably available (3) information that (4) was omitted from the proxy materials." *Id.* at 686. An omitted or misstated fact is material where there is a "substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *In re Orchard Enters., Inc. Stockholder Litig.*, 88 A.3d 1, 17 (Del. Ch. 2014).

As an initial matter, the D&O Defendants argue that Plaintiff's duty of disclosure claims should be dismissed because Delaware law does not allow recovery of damages for disclosure violations. (Mem. in Supp. of Mot. of D&O Defs. to Dismiss Second Am. Compl. at 19.) The D&O Defendants rely on *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346 (Del. Ch. 2008), for

the proposition that plaintiffs must seek a preliminary injunction before the shareholder vote to enforce the duty of disclosure. *Transkaryotic Therapies, Inc.*, 954 A.2d at 360. However, Delaware law is far from settled on whether this constitutes a requirement rather than merely a preference. *See Orchard Enters.*, 88 A.3d at 52–53 (disagreeing with *Transkaryotic* and stating that "[i]n my view, in an appropriate case Delaware law continues to recognize the possibility of a post-closing award of damages as a remedy for a breach of fiduciary duty of disclosure"). In any event, this is a consideration about the appropriate remedy that does not support the dismissal of Plaintiff's claim at this stage of the litigation. *See id.* at 53 (reserving judgment until after trial as to whether damages are appropriate).

Plaintiff cites various misrepresentations in the proxy. First, Plaintiff argues that the proxy affirmatively misrepresented the fact that the Trustee, rather than the Directors, would sell the assets. (Mem. of Law in Opp'n to D&O Defs. Mot. to Dismiss Second Am. Compl. at 16.) In particular, he cites a statement under the heading, "Sales of our Assets," which provides that "[s]ales of our assets will be made on such terms as are approved by the Board of Directors in its sole discretion." (Mot. of D&O Defs. to Dismiss Second Am. Compl., Ex. 1 [Proxy], at 15.) However, alleged misrepresentations are not material when they would only mislead a stockholder if read in isolation, rather than in the context of the entire document. *See In re Best Lock Corp. S'holder Litig.*, 845 A.2d 1057, 1071 (Del. Ch. 2001). Both on the page immediately preceding the statement quoted above and in the section titled "Risk Factors to Be Considered by Stockholders in Deciding Whether to Approve the Plan of Dissolution," the proxy makes clear that the Directors could resign and turn management of the liquidation process over to a third-party trustee at any time. (Proxy at 9, 14.) Therefore, Plaintiff does not state a claim for breach of the duty of disclosure based on this allegation.

16

Second, Plaintiff alleges that the following statement in the proxy is "deceitfully worded" because it avoids disclosing the benefit to Kaye, who did not participate in the board vote: "it is not currently anticipated that our liquidation and dissolution will result in any material benefit to any of our executive officers or to directors who participated in the vote to adopt the Plan of Dissolution." (Second Am. Compl. ¶ 133; Mem. of Law in Opp'n to D&O Defs. Mot. to Dismiss Second Am. Compl. at 16.) Plaintiff also argues that this statement fails to consider the severance packages to which Armstrong and Kelly would be entitled upon dissolution. (Mem. of Law in Opp'n to D&O Defs. Mot. to Dismiss Second Am. Compl. at 16.) In this case it is Plaintiff's argument, not the proxy, which is misleading. The sentence quoted above begins with the phrase "[o]ther than as set forth above" and is directly preceded by a lengthy statement of the benefits the directors and officers would receive, including the severance packages, as well as a caveat that "[a]s a result of these benefits, our directors and executive officers generally could be more likely to vote to approve the Plan of Dissolution." (Proxy at 11–14.) As discussed above, the SAC does not adequately allege that Kaye received any other benefits from the dissolution besides those described in the proxy. Plaintiff does not state a claim on this point.

Third, Plaintiff argues that the D&O Defendants should have disclosed that selling Genaera as a whole would have allowed it to monetize its net operating loss, which Plaintiff believes was the most valuable alternative to dissolution. (Second Am. Compl. ¶ 118.) However, Delaware law does not require directors to disclose all the possible alternatives, because it is the directors' responsibility to consider various courses of action and to decide which to propose. *Dent*, 2014 WL 2931180, at *15. Plaintiff's opinions about the relative strength of this option do not make it a material omission, and thus Plaintiff fails to state a claim.

