# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALAN SCHMIDT, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| JOHN A. SKOLAS, et al., | : | No. 12-3265 |
| Defendants. | : | |

## MEMORANDUM

**Schiller, J.**                                                                                                  May 9, 2018

      Alan Schmidt, a former shareholder of Genaera Corporation and then a unitholder of the Genaera Liquidating Trust, brought a putative class action complaint against more than two dozen defendants alleging a number of claims related to the dissolution of Genaera. The case has now been pared down to one defendant, Argyce LLC, the Trustee of Genaera Liquidating Trust, and one count of breach of fiduciary duty related to the sale of two pharmaceutical assets and the Trustee's fees. The Court ordered limited discovery on the issue of the statute of limitations and Argyce now moves for summary judgment. The sole question before the Court is whether Schmidt's claims are barred by the statute of limitations. In short, what did Schmidt know (or what should he have known) and when did he know (or when should he have known) it?

      Because the Court finds that Schmidt knew, or should have known, of his injuries and their cause related to the sales of two of the pharmaceutical assets more than two years before suing Genaera, it will grant summary judgment to Argyce on the breach of fiduciary duty claim related to those transactions. The Court will deny summary judgment as to the claim related to the Trustee's fees, however, because there remains a genuine issue of material fact as to when that alleged injury was incurred.

I.  **BACKGROUND**

This action arises from the dissolution and liquidation of Genaera, a biotechnology company that developed pharmaceutical drugs. Schmidt's claim of breach of fiduciary duty is premised on the sale of two classes of pharmaceutical compounds and administrative fees charged by the Trustee resulting from the administration of the Trust.

A.  **Genaera**

Prior to its dissolution, Genaera developed pharmaceutical drugs and licensed its intellectual property. (Second Am. Compl. ("SAC") ¶ 61.) Its core assets at the time of dissolution included: (1) Interlukin 9 ("IL9" or "IL-9"), an antibody program for asthma, (2) several squalamine and other aminosterol compounds (the "Aminosterol Assets"); and (3) Pexiganan, a topical cream treatment for diabetic foot infections. (SAC ¶ 3.)

On April 18, 2009, Genaera's Board of Directors approved a dissolution plan, which created a liquidating trust and tasked it with winding up Genaera's affairs and disposing all of its assets within three years. (SAC ¶¶ 122, 124.) In June 2009, Genaera's stockholders approved the dissolution plan and Genaera transferred all of its assets and liabilities to the Genaera Liquidating Trust, which all Genaera shareholders became unitholders in. (SAC ¶¶ 139–140, 150, 159.) Argyce became the Trustee of the Liquidating Trust. (SAC ¶ 151.) John Skolas, who years earlier was Genaera's Chief Financial Officer, Secretary, and General Counsel, was the President of Argyce. (SAC ¶ 153.) As the Trustee, Argyce owed a fiduciary duty to the unitholders of the Liquidating Trust.

### B. Aminosterol Assets

The Trust sold the Aminosterol Assets for $200,000, including a $50,000 down payment. (SAC ¶ 205.) In early January 2010, the buyer disclosed in its 10-K filing that it had "completed the acquisition" of the Aminosterol Assets on August 19, 2009. (Pl.'s Stmt. of Add'l Facts ¶ 54.) Schmidt alleges that Argyce breached its fiduciary duty by not publicly requesting bids or having the Aminosterol Assets appraised, accepting a down payment only 26 days after the Liquidating Trust was formed, and selling the Aminosterol Assets for the "unacceptable" price of $200,000. (SAC ¶¶ 205–07.) According to Schmidt, other potential buyers had expressed interest in the Aminosterol Assets and the Trust could have received a higher price had it not sold the compounds prematurely. (SAC ¶¶ 212, 218–19.)

### C. Pexiganan

Genaera first licensed Pexiganan, a topical anti-infective cream, to a company called MacroChem in 2007. (SAC ¶¶ 80–81, 84–85.) The final license agreement provided for a $1 million upfront payment to Genaera, in addition to a 10% royalty on net sales and additional payments based on clinical, regulatory, and sales-based milestones. (SAC ¶¶ 75, 85, 88.) By late 2008, however, MacroChem "abruptly reversed course" and drastically cut its development budget for Pexiganan. (SAC ¶ 104.)