17

Fourth, Plaintiff argues that various pieces of information about the value of Genaera's assets should have been disclosed in the proxy. None meets the requirements to state a claim for breach of the duty of disclosure under Delaware law. He states that the proxy should have included independent valuation estimates for the assets, but does not allege that current valuations existed and were "within the board's control." (Second Am. Compl. ¶ 130); *see Loudon v. Archer-Daniel-Midlands Co.*, 700 A.2d 135, 143 (Del. 1997). He argues that the directors should have disclosed that Genaera had the right to demand the return of Pexiganan but that they, as Genaera's directors, had refused to exercise that right. (Second Am. Compl. ¶ 127(h).) Even if this were true, which is not supported by Plaintiff's reference to the license agreement with MacroChem, directors are not required to engage in "self-flagellation" by drawing legal conclusions that implicate themselves in breaches of fiduciary duty. *See Loudon*, 700 A.2d at 143; (Mem. of Law in Opp'n to D&O Defs. Mot. to Dismiss, at 18; D&O Defs. Mot. to Dismiss, Ex. 7 [MacroChem License Agreement], at 25.). Plaintiff also alleges that the D&O Defendants should have included information about MedImmune's plans to end an existing clinical hold and resume active development of the IL9 program. (Second Am. Compl. ¶ 127.) However, since the proxy also does not discuss the clinical hold, the SAC does not state a claim that information about the end of that hold would sufficiently alter the total mix of information to be considered material. (*See* Proxy at 4.) Plaintiff alleges that the D&O Defendants failed to disclose that bidders were seeking to purchase the Aminosterol Assets, but the Proxy does discuss the Board's ongoing negotiations for the sale of those assets. (*See* Second Am. Compl. ¶ 127(g); Proxy at 5.)

Finally, Plaintiff alleges that the Directors had already selected Skolas to be the Trustee of GLT and failed to disclose this information in the proxy. (Second Am. Compl. ¶ 137.) This is

a factual allegation that the Court must credit, and it is supported by the short timeline of approximately a month between the issuance of the proxy and the signing of the Trust Agreement. (*See* Second Am. Compl. ¶ 150.) The choice of Trustee's impact on the course of Genaera's dissolution would "sufficiently alter[] the total mix of information" available to the shareholders. *See Loudon*, 700 A.2d at 143. Therefore, Plaintiff states a claim in this instance for breach of the duty of disclosure.

In sum, there is a single allegation that states a claim against the D&O Defendants for breach of fiduciary duty: that the D&O Defendants failed to disclose the fact that they had already selected the Trustee. (Second Am. Compl. ¶ 137.) However, this claim, as described in the next section, must be dismissed for lack of timeliness.

### 3. Statute of Limitations

On appeal from this Court's August 12, 2013 Order, the Third Circuit held that Plaintiff's allegations, on their face, did not show that he had missed the statute of limitations with regard to the sale of Genaera's various assets. *Schmidt*, 770 F.3d at 253. The court acknowledged, however, that a claim may be dismissed under Rule 12(b)(6) on the basis of the statute of limitations if the defense is apparent from the face of the complaint, even if the plaintiff invokes the discovery rule. *Id.* at 249, 251. The Third Circuit held that the face of the First Amended Complaint did not make clear that Plaintiff knew or should have known more than two years before the filing of this lawsuit that the Trustee had sold Genaera's assets for unacceptably low prices. *See id.* at 252–53. However, the Third Circuit did not address the narrower breach of the duty of disclosure claim that now survives against the D&O Defendants under Count I. Therefore, it is appropriate for this Court to now consider whether the sole claim under Count I that satisfies federal pleading standards is facially barred by the statute of limitations.