After the development of Pexiganan stalled, the Liquidating Trust terminated the license agreement in November 2009. (SAC ¶ 189.) On January 11, 2010, the Trust announced that it was seeking bids for Pexiganan and set a one-month bidding period. (SAC ¶ 191.) It ultimately sold Pexiganan for $272,500 and a reduced royalty to a company started by former MacroChem executives. (SAC ¶¶ 36–37, 191, 193, 195.)

Schmidt alleges that Argyce breached its fiduciary duty by not preparing Pexiganan for sale earlier or allowing potential buyers to have more time to bid, which he claims resulted in an unreasonably low sale price. (SAC ¶¶ 190, 201–03.)

### D. Trustee's Fees

The Liquidating Trust Agreement (the "Agreement") provided for the Trustee to be compensated at $250 per hour, in addition to one to three percent of the distributions made to unitholders. (Def.'s Stmt. of Undisputed Facts Ex. C, at 22–23.) The Agreement also allowed the Trustee to be reimbursed for all reasonable expenses. (*Id.* at 23.)

In March 2011, the Trust published financial statements for the year 2010, which showed that it had incurred "General and administrative expenses" of $687,000 while realizing just over $3 million of revenue. (Def.'s Stmt. of Undisputed Facts Ex. E, at 14.) Schmidt challenges these fees as excessive. (SAC ¶ 221.)

### E. Alan Schmidt's Lawsuit

Schmidt initially filed a complaint on June 8, 2012, and later filed a First Amended Complaint and Second Amended Complaint. Schmidt alleges that Argyce and its CEO, John Skolas, breached their fiduciary duty to the unitholders of the Liquidating Trust in the sales of IL9, the Aminosterol Assets, and Pexiganan. (First Am. Compl. ("FAC") ¶¶ 245–48; SAC ¶¶ 230–41.) Schmidt also claims that Argyce unlawfully enriched itself by billing $687,000 in "General and Administrative" expenses in 2010. (FAC ¶ 236; SAC ¶ 221.)

This Court dismissed the First Amended Complaint in its entirety, finding that the statute of limitations barred Schmidt's claims against Argyce. On appeal, the Third Circuit reversed in part, holding that dismissal on statute of limitations grounds was premature. *Schmidt v. Skolas*, 770 F.3d 241, 252–53 (3d Cir. 2014). In particular, the Third Circuit found that extraneous

documents were required to determine the date of the Pexiganan sale and whether sufficient warnings existed to require Schmidt to inquire into his injury. *Id*.

In 2015, this Court dismissed Schmidt's Second Amended Complaint. After noting that the Trust Agreement limited the Trustee's liability to gross negligence, this Court found that Schmidt failed to adequately allege gross negligence. On appeal, the Third Circuit affirmed the dismissal of the claims related to IL9, but reinstated the claims related to sale of the Aminosterol Assets and Pexiganan, noting that a trustee's performance is subject to enhanced scrutiny and finding that Schmidt's allegations were plausible. *Schmidt v. Skolas*, 706 F. App'x 68, 73 (3d Cir. 2017). The Court of Appeals also found Schmidt's claim regarding the fees to be plausible and reinstated that claim. *Id.* at 73 n.6.

## II.  STANDARD OF REVIEW

Summary judgment is appropriate when the admissible evidence fails to demonstrate a genuine dispute of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). When the movant does not bear the burden of persuasion at trial, it may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry its burden of persuasion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986).

Thereafter, the nonmoving party demonstrates a genuine issue of material fact if it provides evidence sufficient to allow a reasonable finder of fact to find in its favor at trial. *Anderson*, 477 U.S. at 248. In reviewing the record, a court "must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Prowel v. Wise Bus. Forms, Inc.*, 579 F.3d 285, 286 (3d Cir. 2009). A court may not, however, make credibility

determinations or weigh the evidence in considering motions for summary judgment. *See Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000); *see also Goodman v. Pa. Tpk. Comm'n*, 293 F.3d 655, 665 (3d Cir. 2002).

**III.    DISCUSSION**

Argyce asserts that Schmidt's claims are barred by the statute of limitations. Because this is a diversity action, the Court applies Pennsylvania's statute of limitations. *Mest v. Cabot Corp.*, 449 F.3d 502, 510 (3d Cir. 2006). The statute of limitations for claims of breach of fiduciary duty is two years. 42 Pa. Cons. Stat. § 5524(7). Typically, the clock begins to run as soon as the injury is sustained. *Mest*, 449 F.3d at 510; *see also Skolas*, 770 F.3d at 250.