19

The parties have previously agreed that Pennsylvania's two-year statute of limitations for breach of fiduciary duty applies. *Id.* at 250. Generally, the statute begins to run "as soon as the right to institute and maintain suit arises." *Haugh v. Allstate Ins. Co.*, 322 F.3d 227, 231 (3d Cir. 2003). The event that gave rise to the surviving breach of the duty of disclosure claim occurred on the date the proxy was issued, May 14, 2009. (Proxy at 2.) However, under Pennsylvania's discovery rule, the statute is tolled until the plaintiff knew or reasonably should have known that the opposing party caused his injury. *Haugh*, 322 F.3d at 231. The sole allegation in question is that the Genaera directors failed to disclose in the proxy that John Skolas and his firm, Argyce, LLC, had been selected as Trustee, a fact that Plaintiff plausibly infers from the timing of the announcement shortly after the shareholder vote. (*Id.* ¶ 137.) The SAC alleges that Argyce was officially named Trustee on June 12, 2009, at which time Plaintiff's shares were converted to units of the liquidating trust. (Second Am. Compl. ¶¶ 150–51, 159.) The SAC also alleges that Plaintiff had discussed the disposition of Genaera's assets with Skolas prior to the sale of the IL9 program on May 18, 2010. (*Id.* ¶¶ 172, 174.) Therefore, it is clear from the face of the complaint that Plaintiff actually knew that Skolas's firm was selected as Trustee, likely as early as June 12, 2009 and definitely prior to May 18, 2010. When he filed this complaint on June 8, 2012, the two-year statute of limitations had run. Since the SAC alleges facts showing actual knowledge of the alleged breach of the duty of disclosure, it is unnecessary to inquire into when Plaintiff should have been aware of the conduct in question in the exercise of reasonable diligence and considering the fiduciary relationship between the parties. *See Schmidt*, 770 F.3d at 252–53. Plaintiff's claim for breach of the duty of disclosure concerning the D&O Defendants' failure to inform shareholders of Argyce's selection as Trustee is barred by the statute of limitations.

### B.  Breach of Fiduciary Duty Against the Trust Defendants

Like corporate directors and officers, trustees owe beneficiaries duties of due care, loyalty, and good faith. *See* Bogert & Bogert, The Law of Trusts and Trustees §§ 542–44 (2014). Plaintiff alleges that Argyce and Skolas breached these duties, as well as the duties owed under the Trust Agreement between Genaera and Argyce, by mismanaging the sale of Genaera's assets and selling the IL9 program, Pexiganan, and the Aminosterol Assets for unreasonably low prices as part of a coordinated effort to deliver those assets to insider purchasers. (Second Am. Compl. ¶¶ 160–220). He also argues that the fees charged to the Trust were excessive. (*Id.* ¶ 221.)

The Trust Agreement imposes duties on the Trustee that generally mirror common law fiduciary duties. (*See* Trustee Defs. Mot. to Dismiss Second Am. Compl., Ex. 2 [Trust Agreement] § 7.1.) However, the Trust Agreement limits the Trustee's liability, stating that neither Argyce nor its employees or agents shall be subject to personal liability to any beneficiary "except for gross negligence, fraud, or willful misconduct knowingly and intentionally committed in bad faith." (*Id.* § 7.3.) It also states that "the Trustee shall not be liable for any reasonable error of judgment made in good faith." (*Id.* § 7.1(d).) Delaware law permits these types of exculpatory provisions, provided they do not exculpate conduct that rises to the level of gross negligence. *McNeil v. McNeil*, 798 A.2d 503, 509 (Del. 2002). Plaintiff briefly argues that the Trust Agreement should not be relied on because it is not integral to the SAC. (*See* Mem. of Law in Opp'n to Trust Defs. Mot. to Dismiss Second Am. Compl. at 14 n.4.) However, the SAC explicitly alleges breach of the Trust Agreement, and the common law fiduciary duties underlying Plaintiff's claim against the Trustee only exist by virtue of the fiduciary relationship that the Trust Agreement creates. Therefore, this is a paradigm case in

21

which a complaint explicitly relies on a document. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997).

Because the Trustee was selling Genaera's assets for cash, Delaware's *Revlon* standard of review, which requires the fiduciary to maximize shareholder value, applies. *See Paramount Comms. Inc. v. QVC Network Inc.*, 637 A.2d 34, 46 (Del. 1993). Although the Delaware Supreme Court's decision in *Revlon* came in the context of a challenge to the actions of corporate directors, it stemmed from existing Delaware law that requires any fiduciary who sells an asset for cash to pursue the single goal of obtaining the best price available. *See Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, 506 A.2d 173, 185 (Del. 1986); *Wilmington Trust*, 200 A.2d at 448 (noting that "ordinarily speaking, when selling trust assets a Trustee is required to obtain the best price obtainable"). Thus, Argyce was under a duty to sell Genaera's assets for the highest possible price. However, under the Trust Agreement, Argyce can only be liable to Plaintiff if it acted with gross negligence or in bad faith in failing to discharge this duty.