The statute of limitations on Schmidt's claims regarding the Aminosterol Assets and Pexiganan transactions began to run from the dates of their sale unless a tolling principle applies. *See Skolas*, 770 F.3d at 250. The Aminosterol Assets were sold in the summer of 2009 and the Pexiganan buyer signed an asset purchase agreement on April 8, 2010. Since Schmidt filed this lawsuit on June 8, 2012—more than two years later—his fiduciary duty claim related to the sale of those assets is barred by statute of limitations unless it has been tolled.

**A.    Statute of Limitations Tolling Principles**

"Pennsylvania courts have developed certain tolling principles to ameliorate the sometimes-harsh effects of the statute of limitations." *Bohus v. Beloff*, 950 F.2d 919, 924 (3d Cir. 1991). Schmidt asserts that the discovery rule and doctrine of fraudulent concealment apply.

The discovery rule tolls the statute of limitations where the injured party is unable to know of the injury or its cause, despite having exercised reasonable diligence. *Id.* If applied, the statute of limitations will run as soon as "the plaintiff knows, or reasonably should know, (1) that

he has been injured, and (2) that his injury has been caused by another party's conduct." *Id.* Importantly, the inquiry is not whether the plaintiff had actual knowledge of the injury, but whether the injury and its cause were knowable to the plaintiff through reasonable diligence. *Id.* at 925.

The doctrine of fraudulent concealment tolls the statute of limitations where a plaintiff has relaxed his vigilance due to the defendant's fraud or concealment. *Fine v. Checcio*, 870 A.2d 850, 860 (Pa. 2005). Fraudulent concealment may be intentional or unintentional, but it requires "an affirmative and independent act of concealment that would divert or mislead the plaintiff from discovering the injury." *Bohus*, 950 F.2d at 925. The doctrine of fraudulent concealment, like the discovery rule, requires that the plaintiff exercise reasonable diligence to discover the injury. *Id.* at 925–26.

Reasonable diligence requires a plaintiff to utilize "those qualities of attention, knowledge, intelligence, and judgment which society requires of its members for the protection of their own interests and the interests of others." *Knopick v. Connelly*, 639 F.3d 600, 611 (3d Cir. 2011). "There are very few facts which diligence cannot discover, but there must be some reason to awaken inquiry and direct diligence in the channel in which it would be successful." *Vernau v. Vic's Mkt., Inc.*, 896 F.2d 43, 46 (3d Cir. 1990). The question of what a plaintiff knew or reasonably should have known and when he knew it is "fact intensive, and therefore, ordinarily is a question for a jury to decide." *Wilson v. El-Daief*, 964 A.2d 354, 362 (Pa. 2009). Nevertheless, a court may decide the issue on summary judgment if no reasonable mind could find that the plaintiff exercised reasonable diligence. *Id.*

The standard of reasonable diligence is objective. However, the Pennsylvania Supreme Court has noted that it is also "sufficiently flexible . . . to take into account the differences

between persons and their capacity to meet certain situations and the circumstances confronting them at the time in question." *Fine*, 870 A.2d at 858.[1]

The reasonable diligence standard is more deferential to a plaintiff who alleges that his fiduciary committed misconduct. *Schmidt*, 770 F.3d at 253. "[T]he existence of a fiduciary relationship is relevant to a discovery rule analysis precisely because it entails such a presumptive level of trust in the fiduciary by the principal that it may take a 'smoking gun' to excite searching inquiry on the principal's part into its fiduciary's behavior." *In re Mushroom Transp. Co.*, 382 F.3d 325, 343 (3d Cir. 2004). While a fiduciary relationship may be "pertinent" to the analysis of whether a plaintiff had a duty to investigate, "the relationship is not dispositive." *Perelman v. Perelman*, 545 F. App'x 142, 150 (3d Cir. 2013). In evaluating Schmidt's diligence, the Court is mindful of the fact that Argyce was the Trust unitholders' fiduciary.