Plaintiff argues that the Trustee acted in bad faith, but he does not allege facts sufficient to support this conclusion. The SAC does not allege any communications with the various purchaser Defendants that would suggest that the Trustee conspired to sell them the assets at low prices. Plaintiff alleges that the Trustee sold the IL9 program to Ligand with the purpose of secretly benefiting BVF. However, he cites no legal authority to support the proposition that a conflict of interest would have prevented BVF from purchasing the asset directly. (*See Second Am. Compl.* ¶¶ 173, 184; Mem. of Law in Opp'n to Trustee Defs. Mot. to Dismiss, at 15.) This is a legal conclusion that the Court need not credit, and in fact appears to be incorrect. *See Fowler*, 578 F.3d at 210–11. Therefore, nothing in the series of apparently legal transactions Plaintiff alleges that the Trustee engaged in suggests that it must have colluded with the

purchasers in bad faith. *See Twombly*, 550 U.S. at 566 (requiring allegations of more than parallel business conduct to state a claim for conspiracy). Plaintiff's allegations of fraud and bad faith are thus entirely conclusory.

Plaintiff also argues that the Trustee utilized inadequate bidding procedures for Pexiganan, the IL9 program, and the Aminosterol Assets, which failed to foster sufficient competition for the assets and thus yielded below-market prices. (*See* Second Am. Compl. ¶¶ 173, 182, 191, 205–07.) While the facts alleged in the SAC suggest that the Trustee may have rushed the sales of certain assets, these facts do not state a claim for gross negligence, as required by the Trust Agreement. Under Delaware law, gross negligence constitutes an "extreme departure from the ordinary standard of care" and is functionally equivalent to criminal negligence. *Hardy v. Hardy*, Civ. A. No. 7531, 2014 WL 3736331, at * 15 (Del. Ch. July 29, 2014). In order to state a claim for gross negligence, Plaintiff must plead facts tending to show that the Trustee acted "outside the bounds of reason." *See Albert v. Alex. Brown Mgmt. Servs., Inc.*, Civ. A. No. 762, 2005 WL 2130607, at *4 (Del. Ch. Aug. 26, 2005). While the *Revlon* standard of review is less deferential than the business judgment rule, it does not give courts license to second guess reasonable decisions. *In re Lear Corp. S'holder Litig.*, 926 A.2d 94, 115 (Del. Ch. 2007).

The facts alleged in the SAC about the sales of the three assets at issue do not give rise to an inference of unreasonableness. Plaintiff alleges that the Trustee's valuation of the IL9 program was unreasonable based on independent market estimates of potential sales. (Second Am. Compl. ¶ 169.) However, he explains that the Trustee had decreased the valuation of the program to reflect the additional time that would be required to bring the drug to market, and fails to explain why that adjustment was unreasonable. (*See id.* ¶ 168.) Plaintiff focuses on the

alleged conspiracy to transfer the IL9 program to BVF, but does not show that the Trustee's decision to sell the program for $2.75 million constituted an extreme departure from the standard of care. (*See id.* ¶¶ 178–83.) Plaintiff also argues that by setting a short deadline for bids on both Pexiganan and IL9 of only one month after the first public announcement of their sale, the Trustee favored insiders who were already familiar with the assets. (*Id.* ¶ 191.) While it may be true that the short deadline was favorable to insiders, a short window for bids could just as easily encourage, rather than discourage, potential purchasers to make offers, and thus the length of the bidding period cannot itself state a claim for gross negligence. Finally, Plaintiff alleges that by selling the Aminosterol Assets less than a month after the formation of the Trust, the Trustee lost the opportunity to sell the assets to a higher bidder. (*Id.* ¶¶ 205–12.) However, as the SAC alleges, Genaera was already in negotiations with the eventual purchaser, among others, to sell the Aminosterol Assets prior to dissolution. (*Id.* ¶¶ 127(g).) The fact that the Trustee consummated this transaction shortly after Genaera's dissolution does not give rise to an inference of gross negligence. Critically, plaintiff never alleges that the sale price of any of these three assets was significantly below a contemporaneous valuation or an existing offer. *Cf. In re Comverge, Inc.*, Civ. A. No. 7368, 2014 WL 6686570, at *12 (Del. Ch. Nov. 25, 2014) (finding that the plaintiff stated a claim for gross negligence under *Revlon* where the directors agreed to a merger price 7.4% below the market price of the business's common stock the day before the announcement). Therefore, Plaintiff fails to allege facts stating a plausible claim of gross negligence.