B.  **Aminosterol Assets**

The Aminosterol Assets were sold in August 2009, more than two years before Schmidt filed his complaint on June 8, 2012. Schmidt, however, argues that his claim is not barred by the

---

[1] The Court need not hold Schmidt to a higher standard of diligence based on his experience as a securities analyst, as Argyce suggests. "Such flexibility notwithstanding, it is firmly established that the test governing the Pennsylvania discovery rule is an objective one." *Kach v. Hose*, 589 F.3d 626, 642 n.17. Where courts do apply this flexibility, they typically do so to account for a plaintiff's limited capabilities. *See, e.g.*, *Miller v. Phila. Geriatric Ctr.*, 463 F.3d 266, 276 (3d Cir. 2006) (considering a plaintiff's intellectual disability in evaluating whether he was "capable of knowing" he was injured); *see also Kach*, 589 F.3d at 641 (describing the *Fine* decision as having created "a modicum of maneuvering room for a plaintiff claiming the benefit of the discovery rule on account of her particular circumstances"). *But see Neff v. Unum Provident Corp.*, Civ. A. No. 14-6696, 2015 WL 5036390, at *4 (E.D. Pa. Aug. 19, 2015) (holding plaintiff, who was an "experienced attorney," to the standard of a "reasonable and diligent attorney" in refusing to toll the statute of limitations in lawsuit between plaintiff and his former client).

statute of limitations because: (1) he did not know he was injured when he learned of the sale and (2) the Trust fraudulently concealed Schmidt's injury.

*i.     The Aminosterol Assets sale*

Schmidt learned of the sale of the Aminosterol Assets in January 2010. In early January, Schmidt received a Google Alert notifying him of Ohr Pharmaceutical's Form 10-K, which disclosed that the company had purchased the Aminosterol Assets for $200,000 in August 2009. (Def.'s Stmt. of Undisputed Facts ¶¶ 62–63.)

In 2009, Schmidt wrote to Skolas that though he thought that a major component of the Aminosterol Assets called "1436" had value, "even a super cheap price for the program would be better than zero." (Pl.'s Stmt. of Add'l Facts ¶ 55.) In his deposition, Schmidt stated that he realized in 2009 that the Aminosterol Assets might not be worth a "grand price," but that he expected the Trust "to be able to get some kind of a decent deal out of it." (Def.'s Stmt. of Undisputed Facts Ex. A ["Schmidt Dep."] 150:14–19.)

On January 11, 2010, Schmidt emailed Skolas that he was "hugely disappointed" to have read of the sale. (Def.'s Stmt. of Undisputed Facts Ex. H, at 2.) He wrote that while he "understood and accepted the view that Squalamine was virtually worthless some time ago . . . . The 1436 and related backups however is a different matter." (*Id.*) He laid blame directly on Skolas: "I can imagine a situation where a financial guy, rather than someone with a scientific background, wasn't able to negotiate for more than $200,000. But it was worth a lot more than that." (*Id.*; *cf.* Schmidt Dep. 78:5–13 (Plaintiff characterizing Skolas as a "finance guy" without "any kind of scientific expertise" and someone who "didn't really understand science type things").) Rather than continue to air his grievances on the Aminosterol Assets sale, Schmidt refocused on the upcoming sale of IL9, which he perceived to be far more valuable:

9

> I am not going to do any kind of a memo about this. I don't want to make anything difficult for you. . . . I can imagine that you saw essentially two alternatives: the deal [for the Aminosterol Assets] noted above – or zero. That most definitely is NOT what you confront with the IL9 asset. . . . Selling most of it, or a lot of it, for a cheap price would not be justified, and would certainly not be in the interests of trust unit holders.

(Pl.'s Stmt. of Add'l Facts Ex. H, at 2–3.)

Schmidt reiterated at his deposition that he was "hugely disappointed" by what he thought at the time of the transaction was an "atrocious sale." (Schmidt Dep. 119:2–7.) When the Liquidating Trust was first formed, Schmidt described the Aminosterol Assets as being "very, very valuable" and worth "many, many millions of dollars." (*Id.* 80:9–81:4.) His projections apparently dimmed somewhat in the following year. Nevertheless, he repeatedly described believing in early 2010 that the Aminosterol Assets had been sold for "a pittance" and a "ridiculously low price." (*Id.* 112:25–113:6, 120:14–15; *see also id.* 119:15 ("outrageous price"); 120:5 ("ridiculously a pittance").)

Furthermore, Schmidt thought in January 2010 that Skolas had been misleading in the way he handled the transaction. In particular, he blamed Skolas for not disclosing the sale earlier: "I thought he had been deceitful, and he stabbed us in the back particularly because of his silence and what he had done in spite of my effort to help him." (*Id.* 112:15–19; *see also id.* 125:4–12 (referring to Skolas' nondisclosure as "treachery").)