Plaintiff's final contention is that the fees charged by the Trustee were "excessive." (Second Am. Compl. ¶ 221.) However, the SAC does not allege that the fee violated the terms of the Trust Agreement or that the Trust Agreement's fee provision was unreasonable. Nor does it

allege any other facts to support the claim that the fees were excessive. Therefore, Plaintiff does not state a claim for breach of fiduciary duty against the Trust Defendants.

### C. Aiding and Abetting the D&O Defendants' and Trust Defendants' Breaches of Fiduciary Duty

In addition to alleging breach of fiduciary duty by the D&O Defendants and Trust Defendants, Counts I and II allege aiding and abetting that breach by all of the other defendants. "Under Delaware law, a valid claim for aiding and abetting a breach of fiduciary duty requires: (1) the existence of a fiduciary relationship; (2) the fiduciary breached its duty; (3) a defendant, who is not a fiduciary, knowingly participated in a breach; and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and the nonfiduciary." *Globis Partners, L.P. v. Plumtree Software, Inc.*, No. 1577-VCP, 2007 WL 4292024, at *15 (Del. Ch. Nov. 30, 2007). Knowing participation requires a plaintiff to show that the defendant advocated or assisted conduct while knowing that the conduct constituted a breach of fiduciary duty. *Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001). As noted above, Plaintiff has not stated a claim against the D&O Defendants or the Trust Defendants for breach of their fiduciary duties, aside from a single time-barred breach of the duty of disclosure. Therefore, he similarly cannot state a claim against the remaining Defendants for aiding and abetting. However, even if Plaintiff had stated a primary claim under Count I or Count II, he still does not sufficiently allege knowing participation by any of the defendants to establish aiding and abetting. The Court will briefly discuss the allegations against each defendant.

#### 1. D&O Defendants

Except Kelly, who was employed by Argyce, Plaintiff does not allege that any of the D&O Defendants communicated with the Trustee in any way after the establishment of GLT. The SAC makes no specific allegations about Kelly's role in the Trustee's alleged breach of

25

fiduciary duty. As discussed above, the allegation that Kaye provided confidential information to BVF, which was made "upon information and belief," is not supported by facts that make the inference plausible. (*See* Second Am. Compl. ¶ 179.) The SAC does not allege any facts that show that the D&O Defendants advocated or assisted any of the Trustee's conduct, much less that they aided and abetted the Trustee in breaching its fiduciary duties. Plaintiff seems to suggest that by selecting Argyce as the Trustee, the D&O Defendants enabled Argyce to breach its fiduciary duties. However, the fact that they created the initial fiduciary relationship does not mean that they aided and abetted a breach of the Trustee's fiduciary duties.

### 2. *Trust Defendants*

Plaintiff's argument that Skolas and Argyce aided and abetted the D&O Defendants' alleged breach is similarly unsubstantiated by the SAC. The SAC does not allege any facts tending to show that the Trust Defendants asked or encouraged the D&O Defendants to dissolve Genaera. Rather, it alleges in a conclusory manner that they knew about and participated in the D&O Defendants' actions. (*Id.* ¶ 229); *cf. Iqbal*, 556 U.S. at 678. Plaintiff's argument that "Skolas's knowing participation was necessary for the D&O Defendants' breach to have purpose," is circular and highlights Plaintiff's inability to show, based on the facts alleged in the SAC, that he is entitled to relief. *See Fowler*, 578 at 211; (Mem. of Law in Opp'n to Trustee Defs. Mot. to Dismiss, at 12.).

### 3. *Access Defendants*

Plaintiff argues that Access purposefully stopped developing Pexiganan in order to end the original license and allow Luci and DeLuccia, who were then Access directors and officers, to form a new company and buy Pexiganan on more favorable terms. He further suggests that MacroChem's previous acquisition of Virium was somehow part of this scheme. (Second Am.

Compl. ¶¶ 92–109, 198.) However, he does not allege any actual interactions between Access and the D&O or Trust Defendants, other than arm's-length transactions that cannot constitute aiding and abetting. *See Malpiede*, 780 A.2d at 1097–98 (recognizing that arm's-length negotiations do not constitute aiding and abetting unless the bidder attempts to create or exploit conflicts of interest in the target company's board, or conspires with the board). While Plaintiff alleges that Kaye had co-invested with Defendants Rouhandeh, Davis, and SCO in another company, he does not allege facts that connect this investment to any breach of fiduciary duty relating to Genaera. (Second Am. Comp. ¶ 67.) The allegations that the Access Defendants knew that the Genaera directors were breaching their fiduciary duties and conspired with them to do so are conclusory and are not supported by any facts showing that the Access Defendants actually advocated or assisted in any challenged conduct.