Schmidt accuses opposing counsel of "cherry-picking" from his deposition transcript and characterizing his testimony "as if he were describing what he believed in January 2010 when his deposition makes clear that he was testifying to what he now believed." (Pl.'s Opp'n to Mot. for Summ. J. at 17–18.) This misstates the record. Defense counsel specifically asked about—and Schmidt testified to—his views as of January 2010. (*See, e.g.*, Schmidt Dep. 112:9–19 ("Q: Did you feel *at the moment you learned of that sale* of the Aminosterol asset that Mr. Skolas had

10

been deceitful? A: Yes. Q: That was your reaction *when you first learned of it*? A: Yes. I thought he had been deceitful, and he stabbed us in the back . . .") (emphasis added); *id.* 119:25–120:5 ("Q: So your view was *in . . . January 11, 2010*, that the price that he had sold these Aminosterol assets [was] atrocious? Outrage? A: Yeah, ridiculously a pittance.") (emphasis added); *id.* 126:3–10 ("Q: What was your reaction to [Skolas' reply to Schmidt's January 11, 2010 email] *when you read it*? A: I remember one thing, he really didn't know what he was talking about [with] his comments about [one of the Aminosterol assets]. I thought it was a lot of malark[e]y the way he was explaining it, didn't explain it.") (emphasis added).)

    ii.  *The discovery rule does not toll the statute of limitations beyond January 2010*

Schmidt's breach of fiduciary duty claim regarding the Aminosterol Assets sale is premised on the allegation that the Trust prematurely sold the Aminosterol Assets without a public announcement or bidding, resulting in an unreasonably low price. (SAC ¶¶ 205–07, 212, 218–19.) If Schmidt can demonstrate that he was unable to discover his injury, despite having exercised reasonable diligence, then the discovery rule will apply.

Despite his own testimony to the contrary, Schmidt now argues that although he was disappointed when he learned of the sale, he nevertheless concluded that the Trust had obtained a reasonable price. Specifically, he points to his views of some of the Aminosterol Assets prior to their sale. He also claims that he did not know at the time that the allegedly inadequate sales process caused Aminosterol to be sold for less than it was worth.

The discovery rule does not toll the statute of limitations until a plaintiff knows his exact injury. *Mest*, 449 F.3d at 510. Rather, it is only tolled until the plaintiff knows or reasonably should have known that he has been injured and that his injury was caused by another's conduct. *Id.*

By January 11, 2010, Schmidt knew the identity of the buyer and the sale price. He blamed the Trust for selling the Aminosterol Assets for far less than he believed them to be worth and not disclosing the sale earlier. His own vivid testimony confirms that he perceived the Aminosterol Assets as having been sold for "a pittance." It is clear that Schmidt had sufficient knowledge of his injury and its cause. *See id.* Thus, the discovery rule cannot toll the statute of limitations beyond January 11, 2010.

Alternatively, the Court finds that Schmidt did not exercise reasonable diligence. These facts formed a warning sign sufficient to trigger Schmidt's duty to investigate his injury, if he did not have actual knowledge of his injury and its cause. *See Perelman v. Adams*, 945 F. Supp. 2d 607, 616 (E.D. Pa. 2013), *aff'd sub nom. Perelman v. Perelman*, 545 F. App'x 142 (3d Cir. 2013). Having felt betrayed by his fiduciary, Schmidt should have inquired further into the transaction, including by exercising his right to inspect the Trust's books and records. (*See* Def.'s Stmt. of Undisputed Facts ¶ 33.) By not taking any steps beyond briefly expressing his disappointment, Schmidt failed to exercise reasonable diligence to discovery his injury.

    iii.   *The doctrine of fraudulent concealment does not apply*

Schmidt alternatively argues that the doctrine of fraudulent concealment applies because Skolas reassured Schmidt that the Trust had received a fair price for the Aminosterol Assets. Schmidt points to Skolas' response to his January 11, 2010 email, in which Skolas wrote that the Aminosterol Assets were "not worth more than what was paid" and that a study showed that the drug was cytotoxic and therefore "not commercially saleable." (Def.'s Stmt. of Undisputed Facts Ex. I at 1.) The following day, Skolas also wrote that he "personally looked at data from a really top flight company" to inform his view of the Aminosterol Assets. (Pl.'s Stmt. of Add'l Facts Ex. 9.) Schmidt alleges that he dropped his inquiry as a result of these reassurances.