### 4. BVF Defendants

Plaintiff alleges that BVF's President, Lampert, used his personal relationship with Kaye and BVF's status as Genaera's second-largest shareholder to encourage the company's dissolution and to obtain a partial interest in the IL9 program for BVF at a low price. (Second Am. Comp. ¶¶ 65, 127(l), 173, 178–79.) However, as noted above, purchasing an asset at arm's-length does not constitute aiding and abetting. The only other fact that Plaintiff alleges about BVF's involvement is that Kaye provided Lampert with confidential information about IL9. However, even if true, this fact would not state a claim. *See In re Answers Corp. S'holder Litig.*, No. 6170-VCN, 2012 WL 1253072, at *10 (Del. Ch. Apr. 11, 2012) ("When a board is negotiating the sale of the company it directs, the board typically provides potential purchasers with confidential information about the company, and the receipt of confidential information, without more, will not usually be enough to plead a claim for aiding and abetting."). Plaintiff

does not allege any other facts that suggest that the BVF Defendants advocated or assisted any of the D&O or Trust Defendants' conduct.

### 5. *XMark Defendants*

The only action XMark is alleged to have taken to encourage the challenged conduct is voting its shares in favor of Genaera's dissolution. (Second Am. Compl. ¶ 142.) This fact, however, does not give rise to an inference of wrongdoing. Rather, Delaware law presumes that when a large shareholder votes for a decision, it does so with the goal of maximizing the value of its own shares, and thus all other shareholders' shares. *See In re Morton's Restaurant Grp., Inc. S'holder Litig.*, 74 A.3d 656, 662 (Del. Ch. 2013). The only allegation suggesting that XMark received a benefit at the expense of other shareholders is that it had prearranged to sell a large amount of stock at a high price on the day after the shareholder vote. (Second Am. Compl. ¶ 148.) However, the SAC does not allege facts showing any relationship between the dissolution vote and the sale of stock that would create a motive for Xmark to circumvent the other shareholders' interests. The facts alleged against XMark are insufficient to state a claim for aiding and abetting.

### 6. *Dipexium Defendants*

The Dipexium Defendants benefitted from Genaera's dissolution. Luci and DeLuccia, former directors and officers of Access and MacroChem, formed Dipexium in order to acquire Pexiganan on more favorable terms than Access/MacroChem's previous license. (*Id.* ¶ 193.) However, Plaintiff does not allege any contact with the D&O Defendants or the Trust Defendants that could constitute knowing participation. Again, arm's-length negotiations do not constitute aiding and abetting unless the Defendant tries to create, exploit, or otherwise profit from a fiduciary's conflict. *In re Hechinger Inv. Co. of Del., Inc.*, 278 F. App'x 125, 130 (3d Cir.

2008). An allegation that a bidder got a favorable deal does not give rise to an inference of aiding and abetting. *In re Comverge, Inc.*, No. 7368-VCP, 2014 WL 6686570, at *19 (Del. Ch. Nov. 25, 2014). Thus the facts alleged against the Dipexium Defendants do not state a claim.

### 7.  *Ligand Defendants*

Plaintiff similarly fails to state a claim against the Ligand Defendants. Ligand's only alleged involvement with Genaera was purchasing the IL9 program from the Trustee and then selling a half interest to BVF. (Second Am. Compl. ¶ 173.) Contrary to Plaintiff's claims, however, there is no apparent reason why BVF could not have bought the IL9 program from GLT directly. In any event, the SAC does not allege any interactions between the Ligand Defendants and the D&O and Trust Defendants that could constitute aiding and abetting by the Ligand Defendants.

### D.  Punitive Damages and Recission

Punitive damages and recission are remedies. *See Fulton Bank, N.A. v. UBS Secs. LLC*, 2011 WL 5386376, at *16 (E.D. Pa. 2011). Therefore, since the underlying causes of action in Counts I and II of the SAC will be dismissed, Counts III and IV must be dismissed as well.

## IV.    CONCLUSION

For the foregoing reasons, the Court grants Defendants' motions to dismiss. An Order consistent with this Memorandum will be docketed separately.