The doctrine of fraudulent concealment tolls a statute of limitations only where a defendant "through fraud or concealment . . . causes the plaintiff to relax vigilance or deviate from the right of inquiry." *Ciccarelli v. Carey Canadian Mines, Ltd.*, 757 F.2d 548, 556 (3d Cir. 1985). The plaintiff bears the burden of proving fraudulent concealment by "clear, precise, and convincing evidence." *Fine*, 870 A.2d at 860.

Schmidt's emails and deposition testimony undermine his argument again. After expressing his disappointment with the Aminosterol Assets sale, Schmidt chose not to inquire further because he was more concerned with the upcoming sale of IL9. In his January 11, 2010 email—before Skolas reassured him that the Trust received a fair price—Schmidt foreclosed any further inquiry into the Aminosterol Assets transaction by writing, "I am not going to do any kind of a memo about this. I don't want to make anything difficult for you." (Def.'s Stmt. of Undisputed Facts Ex. H, at 2–3.) The following day, Schmidt reiterated to Skolas, "What is done is done . . . . My big concern is that you not give away a majority of the MEDI 528 IL9 program for a cheap price." (Pl.'s Stmt. of Add'l Facts Ex. 9.)

Schmidt explained in his deposition, "Mind you I was not trying to antagonize Skolas . . . because my biggest effort was trying to persuade him to keep the bulk of the IL-9 assets for us. I was being polite, and I was avoiding a confrontational situation . . . ." (Schmidt Dep. 221:4–12.) When asked whether he considered retaining a lawyer following the sale of the Aminosterol Assets, he testified:

> That didn't occur to me at that time, no. If it occurred to me frankly it would have seemed like something to do because we still – I was concerned about the IL-9 royalty flow, that's what I wanted. I didn't want to have a legal battle. I wanted to get our IL-9 royalty.

(*Id.* 224:18–225:7.)

And in April 2010, once Schmidt assumed that the Trust had decided to sell, or had already sold, all of the core assets, Schmidt stopped contacting Skolas altogether because he distrusted Skolas and blamed him for not properly disclosing the sale of the Aminosterol Assets. (*See id.* 200:2–12; *cf id.* 127:5–6 (referring to email as "[t]he only way I communicated with him").) Rather than ever cause him to relax his vigilance, Schmidt's interactions with Argyce only made him more suspicious, until he ultimately concluded that the unitholders "had been screwed." (*Id.* 200:12.) Therefore, Skolas' comments regarding the Aminosterol Assets did not cause Schmidt to relax his vigilance, and the fraudulent concealment doctrine does not apply.

**C. Pexiganan**

Argyce argues that, although there is a disagreement over when Schmidt learned of the Pexiganan sale, his claim is barred by the statute of limitations because he did not exercise reasonable diligence. Schmidt disputes that there was any warning sign to trigger his duty to investigate and reiterates that he did not discover the "pertinent details" of the sale until after June 8, 2010.

   *i.*  *The Pexiganan sale*

On January 11, 2010, the Trust announced that it was selling Pexiganan and IL9 and set a February 12, 2010 deadline for receiving bids. Schmidt read the press release and testified that he thought at the time that the short bidding period was "ridiculous" and "intentionally inadequate." (*Id.* 134:5, 134:23, 136:5–11.) According to Schmidt, he "certainly knew" at the time that the Trust could not receive "any kind of a serious bid" for Pexiganan because "no responsible pharmaceutical company would be capable of doing an adequate amount of due diligence in just 30 days to make a serious bid for a complicated asset . . ." (*Id.* 135:7–12, 136:10–11; *see also id.* 137:13–18.) Schmidt viewed the announcement as a "smoke screen to

cover [Skolas] up" and testified that it made him more suspicious of the Trust. (*Id.* 138:6–8.) Schmidt did not raise his concerns regarding the bidding period with Skolas, however, because he generally "didn't want to do things to antagonize him." (*Id.* 138:17–22.)

On February 19, 2010, the Trust posted on its website that it had "received multiple expressions of interest and non-binding proposals" for Pexiganan and IL9 and that "discussions continue with serious, interested parties." (Def.'s Stmt. of Undisputed Facts, Ex. K.) Schmidt read the announcement shortly after it was released, but he doubted its veracity due to his prior concerns about the 30-day bidding window being too brief to allow a bidder to complete due diligence. (Schmidt Dep. 170:16–18, 171:17–25, 172:14–173:6.) He testified, "I just thought he was making something up about multiple expressions of interest. I hope that was true, but I was skeptical." (*Id.* 171:22–25.) Despite his belief that the Trust's disclosure "didn't make sense," he did not question Skolas or ask for any additional details. (*Id.* 173:6, 172:6–12.)

In early April, the Trust referenced the bidding for Pexiganan and IL9 and disclosed that it was "negotiating closing documents for the sale of one asset and negotiating terms for the disposition of the other asset." (Def.'s Stmt. of Undisputed Facts Ex. L.) The Trust also advised that due to "confidentiality obligations to the parties involved in these processes, we cannot provide additional detail on these matters at this time." (*Id.*) Despite the general phrasing of the announcement, Skolas assumed that the Trust's reference to "closing documents" pertained to Pexiganan. (Schmidt Dep. 190:13–191:3.)

MacroChem signed an Asset Purchase Agreement for Pexiganan on April 8, 2010, but the sale was not disclosed then to the Trust's unitholders.[2] Later that month, Schmidt emailed

---

[2] Argyce posted an update dated May 21, 2010 to the Trust's website in which it said that it had "sold substantially all of the assets of the Trust" and would soon be making distributions. (Def.'s Mot. for Summ. J. Ex. P.) Schmidt denied ever seeing the announcement despite his regular

15

Skolas and asked, "What's wrong with – Making a 2nd Quarter distribution of proceeds, less expenses from the Aminosterol and Pexiganan/antibiotic sale . . . ???" (Def.'s Stmt. Of Undisputed Facts, Ex. N.) In his deposition, Schmidt explained that he "did not know, but [was] assuming that the Pexiganan had been sold because of what [Skolas] said earlier." (Schmidt Dep. 189:17–19.) However, he was "preoccupied with [the Trust] keeping most of the IL-9 assets for the benefit of the unitholders and not selling it 100 percent outright" because he considered that to be the more valuable asset. (*Id.* 189:21–24; *see id.* 193:24–194:7 (describing IL9 as "the most advanced asset of all" and "worth really quite a bit of money").)

Schmidt ceased emailing Skolas that month. He explained that he stopped reaching out "[b]ecause [Skolas] was unappreciative of my efforts to help, because he was stonewalling me . . . with his nonreporting of the Aminosterol sales, and his presumed nonreporting of Pexiganan that he had done a very deceitful job with us. I mean, we had been screwed." (*Id.* 200:2–12.) Schmidt did not ask whether the Trust appraised the assets or put them up for auction, (*id.* 223:6–224:4), confirm that Pexiganan had actually been sold, (*id.* 191:13–19), or request any transactional documents. (*Id.* 218:12–16.)

        ii.        *The discovery rule cannot save Plaintiff's claim*

Schmidt assumed in April 2010 that Pexiganan had been sold, but now insists that he lacked actual knowledge of the sale and that he did not know all the "pertinent details" of the sale, such as the identity of the buyer and future milestone payments. A statute of limitations is not tolled until a plaintiff has knowledge of the full extent of the injury, however. *Brawner v. Educ. Mgmt. Corp.*, 513 F. App'x 148, 151 (3d Cir. 2013). Rather, "once a plaintiff possesses the

---

visits to the website and suggests that the update was not actually posted in May 2010. (Schmidt Dep. 209:2–11; Pl.'s Opp'n to Summ. J., at 11.) Because the Court cannot make credibility determinations or weigh evidence on summary judgment, *see Rees*, 530 U.S. at 150, it has not considered this disclosure in its analysis.

16

salient facts concerning the occurrence of his injury and *who* or *what* caused it, he has the ability to investigate and pursue his claim." *Berardi v. Johns-Manville Corp.*, 482 A.2d 1067, 1071 (Pa. Super. Ct. 1984).

Schmidt notes that Pennsylvania law relaxes the plaintiff's burden when it comes to discovering a fiduciary's misconduct. While the existence of a fiduciary relationship factors into an evaluation of whether a plaintiff exercised reasonable diligence, "subsequent events, other than the fiduciary's disclosure of the fraud, may put the principal on notice of the need for an increased level of inquiry." *Perelman*, 945 F. Supp. 2d at 616. A court may require that these "subsequent events" be a clear warning sign or a "smoking gun." *See In re Mushroom Transp. Co.*, 382 F.3d at 343.

Once a plaintiff encounters such a warning sign, he must conduct a "searching inquiry into his fiduciary's actions." *Perelman*, 945 F. Supp. 2d at 617. In *Perelman*, a plaintiff sold several companies for $24 million on the condition that half of the stock of the companies be transferred to a trust to benefit the plaintiff's granddaughter, with the plaintiff's lawyer serving as the trustee. *Id.* at 611. The buyer never paid the $24 million or established the trust for the granddaughter. *Id.* When the plaintiff sued 20 years later, he claimed that he did not learn that the buyer never paid the $24 million until shortly before he filed suit and thus, the discovery rule tolled the statute of limitations. *Id.* at 616. The plaintiff conceded, however, that years earlier he was "shocked and dismayed" to learn that his granddaughter was not provided for in the trust. *Id.* at 617. The Third Circuit affirmed the district court's dismissal on statute of limitations grounds, noting that a plaintiff who was "shocked and dismayed" about one critical part of the transaction was on notice that he must investigate his fiduciary's other actions. *Perelman*, 545 F. App'x at

17

151. That the plaintiff never received the transaction documents or did not have actual notice of the alleged fraud was no defense. *Perelman*, 945 F. Supp. 2d at 617.

Schmidt, too, expressed dismay at his fiduciary's conduct. Prior to June 8, 2010, Schmidt: (1) thought the Trust created an intentionally inadequate bidding process; (2) believed that the flawed process would result in Pexiganan being sold for less than it was worth; (3) assumed that Pexiganan had already been sold and requested that a distribution be made to unitholders; and (4) stopped contacting Skolas because of what he perceived as the Trust's deceit and inadequate disclosure of the Pexiganan transaction. That Schmidt thought that Argyce had already sold the Aminosterol Assets for a "pittance" and committed "treachery" by not disclosing that sale earlier further underscores the salience of the Pexiganan warning signs. Taken together, these facts amounted to a smoking gun that imposed a duty to inquire.

Schmidt also points to his regular communications with Skolas and careful review of Trust disclosures as evidence that he exercised reasonable diligence. Once there is reason to inquire, however, "there are few facts which diligence cannot discover." *Knopick*, 639 F.3d at 611. This is particularly so here, where Schmidt was in regular, direct contact with the Trustee and had the right to inspect the Trust's books and records. Schmidt never questioned the Pexiganan bidding process or sought details of the sale to confirm his assumption that Pexiganan had already been sold.[3] Instead of responding to the warning signs by further investigating his injury, Schmidt threw up his hands and ceased communicating with Skolas. In doing so, he failed to exercise reasonable diligence.

---

[3] Schmidt suggests that such inquiries would have been futile because the Trustee concealed the sale and the buyer's identity. The focus of a reasonable diligence inquiry is the plaintiff's conduct, however. *See Knopick*, 639 F.3d at 612 ("[I]f something exists to trigger the inquiry, then the plaintiff must demonstrate that he conducted an investigation, and despite doing so, he did not discover his injury.").

### D. Trustee's Fees

In a footnote, Argyce asserts that Schmidt's claims regarding the Trustee's fees are also barred by the statute of limitations because Schmidt did not exercise reasonable diligence in investigating his alleged injury. It is undisputed that Schmidt had the right to inspect the Trust's books and records and never did so. But Schmidt argues that the Trust did not disclose the $687,000 of "General and administrative" expenses incurred in 2010 until the Trust issued its financial report in March 2011—well within the two-year statute of limitations period. (Pl.'s Opp'n to Summ. J. at 25.) Furthermore, the Trust was in operation through March 2011, so any fees were not final until that time. (*Id.*)

Argyce has not shown that that the fees were discoverable or even incurred before June 8, 2010. Unlike the sales of the Aminosterol Assets and Pexiganan, Schmidt seemingly had no warning signs of any excessive spending. *See In re Mushroom Transp. Co.*, 382 F.3d at 343.

It may be that the fees were reasonable and justified under the rates set by the Trust Agreement. But the claim is not barred by the statute of limitations.

## IV. CONCLUSION

For the foregoing reasons, the motion is granted as to the Aminosterol Assets and Pexiganan. Because the Court bifurcated discovery, the parties shall proceed with discovery on the remaining breach of fiduciary duty claim regarding the Trustee's fees. An Order consistent with this Memorandum will be docketed separately.